IN THE SUPREME COURT OF NORTH CAROLINA

No. 413PA21-2

Filed 28 April 2023

REBECCA HARPER; AMY CLARE OSEROFF; DONALD RUMPH; JOHN ANTHONY BALLA; RICHARD R. CREWS; LILY NICOLE QUICK; GETTYS COHEN, JR.; SHAWN RUSH; JACKSON THOMAS DUNN, JR.; MARK S. PETERS; KATHLEEN BARNES; VIRGINIA WALTERS BRIEN; DAVID DWIGHT BROWN

v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR RALPH HISE, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR PAUL NEWTON, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES TIMOTHY K. MOORE; PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE PHILIP E. BERGER; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; and DAMON CIRCOSTA, in his official capacity

NORTH CAROLINA LEAGUE OF CONSERVATION VOTERS, INC.; HENRY M. MICHAUX, JR.; DANDRIELLE LEWIS; TIMOTHY CHARTIER; TALIA FERNÓS; KATHERINE NEWHALL; R. JASON PARSLEY; EDNA SCOTT; ROBERTA SCOTT; YVETTE ROBERTS; JEREANN KING JOHNSON; REVEREND REGINALD WELLS; YARBROUGH WILLIAMS, JR.; REVEREND DELORIS L. JERMAN; VIOLA RYALS FIGUEROA; and COSMOS GEORGE

v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR RALPH E. HISE, JR., in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR PAUL NEWTON, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; REPRESENTATIVE TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of

Representatives; SENATOR PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; THE STATE OF NORTH CAROLINA; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as Chairman of the North Carolina State Board of Elections; STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; JEFF CARMON III, in his official capacity as Member of the North Carolina State Board of Elections; STACY EGGERS IV, in his official capacity as Member of the North Carolina State Board of Elections; TOMMY TUCKER, in his official capacity as Member of the North Carolina State Board of Elections; and KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections

On direct appeal pursuant to Rule 3 of the North Carolina Rules of Appellate Procedure from the unanimous decision of a three-judge panel entered on 23 February 2022 in the Superior Court, Wake County, approving Legislative Defendants' Remedial House Plan and Remedial Senate Plan, rejecting their Remedial Congressional Plan, and adopting an Interim Congressional Plan. Heard in the Historic 1767 Chowan County Courthouse in Edenton, North Carolina on 4 October 2022, and opinion filed on 16 December 2022. Subsequently, this Court allowed Legislative Defendants' petition for rehearing pursuant to Rule 31(a) of the North Carolina Rules of Appellate Procedure. Heard in the Supreme Court on 14 March 2023.

*Patterson Harkavy LLP, by Burton Craige, Narendra K. Ghosh, and Paul E. Smith; Elias Law Group LLP, by Lalitha D. Madduri, Jacob D. Shelly, and*

*Abha Khanna; and Arnold and Porter Kaye Scholer LLP, by Elisabeth S. Theodore, R. Stanton Jones, and Samuel F. Callahan, for Harper Plaintiffs.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Adam K. Doerr, Stephen D. Feldman, and Erik R. Zimmerman; and Jenner & Block LLP, by Sam Hirsch, pro hac vice, and Jessica Ring Amunson, pro hac vice, for Plaintiff North Carolina League of Conservation Voters.*

*Southern Coalition for Social Justice, by Hilary H. Klein, Mitchell Brown, Katelin Kaiser, Jeffrey Loperfido, and Noor Taj; and Hogan Lovells US LLP, by J. Tom Boer, pro hac vice, and Olivia T. Molodanof, pro hac vice, for Plaintiff Common Cause.*

*Nelson Mullins Riley & Scarborough LLP, by Phillip J. Strach, Thomas A. Farr, John E. Branch, III, D. Martin Warf, Nathaniel J. Pencook, and Alyssa M. Riggins; and Baker Hostetler LLP, by Mark E. Braden, pro hac vice, Katherine McKnight, pro hac vice, and Richard Raile, pro hac vice, for Legislative Defendants.*

*North Carolina Department of Justice, by Amar Majmundar, Senior Deputy Attorney General, Terence Steed, Special Deputy Attorney General, Mary Carla Babb, Special Deputy Attorney General, and Stephanie Brennan, Special Deputy Attorney General, for State Defendants.*

NEWBY, Chief Justice.

"A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35. Since our founding in 1776 almost 250 years ago, this provision in our state constitution has reminded us of the critical importance of remembering fundamental principles. This case now invites us to return to those principles.

The constitution is our foundational social contract and an agreement among the people regarding fundamental principles. It is for everyone, not just lawyers and judges. The state constitution is different from the Federal Constitution: the Federal Constitution is a limited grant of power while the state constitution is a limitation on power. The state constitution declares that all political power resides in the people. N.C. Const. art. I, § 2. The people exercise that power through the legislative branch, which is closest to the people and most accountable through the most frequent elections. *See id.* art. I, § 9. In the constitutional text, the people have assigned specific tasks to, and expressly limited the powers of, each branch of government. The state constitution is detailed and specific. The people speak through the express language of their constitution, and only the people can amend it. *See id.* art. XIII.

The constitution is interpreted based on its plain language. The people used that plain language to express their intended meaning of the text when they adopted it. The historical context of our constitution confirms this plain meaning. As the courts apply the constitutional text, judicial interpretations of that text should consistently reflect what the people agreed the text meant when they adopted it. There are no hidden meanings or opaque understandings—the kind that can only be found by the most astute justice or academic. The constitution was written to be understood by everyone, not just a select few.

The state constitution establishes three branches of government: legislative, executive, and judicial. It assigns specific roles to each branch. Since its inception, the constitution has provided for separation of powers: in other words, each branch is directed to perform its assigned duties and avoid encroaching on the duties of another branch. Separation of powers protects individual freedoms. The will of the people is achieved when each branch of government performs its assigned duties. When, however, one branch grasps a task of another, that action violates separation of powers.

The judicial branch is designed to resolve legal disputes and to ensure that the other branches do not violate the constitution. Our power of judicial review, however, is not unlimited. Since the first articulation of the doctrine of judicial review in *Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787), courts have refused to exercise that power if the constitution assigns the matter to another branch, or the constitution does not provide a judicially discoverable or manageable standard, or resolution of the matter involves policy choices. Such matters are deemed political questions and are nonjusticiable. The Supreme Court of the United States recognized these limitations in its seminal case, *Marbury v. Madison*, in which it first adopted the concept of judicial review:

> It is scarcely necessary for the court to disclaim all pretensions to [intermeddle with the prerogatives of

> another branch]. An extravagance, so absurd and
> excessive, could not have been entertained for a moment.
> The province of the court is, solely, to decide on the rights
> of individuals, not to enquire how [other branches] perform
> duties in which they have a discretion. Questions, in their
> nature political, or which are, by the constitution and laws,
> submitted to [another branch], can never be made in this
> court.

5 U.S. (1 Cranch) 137, 170 (1803).

Historically, North Carolina courts have respected their significant but restrained role of judicial review by adhering to a standard of review that sets the most demanding requirements for reviewing legislative action: courts presume that an act of the General Assembly is constitutional, and any challenge alleging that an act of the General Assembly is unconstitutional must identify an express provision of the constitution and demonstrate that the General Assembly violated the provision beyond a reasonable doubt.

Giving a fixed meaning to the constitution and using a deferential standard to review legislation ensures that courts will perform their assigned role, stay within their lane of authority, and refrain from becoming policymakers. Courts are not designed to be thrust into the midst of various political disputes. Such engagement in policy issues forces courts to take sides in political battles and undermines public trust and confidence in the judiciary. Choosing political winners and losers creates a perception that courts are another political branch. The people did not intend their

courts to serve as the public square for policy debates and political decisions. Instead, the people act and decide policy matters through their representatives in the General Assembly. We are designed to be a government of the people, not of the judges. At its heart, this case is about recognizing the proper limits of judicial power.

This matter is before this Court on rehearing. The North Carolina Rules of Appellate Procedure authorize rehearing a case when "the court has overlooked or misapprehended" a point "of fact or law." N.C. R. App. P. 31(a). In their petition for rehearing, Legislative Defendants ask the Court to revisit the crucial issue in this case: whether claims of partisan gerrymandering are justiciable under the state constitution. They assert that such claims are not justiciable. Legislative Defendants maintain that "[t]he *Harper* experiment" has failed: "*Harper II* failed . . . because *Harper I* set this Court up to fail." In support of this argument, Legislative Defendants argue that *Harper I* "fell short in concrete guidance" and "declined to disclose what standard applies." They assert that "*Harper II* reaffirms the non-justiciable and unprecedented standard set forth in *Harper I*" and, therefore, "a necessary consequence of correcting the errors in *Harper II* is to overrule *Harper I*." Legislative Defendants argue that their rehearing petition "gives this Court a much[-]needed opportunity to address the root of the problem: *Harper I* was based on

profoundly flawed legal principles." Accordingly, they ask this Court to withdraw its *Harper II* opinion and overrule *Harper I*.

In this case plaintiffs claim that the General Assembly violated the state constitution by drawing legislative districts that unfairly benefited one political party at the expense of another, in other words, partisan gerrymandering.[1] Partisan gerrymandering is the practice of dividing a geographical or jurisdictional area into political units or election districts to give a particular political party or group "a special advantage." *See Gerrymandering*, Black's Law Dictionary (11th ed. 2019).

In the first opinion in this matter, four justices held that partisan gerrymandering presents a justiciable claim, *Harper v. Hall* (*Harper I*), 380 N.C. 317, 390, 868 S.E.2d 499, 551 (2022), and violates several provisions of the Declaration of Rights of our constitution, *id.* at 383, 868 S.E.2d at 546. The four justices then discussed certain political science tests that they claimed were judicially discoverable and manageable. *Id.* at 384–85, 868 S.E.2d at 547–48. They maintained that these political science tests could reliably identify unconstitutional partisan

---

[1] In their complaints, plaintiffs allege that "partisan gerrymandering" violates the state constitution. Sometimes they modify this phrase with words like "extreme" or "severe." In *Rucho v. Common Cause*, the Supreme Court of the United States referred to this concept as "excessive partisan gerrymandering." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019). In this opinion we will generally use the term "partisan gerrymandering" to refer to these claims.

gerrymandering, *id.*, but they did not define how much partisan gerrymandering is too much, *id.* at 384, 868 S.E.2d at 547. In the most recent opinion in this matter, the same four members of this Court said that the General Assembly, three former jurists serving as Special Masters, the three-judge panel, and three members of this Court— in total, nine current and former jurists—all wrongly applied the approach set out in *Harper I. See Harper v. Hall* (*Harper II*), 383 N.C. 89, 94, 881 S.E.2d 156, 162 (2022). Thus, we must now reconsider whether a standard that only four justices know and understand, that is riddled with policy choices, and that is not mentioned in our constitution is truly judicially discoverable and manageable. That inquiry requires us to revisit the fundamental premises underlying the decisions in both *Harper II* and *Harper I.*

The issue presented in this case is whether the North Carolina Constitution prohibits partisan gerrymandering. Specifically, plaintiffs allege that legislative and congressional redistricting plans drawn by the General Assembly in 2021 and then again in 2022 on remand are partisan gerrymanders in violation of specific provisions of the constitution.

Our constitution expressly assigns the redistricting authority to the General Assembly subject to explicit limitations in the text. Those limitations do not address partisan gerrymandering. It is not within the authority of this Court to amend the

constitution to create such limitations on a responsibility that is textually assigned to another branch. Furthermore, were this Court to create such a limitation, there is no judicially discoverable or manageable standard for adjudicating such claims. The constitution does not require or permit a standard known only to four justices. Finally, creating partisan redistricting standards is rife with policy decisions. Policy decisions belong to the legislative branch, not the judiciary.

Recently, the Supreme Court of the United States reviewed similar claims under the Federal Constitution and determined that "excessive" partisan gerrymandering claims involve nonjusticiable, political questions. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2491, 2507 (2019). We find the Supreme Court's analysis in *Rucho* insightful and persuasive.

For all these reasons, we hold that partisan gerrymandering claims present a political question that is nonjusticiable under the North Carolina Constitution. Accordingly, the decision of this Court in *Harper I* is overruled. We affirm the three-judge panel's 11 January 2022 Judgment concluding, *inter alia*, that partisan gerrymandering claims are nonjusticiable, political questions and dismissing all of plaintiffs' claims with prejudice. This Court's opinion in *Harper II* is withdrawn and superseded by this opinion. The three-judge panel's 23 February 2022 order is vacated. Plaintiffs' claims are dismissed with prejudice.

## I.  Procedural History

### A.  Initial Litigation

As required by both our state constitution and the Federal Constitution, the General Assembly, following the 2020 census, enacted redistricting plans for the North Carolina Senate and House of Representatives and for the United States House of Representatives (2021 Plans).[2] The General Assembly enacted the 2021 Plans on 4 November 2021. The North Carolina League of Conservation Voters and a group of individual North Carolina voters (NCLCV plaintiffs), along with another group of

---

[2] Before drawing any maps, the General Assembly's Senate Committee on Redistricting and Elections convened a Joint Meeting of the Senate Redistricting and Elections Committee and the House Redistricting Committee on 5 August 2021 to discuss the criteria that would govern the redistricting process. Following this initial meeting, a General Assembly staff member distributed to the joint committee members a list of the legislative redistricting criteria that had been previously mandated by a three-judge panel in *Common Cause v. Lewis*—a case decided just a few years earlier in 2019. *See Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584 (N.C. Super. Ct. Wake County Sept. 3, 2019).

One week after its first meeting, the Joint Redistricting Committee adopted final redistricting criteria that would govern its 2021 map drawing process (Adopted Criteria). In many respects, the Adopted Criteria were nearly identical to the criteria ordered by the court in *Common Cause v. Lewis* in 2019. Notably, just like the *Lewis* criteria, the Adopted Criteria mandated that no "[p]artisan considerations [or] election results data" would be used in drawing the 2021 Plans. It appears that the Joint Redistricting Committee incorporated the criteria from *Common Cause v. Lewis* into its Adopted Criteria for the 2021 redistricting process because it believed that compliance with the *Common Cause v. Lewis* criteria was necessary to create constitutionally compliant redistricting plans. *See* Legislative Defendants-Appellees' Brief at 20−21, *Harper v. Hall*, 380 N.C. 317 (2022) (No. 413PA21-1) ("To avoid violations identified in the 2010 [redistricting] cycle," including those identified in the *Lewis* order, the General Assembly included a prohibition on the consideration of partisan election data in its Adopted Criteria.).

individual North Carolina voters (Harper plaintiffs) each filed suit against the President Pro Tempore of the North Carolina Senate, the Speaker of the North Carolina House, and the Chairs of the House Standing Committee on Redistricting and the Senate Standing Committee on Redistricting and Elections (Legislative Defendants).[3] NCLCV plaintiffs and Harper plaintiffs challenged the legality of these plans, arguing they were unconstitutional partisan gerrymanders. Additionally, NCLCV plaintiffs alleged that the 2021 Plans "engag[ed] in racial vote dilution" in violation of the free elections clause and the equal protection clause of the North Carolina Constitution and that the 2021 Plans violated the Whole County Provisions (WCP) of the North Carolina Constitution. *See* N.C. Const. art. I, §§ 10, 19, 14, 12; *id.* art. II, §§ 3(3), 5(3). Both groups of plaintiffs also sought a preliminary injunction to enjoin use of the 2021 Plans.

The NCLCV and Harper actions were assigned to a three-judge panel of the Superior Court in Wake County and then consolidated. On 3 December 2021, the three-judge panel denied both NCLCV plaintiffs' and Harper plaintiffs' motions for preliminary injunction. Both sets of plaintiffs filed a notice of appeal with the North

---

[3] NCLCV plaintiffs and Harper plaintiffs also collectively named the State of North Carolina, the North Carolina State Board of Elections, and the Chairman, Secretary, and Members of the State Board of Elections. These defendants took "no position on the merits" of this case. State Defendants' Brief at 2, *Harper v. Hall*, 380 N.C. 317 (2022) (No. 413PA21-1).

Carolina Court of Appeals.

The Court of Appeals denied NCLCV plaintiffs' and Harper plaintiffs' requests for a temporary stay on 6 December 2021. NCLCV plaintiffs and Harper plaintiffs then filed several documents with this Court, including two petitions for discretionary review prior to determination by the Court of Appeals, a motion to suspend appellate rules to expedite a decision, and a motion to suspend appellate rules and expedite briefing and argument. On 8 December 2021, this Court allowed both petitions for discretionary review, granted a preliminary injunction, and temporarily stayed the candidate filing period for the 2022 election cycle until "a final judgment on the merits . . . including any appeals, is entered and a remedy, if any is required, has been ordered." In the same order, this Court expedited the matter, directing the three-judge panel to hold proceedings on the merits of plaintiffs' claims "and to provide a written ruling" on or before 11 January 2022.

Subsequently, Common Cause moved to intervene as a plaintiff in the consolidated proceedings, and the three-judge panel granted the motion on 15 December 2021. Like the NCLCV and Harper plaintiffs, Common Cause filed a complaint alleging that the 2021 Plans were unconstitutional partisan gerrymanders in violation of the free elections clause, the equal protection clause, and the free speech and freedom of assembly clauses of the North Carolina Constitution. Common

Cause also alleged that the 2021 Plans violated North Carolina's equal protection clause by "purposefully discriminat[ing] against" African American voters through "intentional destruction of functioning crossover districts." Finally, Common Cause brought a declaratory judgment claim asking the three-judge panel to declare that the North Carolina Constitution requires the General Assembly to undertake a racially polarized voting (RPV) analysis prior to drawing any legislative districts. Hereinafter, NCLCV plaintiffs, Harper plaintiffs, and Common Cause are collectively referred to as "plaintiffs."

Legislative Defendants filed their answers on 17 December 2021, and the parties then engaged in an "expedited" two-and-one-half-week discovery period culminating in rulings on over ten discovery-related motions, designation of ten expert witnesses, and submission of over 1000 pages of expert reports and rebuttal materials. After the discovery period closed on 31 December 2021, the three-judge panel commenced a three-and-one-half-day trial on 3 January 2022 during which it received approximately 1000 exhibits into evidence and testimony from numerous fact and expert witnesses.

On 11 January 2022, the three-judge panel entered a judgment (11 January 2022 Judgment) concluding that plaintiffs' partisan gerrymandering claims presented nonjusticiable, political questions because redistricting "is one of the purest

political questions which the legislature alone is allowed to answer." The three-judge

panel reached this conclusion because "satisfactory and manageable criteria or

standards do not exist for judicial determination" of partisan gerrymandering claims.

Specifically, the three-judge panel noted that this Court already addressed the

justiciability of similar claims based on North Carolina's Declaration of Rights in

*Dickson v. Rucho* and concluded there was no manageable standard to assess such

claims:

> Finally, plaintiffs argue that the enacted plans violate the "Good of the Whole" clause found in Article I, Section 2 of the Constitution of North Carolina. We do not doubt that plaintiffs' proffered maps represent their good faith understanding of a plan that they believe best for our State as a whole. However, the maps enacted by the duly elected General Assembly also represent an equally legitimate understanding of legislative districts that will function for the good of the whole. *Because plaintiffs' argument is not based upon a justiciable standard*, and because acts of the General Assembly enjoy "a strong presumption of constitutionality," *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam) (citation omitted), plaintiffs' claims fail.

(Quoting *Dickson v. Rucho* (*Dickson I*), 367 N.C. 542, 575, 766 S.E.2d 238, 260 (2014),

*vacated on federal grounds*, 137 S. Ct. 2186 (2017) (mem.) (emphasis added).) As a

result, the three-judge panel concluded that "[w]ere we as a [c]ourt to insert ourselves

in the manner requested, we would be usurping the political power and prerogatives

of an equal branch of government. Once we embark on that slippery slope, there

would be no corner of legislative or executive power that we could not reach."

Additionally, the three-judge panel concluded that the 2021 Plans did not violate the North Carolina Declaration of Rights because "[t]he objective constitutional constraints that the people of North Carolina have imposed on legislative redistricting are found in Article II, Sections 3 and 5 of the 1971 Constitution and not in the Free Elections, Equal Protection, Freedom of Speech or Freedom of Assembly Clauses found in Article I of the 1971 Constitution." Finally, the three-judge panel considered NCLCV plaintiffs' and Common Cause's additional claims of racial vote dilution, racial discrimination, violation of the WCP, and request for a declaratory judgment. Specifically, the three-judge panel concluded that NCLCV plaintiffs and Common Cause "failed to satisfy" their burdens for both the racial vote dilution and racial discrimination claims under the equal protection clause and that the free elections clause is "inapplicable" to vote dilution claims. The three judge-panel then concluded that the evidence did not support NCLCV's WCP claim and that the North Carolina Constitution does not, as Common Cause alleged, require the General Assembly to undertake an RPV analysis prior to drawing legislative districts. Accordingly, the three-judge panel dismissed plaintiffs' claims with prejudice.

Pursuant to this Court's 8 December 2021 order certifying the case for review prior to determination by the Court of Appeals, all plaintiffs filed notices of appeal to

this Court from the three-judge panel's 11 January 2022 Judgment. The case was argued before this Court on 2 February 2022. On 4 February 2022, in a four-to-three decision, this Court entered an order (Remedial Order) adopting the findings of fact from the 11 January 2022 Judgment but concluding that the 2021 Plans were "unconstitutional beyond a reasonable doubt under the free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause of the North Carolina Constitution." The Remedial Order specifically enjoined the use of the 2021 Plans "in any future elections." The Remedial Order also required that, in drawing new redistricting plans, the General Assembly must first conduct an RPV analysis. The Remedial Order remanded the matter to the three-judge panel for remedial proceedings and noted that a full opinion would follow. Three justices dissented to the Remedial Order.

### B. *Harper I*

Ten days later, the four-justice majority issued its full opinion. *See Harper I*, 380 N.C. at 317, 404, 868 S.E.2d at 499, 558–60. The *Harper I* opinion first held that "partisan gerrymandering claims are justiciable in North Carolina courts under the . . . [North Carolina] Declaration of Rights" because the right to aggregate votes based on partisan affiliation is a fundamental right and there are "several manageable standards for evaluating the extent to which districting plans dilute

votes on the basis of partisan affiliation." *Id.* at 390, 868 S.E.2d at 551. Specifically, the majority determined that various political science metrics could serve as a sufficient standard. *See id.* at 384–85, 868 S.E.2d at 547–48. It indicated that two tests in particular—the Mean-Median Difference and the Efficiency Gap—could demonstrate whether a redistricting map "is presumptively constitutional."[4] *See id.* at 386, 868 S.E.2d at 548. According to the *Harper I* majority, a 1% or less Mean-Median Difference score and a 7% or less Efficiency Gap score could serve as thresholds of constitutionality. *See id.*

Nevertheless, the *Harper I* majority refused to delineate a precise standard. *Id.* at 384, 868 S.E.2d at 547 ("We do not believe it prudent or necessary to, at this time, identify an exhaustive set of metrics or precise mathematical thresholds which conclusively demonstrate or disprove the existence of an unconstitutional partisan gerrymander."). Instead, the majority insisted that the three-judge panel—and future trial courts adjudicating redistricting cases—would "work out more concrete and

---

[4] The Mean-Median Difference and Efficiency Gap tests are statistical metrics that purport to forecast partisan success under a particular redistricting plan in hypothetical, future elections. *See id.* at 385−87, 868 S.E.2d at 548−49. The Mean-Median Difference compares a party's mean vote share with its median vote share in each district and assumes that if the mean and median are equal, then the map contains no partisan skew. *See id.* at 386, 868 S.E.2d at 548. As explained in the filings before the three-judge panel, the Efficiency Gap purports to compare each political parties' "wasted votes." According to *Harper I*, a 7% Efficiency Gap score serves as a "workable . . . threshold" of constitutionality. *Id.*

specific standards for evaluating state legislative apportionment schemes in the context of actual litigation." *Id.* at 384, 868 S.E.2d at 547 (quoting *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S. Ct. 1362, 1390 (1964)).

The *Harper I* majority held that "[p]artisan gerrymandering of legislative and congressional districts violates the free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause" of the North Carolina Constitution. *Id.* at 383, 868 S.E.2d at 546. Specifically, the majority reasoned that these provisions reflect "the principle of political equality," *id.* at 382, 868 S.E.2d at 546, which in turn requires that "the channeling of 'political power' from the people to their representatives in government through the democratic processes . . . must be done on equal terms," *id.* at 382, 868 S.E.2d at 546. Accordingly, the majority concluded that to comport with these provisions in the Declaration of Rights, "the General Assembly must not diminish or dilute on the basis of partisan affiliation any individual's vote" because "[t]he fundamental right to vote includes the right to enjoy 'substantially equal voting power and substantially equal legislative representation.'" *Id.* at 383, 868 S.E.2d at 546 (quoting *Stephenson v. Bartlett* (*Stephenson I*), 355 N.C. 354, 382, 562 S.E.2d 377, 396 (2002)). In turn, the majority concluded that "[t]he right to equal voting power encompasses the opportunity to aggregate one's vote with likeminded citizens to elect a governing majority of elected

officials who reflect those citizens' views." *Id.* Thus, ironically, the *Harper I* majority held that the constitution requires consideration of partisanship to remedy the perceived use of partisanship.

The majority determined that because "[t]he right to vote on equal terms is a fundamental right in this state," strict scrutiny must apply once a party demonstrates that a redistricting plan "infringes upon his or her fundamental right to substantially equal voting power" based on partisan affiliation. *Id.* at 392–93, 868 S.E.2d at 553. The majority held that to trigger strict scrutiny a party must demonstrate that a redistricting plan "makes it systematically more difficult for a voter to aggregate his or her vote with other likeminded voters." *Id.* at 392, 868 S.E.2d at 552. A party may make this demonstration using a variety of political science-based tests such as

> median-mean difference analysis; efficiency gap analysis; close-votes-close seats analysis[;] partisan symmetry analysis; comparing the number of representatives that a group of voters of one partisan affiliation can plausibly elect with the number of representatives that a group of voters of the same size of another partisan affiliation can plausibly elect; and comparing the relative chances of groups of voters of equal size who support each party of electing a supermajority or majority of representatives under various possible electoral conditions. Evidence that traditional neutral redistricting criteria were subordinated to considerations of partisan advantage may be particularly salient in demonstrating an infringement of this right.

*Id.* at 392, 868 S.E.2d at 552–53. Once a party makes this initial demonstration, the challenged redistricting plan is "unconstitutional [unless] the State [can] establish that it is narrowly tailored to advance a compelling governmental interest." *Id.* at 393, 868 S.E.2d at 553 (quoting *Stephenson I*, 355 N.C. at 377, 562 S.E.2d at 393). The majority opined that "compliance with traditional neutral districting principles, including those enumerated in [the WCP] of the North Carolina Constitution," might "constitute a compelling governmental interest" that would overcome strict scrutiny, but "[p]artisan advantage" does not. *Id.* at 393, 868 S.E.2d at 553.

The majority then applied these ideas to the three-judge panel's factual findings and determined that the evidence at trial demonstrated that all of the 2021 Plans were partisan gerrymanders. *Id.* at 391−92, 868 S.E.2d at 552. The majority then applied strict scrutiny to each map and concluded that the 2021 Plans were not "carefully calibrated toward advancing some compelling neutral priority." *Id.* at 396, 398, 401, 868 S.E.2d at 555, 556, 558.

The three dissenting justices concluded that plaintiffs' claims were non-justiciable. *See id.* at 413–34, 868 S.E.2d at 566–78 (Newby, C.J., dissenting). The dissent noted that our state constitution expressly assigns the redistricting responsibility to the General Assembly and that the majority failed to identify a

judicially discernable, manageable standard by which to adjudicate the partisan gerrymandering claims at issue. *Id.* at 424, 868 S.E.2d at 572.

## C. Remedial Process

### 1. *Three-Judge Panel's Initial Orders*

On remand, this Court's 4 February 2022 Remedial Order required the General Assembly to submit new congressional and state legislative redistricting plans "that satisfy all provisions of the North Carolina Constitution" by 18 February 2022. The Remedial Order also permitted plaintiffs to submit proposed remedial districting plans by the same deadline and allowed all parties to file comments on any of the submitted plans by 21 February 2022. The Remedial Order mandated that the three-judge panel "approve or adopt compliant congressional and state legislative districting plans no later than noon on 23 February 2022."

In an 8 February 2022 order, the three-judge panel informed the parties of its intent to appoint Special Masters to assist in reviewing the parties' proposed remedial plans and, if needed, in developing alternative remedial plans. Pursuant to the three-judge panel's order, each party submitted suggested individuals to serve as Special Masters, but the three-judge panel appointed three other individuals of its own choosing—former jurists Robert F. Orr, Robert H. Edmunds, Jr., and Thomas W. Ross.

The three-judge panel authorized the Special Masters to hire advisors "reasonably necessary to facilitate their work." The Special Masters hired four advisors to assist in evaluating the General Assembly's new remedial redistricting plans: Dr. Bernard Grofman, Dr. Tyler Jarvis, Dr. Eric McGhee, and Dr. Samuel Wang.

### 2.  *The General Assembly's Remedial Process*

The General Assembly understood *Harper I* as requiring it "to intentionally create more Democratic districts in the [Remedial Plans]." To accomplish this task, the General Assembly started with a blank slate and followed the same process to create each map. Each redistricting committee kept the county groupings used for the 2021 Plans as base maps. Accordingly, any single district county groupings from each of the 2021 Plans were carried over to the Remedial Plans, but otherwise, each map was entirely new.

Next, each redistricting committee "dr[e]w new districts and ma[d]e adjustments tailored to legitimate criteria." To do so, the General Assembly chose to utilize Caliper's Maptitude redistricting software, a "widely accepted districting program." Although expressly prohibited by its previous redistricting criteria and the court-ordered criteria from *Common Cause v. Lewis*, the General Assembly "used partisan election data as directed by the Supreme Court's Remedial Order" to achieve

its goal of "intentionally creat[ing] more Democratic districts." Specifically, the General Assembly chose to utilize partisan data from the set of twelve statewide elections that plaintiffs' expert, Dr. Mattingly, used to analyze the 2021 Plans (Mattingly Election Set).

After Maptitude produced an initial set of House, Senate, and congressional maps, the General Assembly analyzed the partisan fairness of each map using two political science metrics—the Mean-Median Difference and the Efficiency Gap. The General Assembly chose these two metrics because "they have been peer-reviewed in numerous articles by numerous scholars, and because there is some (but not uniform) agreement among scholars regarding thresholds for measuring partisanship." Additionally, the General Assembly selected these metrics because the *Harper I* majority identified them as two of the "multiple reliable ways of demonstrating the existence of an unconstitutional partisan gerrymander." *Harper I*, 380 N.C. at 384, 868 S.E.2d at 547 (majority opinion). For each of these metrics, the General Assembly selected threshold scores that, if achieved, would indicate that the relevant map contained an acceptable level of partisan fairness under *Harper I*. Specifically, the General Assembly selected a 1% threshold score for the Mean-Median Difference metric and a 7% threshold score for the Efficiency Gap metric.

The General Assembly selected these threshold scores based on general

agreement among political scientists that a redistricting plan with a Mean-Median Difference less than 1% and an Efficiency Gap less than 7% is "presumptively constitutional." Additionally, the General Assembly selected these threshold scores because the *Harper I* majority opined that they were "possible bright-line standards" that could indicate a presumptively constitutional level of partisanship:

> [U]sing the actual mean-median difference measure, from 1972 to 2016 the average mean-median difference in North Carolina's congressional redistricting plans was 1%. *Common Cause* [*v. Rucho*], 318 F. Supp. 3d [777,] 893 [(M.D.N.C. 2018)]. That measure instead could be a threshold standard such that any plan with a mean-median difference of 1% or less when analyzed using a representative sample of past elections is presumptively constitutional.
>
> With regard to the efficiency gap measure, courts have found "that an efficiency gap above 7% in any districting plan's first election year will continue to favor that party for the life of the plan." *Whitford v. Gill*, 218 F. Supp. 3d 837, 905 (W.D. Wis. 2016), *rev'd on other grounds,* 138 S. Ct. 1916 (2018). It is entirely workable to consider the seven percent efficiency gap threshold as a presumption of constitutionality, such that absent other evidence, any plan falling within that limit is presumptively constitutional.

*Id.* at 385, 386, 868 S.E.2d at 548.

After selecting its political science metrics and corresponding threshold scores, the General Assembly then adjusted each of the Remedial Plans until their Mean-Median Difference and Efficiency Gap scores were at or below the selected thresholds.

Along with prioritizing the creation of more "purportedly Democratic leaning districts" and ensuring the Remedial Plans scored well on the selected metrics, the General Assembly also focused on the "neutral and traditional redistricting criteria" used in creating the 2021 Plans unless those criteria conflicted with *Harper I*.

After drawing their respective plans, each chamber presented its plan to the relevant redistricting committee. The General Assembly enacted the Remedial Plans on 17 February 2022 and submitted them to the three-judge panel on 18 February 2022. Plaintiffs then offered comments and objections to the Remedial Plans. The Special Masters transmitted a report on the Remedial Plans that was based primarily on four reports written by the advisors. Notably, in crafting their reports, none of the advisors used the General Assembly's chosen redistricting program, Maptitude, nor did they use the General Assembly's chosen Mattingly Election Set. Instead, each advisor used his own preferred data and methods.

The Special Masters' Report found that the Remedial House Plan (RHP) and Remedial Senate Plan (RSP) met the requirements of *Harper I*, but that the Remedial Congressional Plan (RCP) did not. Because the Special Masters concluded that the RCP was unconstitutional, they developed and submitted an alternative plan (Interim Congressional Plan) in consultation with one of the advisors, Dr. Bernard Grofman, for the three-judge panel to consider.

In reviewing the Remedial Plans, the three-judge panel "adopt[ed] in full the findings of the Special Masters." Like the Special Masters, the three-judge panel concluded that the RHP and RSP complied with the requirements of *Harper I* but that the RCP was "not presumptively constitutional," was "subject to strict scrutiny," and was not "narrowly tailored to a compelling governmental interest." Accordingly, the three-judge panel concluded that the RCP was unconstitutional. To support its conclusion, the three-judge panel relied primarily on "the analysis performed by the Special Masters and their advisors" and its conclusion that the RHP and RSP scored below the relevant thresholds for the Mean-Median Difference and Efficiency Gap metrics, but the RCP did not. The three-judge panel did not point to any other evidence regarding the purported level of partisan bias in the Remedial Plans. Finally, because the three-judge panel rejected the General Assembly's RCP, it adopted the Interim Congressional Plan recommended by the Special Masters.

Following the three-judge panel's remedial order, all parties appealed to this Court. The parties petitioned this Court to stay the three-judge panel's remedial ruling, but this Court denied those petitions. Accordingly, the RSP, RHP, and Interim Congressional Plan were used in the 2022 elections.

**D. *Harper II***

In June 2022, Common Cause filed a motion for expedited hearing and

consideration of the three-judge panel's remedial order. On 13 July 2022, Legislative Defendants moved to dismiss their appeal of the three-judge panel's rejection of the RCP because the Interim Congressional Plan "ordered by [the three-judge panel] is only applicable to the 2022 election, and that map will apply to the 2022 election regardless of" this Court's holding on the three-judge panel's remedial order. Legislative Defs.' Mot. to Dismiss Appeal 3, *Harper v. Hall*, 380 N.C. 317 (2022) (No. 413PA21-1). Accordingly, Legislative Defendants sought to dismiss their appeal "in an effort to avoid further cost and confusion to the taxpayers and voters of North Carolina." *Id.*

In July 2022, the same four-justice majority from *Harper I* granted Common Cause's motion for expedited hearing and consideration and set oral argument for October 2022. *Harper v. Hall*, 382 N.C. 314, 315–16, 874 S.E.2d 902, 904 (2022) (order allowing motion to expedite hearing and consideration). Notably, in the same order, the Court expressly declined to address Legislative Defendants' motion to dismiss their appeal. *Id.* at 316, 874 S.E.2d at 904. The three dissenting justices from *Harper I* dissented from this order. *Id.* at 317–24, 874 S.E.2d at 904–09 (Barringer, J., dissenting) (noting that no jurisprudential reason existed to expedite consideration of the appeal).

Ultimately, the same four-justice majority from *Harper I* affirmed the three-

judge panel's rejection of the RCP and its approval of the RHP and reversed the three-judge panel's approval of the RSP.[5] *Harper II*, 383 N.C. at 94, 881 S.E.2d at 162. First, the majority attempted "to clarify and reaffirm" its "constitutional standard" from *Harper I. Id.* at 114, 881 S.E.2d at 174. In *Harper I* the majority stated that "some combination" of political science metrics could demonstrate that "there is a significant likelihood" that a redistricting plan "is presumptively constitutional." 380 N.C. at 384–85, 868 S.E.2d at 547–48. Specifically, the majority opined that a 1% Mean-Median Difference and a 7% Efficiency Gap could serve as "possible bright-line standards" for identifying a plan that "will give the voters of all political parties substantially equal opportunity to translate votes into seats." *Id.* at 385, 868 S.E.2d at 548.

In *Harper II*, however, the same majority reversed course and declared that no combination of political science tests or analysis could adequately identify a redistricting plan that meets their standard:

> Constitutional compliance is not grounded in narrow statistical measures, but in broad fundamental rights. Therefore, a trial court reviewing the constitutionality of a challenged proposed districting plan must assess whether that plan upholds the fundamental right of the people to

---

[5] The four-justice majority issued its *Harper II* opinion on 16 December 2022 when it knew that two members of its majority would complete their terms on this Court just fifteen days later.

vote on equal terms and to substantially equal voting power. This fundamental right "encompasses the opportunity to aggregate one's vote with likeminded citizens to elect a governing majority of elected officials who reflect those citizens' views." Put differently, it requires that "voters of all political parties [have] substantially equal opportunity to translate votes into seats.". . .

Although *Harper* [*I*] mentions several potential datapoints that may be used in assessing the constitutionality of a proposed districting plan, those measures are not substitutes for the ultimate constitutional standard noted above. That is, a trial court may not simply find that a districting plan meets certain factual, statistical measures and therefore dispositively, legally conclude *based on those measures alone* that the plan is constitutionally compliant. Constitutional compliance has no magic number. Rather, the trial court may consider certain datapoints within its wider consideration of the ultimate legal conclusion: whether the plan upholds the fundamental right of the people to vote on equal terms and to substantially equal voting power.

*Harper II*, 383 N.C. at 114, 881 S.E.2d at 174 (first alteration in original) (citations omitted). The majority insisted that it could not delineate a particular set of metrics that would identify a constitutional redistricting map "because our constitution speaks in broad foundational principles, not narrow statistical calculations." *Id.* at 115, 881 S.E.2d at 174.

As a result, the majority implied that the three-judge panel relied too heavily on its findings regarding the Mean-Median Difference and Efficiency Gap in reaching

its ultimate legal conclusions and then "encourage[d] future trial courts . . . to specify how the evidence does or does not support the plan's alignment with the broader constitutional standard of upholding the fundamental right to vote on equal terms." *Id.* at 116, 881 S.E.2d at 175. The majority, however, provided no guidance regarding what sorts of concrete evidence might assist future trial courts in this endeavor, nor did the majority explain how to recognize and weigh it.

The *Harper II* majority then reviewed the three-judge panel's findings of fact and conclusions of law for each of the Remedial Plans. First, the majority affirmed the three-judge panel's rejection of the RCP and adoption of the Interim Congressional Plan, holding that the three-judge panel's conclusions of law were supported by the relevant findings of fact, which were in turn supported by competent evidence. *Id.* at 116−19, 881 S.E.2d at 175−77. Similarly, the majority then affirmed the three-judge panel's approval of the RHP, determining that the panel's conclusions of law were supported by the relevant findings of fact, which were in turn supported by competent evidence. *Id.* at 119−20, 881 S.E.2d at 177−78.

Lastly, the majority reversed the three-judge panel's approval of the RSP because, "unlike for the RHP," the pertinent conclusions of law were not supported by the relevant findings of fact, and some "findings of fact regarding the RSP . . . [we]re unsupported by competent evidence." *Id.* at 120–21, 881 S.E.2d at 178. As the

dissent noted, however, this result was puzzling because on remand, the General Assembly "made the exact same policy choices and followed the exact same redrawing process for the RSP as it did for the RHP"; "the Special Masters made almost identical findings regarding the RHP and the RSP"; and the three-judge-panel made "specific findings regarding the RSP and RHP [that] were nearly identical." *Id.* at 150, 881 S.E.2d at 195−96 (Newby, C.J., dissenting). The dissent highlighted how this conflicting result, along with other contradictions throughout the *Harper II* opinion, demonstrated that the *Harper I* principles are not grounded in a judicially discoverable and manageable standard. *See id.* at 169−70, 881 S.E.2d at 208. The dissent concluded that in both *Harper I* and *Harper II*, the majority "intentionally stat[ed] vague standards" so that it could remain entrenched in the General Assembly's redistricting process and enthrone itself as the final authority over which plans will be used in North Carolina elections. *Id.* at 128, 881 S.E.2d at 183.

### E. Legislative Defendants' Petition for Rehearing

This Court filed its *Harper II* opinion on 16 December 2022, and the mandate issued on 5 January 2023. On 20 January 2023, Legislative Defendants timely filed a petition for rehearing under Rule 31 of the North Carolina Rules of Appellate Procedure. Legislative Defs.' Pet. for Reh'g, *Harper v. Hall*, 383 N.C. 89 (2022) (No. 413PA21). Specifically, Legislative Defendants asked this Court to rehear *Harper II*

because it confirms, *inter alia*, that the standards set forth in both *Harper I* and *Harper II* are unmanageable. As a result, Legislative Defendants requested that this Court, in rehearing *Harper II* also revisit *Harper I* and the issue of whether partisan gerrymandering claims are justiciable under the North Carolina Constitution. This Court granted the petition for rehearing on 3 February 2023. *Harper v. Hall*, ___ N.C. ___, ___, 882 S.E.2d 548, 549–50 (2023) (order granting Legislative Defendants' petition for rehearing).

## II.    *Rucho v. Common Cause*

We begin our analysis with the Supreme Court of the United States' insightful and persuasive opinion in *Rucho v. Common Cause*. In that case the Supreme Court considered claims that "excessive" partisan gerrymandering violated various provisions of the Federal Constitution. *Rucho*, 139 S. Ct. at 2491. There some of the same plaintiffs in this case challenged North Carolina's congressional redistricting map and brought similar claims to those presented here. Specifically, the *Rucho* plaintiffs alleged that the challenged plan violated the Equal Protection Clause of the Fourteenth Amendment by "intentionally diluting the electoral strength of Democratic voters," violated their rights to free speech and freedom of association guaranteed under the First Amendment, exceeded the state legislature's delegated authority to prescribe the "Times, Places and Manner of holding Elections," U.S.

Const. art. I, § 4, cl. 1, and "usurped the right of 'the People' to elect their preferred candidates for Congress, in violation of the requirement in Article I, § 2, of the Constitution that Members of the House of Representatives be chosen 'by the People of the several States.' "[6] *Id.* at 2492. Accordingly, the Supreme Court was tasked with deciding whether partisan gerrymandering claims are " 'justiciable'—that is, properly suited for resolution by the federal courts." *Id.* at 2491. Ultimately, the Supreme Court held that partisan gerrymandering claims present nonjusticiable, political questions. *Id.* at 2506–07.

The Supreme Court first considered the historical background of partisan gerrymandering during the formation of our country. *Id.* at 2494–96. The Supreme Court noted that partisan gerrymandering existed at the time of our nation's founding and that the framers of our Constitution affirmatively considered how to address it. *Id.* at 2494. The framers "settled on a characteristic approach, assigning

---

[6] In this case plaintiffs make very similar claims under parallel provisions of our state constitution—Article I, Section 19 (equal protection), Article I, Section 12 (freedom of assembly), Article I, Section 14 (freedom of speech), and Article I, Section 10 (free elections). *Harper I*, 380 N.C. at 329−31, 868 S.E.2d at 513–14. Common Cause, for example, asserts that partisan gerrymandering violates our equal protection clause by "diminish[ing] the electoral power" of members of the Democratic Party, violates Article I, Sections 12 and 14 by burdening Democratic voters' rights to freedom of speech and freedom to "associate effectively" with the Democratic Party, and violates the free elections clause by preventing elections from reflecting the "will of the people." *See* Verified Compl. for Declaratory J. and Injunctive Relief ¶¶ 189, 200, 180, 184, *Harper v. Hall*, No. 21 CVS 015426, 2021 WL 6884973 (N.C. Super. Ct. Wake County Dec. 16, 2021).

the issue to the state legislatures, expressly checked and balanced by the Federal Congress." *Id.* at 2496. Specifically, the framers "addressed the election of Representatives to Congress in the Elections Clause," which "assigns to state legislatures the power to prescribe the 'Times, Places and Manner of holding Elections' for Members of Congress, while giving Congress the power to 'make or alter' any such regulations." *Id.* at 2495. "At no point was there a suggestion that the federal courts had a role to play. Nor was there any indication that the Framers had ever heard of courts doing such a thing." *Id.* at 2496. The framers could have limited partisan gerrymandering in the Constitution or assigned federal courts a role in policing it, but they did not. As a result, the Supreme Court reasoned that "[t]o hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities," that is, to state legislatures and to Congress. *Id.* at 2497.

The Supreme Court distinguished partisan gerrymandering claims from other types of redistricting claims that courts have historically adjudicated: "In two areas—one-person, one-vote and racial gerrymandering—our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts." *Id.* at 2495–96. The Court noted, however, that "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" than

other types of redistricting issues because "while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering.' " *Id.* at 2497 (quoting *Hunt v. Cromartie*,[7] 526 U.S. 541, 551, 119 S. Ct. 1545, 1551 (1999)). Because some level of partisan gerrymandering is constitutional, "[t]he 'central problem' " with such claims is not determining whether a jurisdiction has engaged in any partisan gerrymandering, which is a simple, yes-or-no delineation. *Id.* (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296, 124 S. Ct. 1769, 1787 (2004) (plurality opinion)). Rather, the problem with partisan gerrymandering claims is "determining when political gerrymandering has gone too far." *Id.* (quoting *Vieth*, 541 U.S. at 296, 124 S. Ct. at 1787). That sort of question requires more than a yes-or-no answer. Instead, it requires "a standard for deciding how much partisan dominance is too much." *Id.* at 2498 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 420, 126 S. Ct. 2594, 2611 (2006) (opinion of Kennedy, J.)).

Because of this inherent difficulty, the Supreme Court stressed that if a standard for resolving such claims exists, it "must be grounded in a 'limited and precise rationale' and be 'clear, manageable, and politically neutral.' " *Id.* (quoting

---

[7] In *Hunt v. Cromartie*, the Supreme Court addressed a redistricting challenge arising from North Carolina. *See Cromartie*, 526 U.S. at 543, 119 S. Ct. at 1547.

*Vieth*, 541 U.S. at 306–08, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment)). Precise constraints on judicial review of partisan gerrymandering claims are necessary because

> "[t]he opportunity to control the drawing of electoral boundaries through the legislative process of apportionment is a critical and traditional part of politics in the United States." [*Davis v.*] *Bandemer*, 478 U.S. [109,] 145, 106 S.Ct. 2797 [(1986)] (opinion of O'Connor, J.). *See Gaffney* [*v. Cummings*], 412 U.S. [735,] 749, 93 S.Ct. 2321 [(1973)] (observing that districting implicates "fundamental 'choices about the nature of representation'" (quoting *Burns v. Richardson*, 384 U.S. 73, 92, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966))). An expansive standard requiring "the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process," *Vieth*, 541 U.S. at 306, 124 S.Ct. 1769 (opinion of Kennedy, J.).

*Id.* (first alteration in original). Accordingly, the Supreme Court concluded that federal courts could "inject [themselves] into [such] heated partisan issues" only if a standard existed "that c[ould] reliably differentiate unconstitutional from 'constitutional political gerrymandering.'" *Id.* at 2499 (first quoting *Bandemer*, 478 U.S. at 145, 106 S. Ct. at 2817 (O'Connor, J., concurring in the judgment); and then quoting *Cromartie*, 526 U.S. at 551, 119 S. Ct. at 1551).

The Supreme Court then examined whether it could locate such a standard in the Federal Constitution. The Court explained that partisan gerrymandering claims

are effectively requests for courts to allocate political power to achieve proportional representation, something that the Federal Constitution does not require:

> Partisan gerrymandering claims invariably sound in a desire for proportional representation. As Justice O'Connor put it, such claims are based on "a conviction that the greater the departure from proportionality, the more suspect an apportionment plan becomes." [*Bandemer*, 478 U.S. at 159, 106 S. Ct. 2797.] "Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be." *Id.*, at 130, 106 S.Ct. 2797 (plurality opinion). *See Mobile v. Bolden*, 446 U.S. 55, 75−76, 100 S.Ct. 1490, 1504, 64 L.Ed.2d 47 (1980) (plurality opinion) ("The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization.").

*Id.* at 2499. Accordingly, partisan gerrymandering claims do not seek to redress a violation of any particular constitutional provisions; rather, such claims "ask the courts to make *their own political judgment* about how much representation particular political parties *deserve*—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end." *Id.* (first emphasis added). Essentially, partisan gerrymandering claims ask courts to "apportion political power as a matter of fairness." *Id.* This judgment call is a policy choice. It is not the kind of "clear, manageable, and politically neutral" standard required for justiciable issues. *Id.* at 2498 (quoting *Vieth,* 541 U.S. at 306–08, 124 S. Ct. at 1793 (Kennedy, J.,

concurring in the judgment)); *see also Vieth*, 541 U.S. at 291, 124 S. Ct. at 1784 (plurality opinion) (" 'Fairness' does not seem to us a judicially manageable standard. . . . Some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking.").

The Court elaborated that settling on a clear, manageable, and politically neutral test for "fairness" is extremely difficult because "it is not even clear what fairness looks like in this context." *Rucho*, 139 S. Ct. at 2500. Fairness could mean increasing the number of competitive districts, in which case the appropriate test would need to accurately identify and "undo packing and cracking so that supporters of the disadvantaged party have a better shot at electing their preferred candidates." *Id.* This definition of fairness, however, could backfire because "[i]f all or most of the districts are competitive . . . even a narrow statewide preference for either party would produce an overwhelming majority for the winning party in the state legislature." *Id.* (alterations in original) (quoting *Bandemer*, 478 U.S. at 130, 106 S. Ct. at 2809).

Alternatively, fairness might be measured by the number of "safe seats" each

party receives, in which case the appropriate test would actually require packing and cracking in the redistricting process to ensure each party wins "its 'appropriate' share of 'safe' seats." *Id.* (citing *Bandemer*, 478 U.S. at 130–31, 106 S. Ct. at 2809). This approach, however, reduces the number of competitive districts and produces what would seem to be an "unfair" result for "individuals in districts allocated to the opposing party." *Id.*

Thus, the Supreme Court concluded that

> [d]eciding among just these different visions of fairness . . . poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral. Any judicial decision on what is "fair" in this context would be an "unmoored determination" of the sort characteristic of a political question beyond the competence of the federal courts.

*Id.* (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196, 132 S. Ct. 1421, 1427 (2012)).

Next, the Supreme Court concluded that, unlike one-person, one-vote claims, the Federal Constitution is also devoid of any objective, mathematical metric for measuring political fairness:

> the one-person, one-vote rule is relatively easy to administer as a matter of math. The same cannot be said of partisan gerrymandering claims, because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly. It hardly follows from the principle that each person must

have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support.

*Id.* at 2051.

The Court noted that it is possible for a constitution to provide the explicit guidance necessary to adjudicate partisan gerrymandering claims and pointed to several state constitutions and state statutes that expressly do so. *Id.* at 2507–08. By contrast, the Federal Constitution contains no such provision.

Finding no manageable standard in the Federal Constitution, the Supreme Court then turned to the political science-based tests proposed by the *Rucho* plaintiffs. *Id.* at 2503−04. The Supreme Court found these were insufficient as well because they are not effective at predicting future election results:

> The [plaintiff]s assure us that "the persistence of a party's advantage may be shown through sensitivity testing: probing how a plan would perform under other plausible electoral conditions." Experience proves that accurately predicting electoral outcomes is not so simple, either because the plans are based on flawed assumptions about voter preferences and behavior or because demographics and priorities change over time. In our two leading partisan gerrymandering cases themselves, the predictions of durability proved to be dramatically wrong. In 1981, Republicans controlled both houses of the Indiana Legislature as well as the governorship. Democrats challenged the state legislature districting map enacted by the Republicans. This Court in *Bandemer* rejected that challenge, and just months later the Democrats increased

their share of House seats in the 1986 elections. Two years later the House was split 50−50 between Democrats and Republicans, and the Democrats took control of the chamber in 1990. Democrats also challenged the Pennsylvania congressional districting plan at issue in *Vieth*. Two years after that challenge failed, they gained four seats in the delegation, going from a 12−7 minority to an 11−8 majority. At the next election, they flipped another Republican seat.

Even the most sophisticated districting maps cannot reliably account for some of the reasons voters prefer one candidate over another, or why their preferences may change. Voters elect individual candidates in individual districts, and their selections depend on the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other considerations. Many voters split their tickets. Others never register with a political party, and vote for candidates from both major parties at different points during their lifetimes. For all of those reasons, asking judges to predict how a particular districting map will perform in future elections risks basing constitutional holdings on unstable ground outside judicial expertise.

*Id.* (citations omitted).

In conclusion, the Supreme Court held that partisan gerrymandering claims are nonjusticiable because there is "no plausible grant of authority in the Constitution and no legal standards to limit and direct [courts'] decisions." *Id.* at 2507. In the final words of the opinion, the Supreme Court warned that adjudication

of partisan gerrymandering claims would constitute "an unprecedented expansion of

judicial power," adding that:

> We have never struck down a partisan gerrymander as unconstitutional—despite various requests over the past 45 years. The expansion of judicial authority would not be into just any area of controversy, but into one of the most intensely partisan aspects of American political life. That intervention would be unlimited in scope and duration—it would recur over and over again around the country with each new round of districting, for state as well as federal representatives. Consideration of the impact of today's ruling on democratic principles cannot ignore the effect of the unelected and politically unaccountable branch of the Federal Government assuming such an extraordinary and unprecedented role.

*Id.*

In *Rucho* the Supreme Court considered partisan gerrymandering claims

under the Federal Constitution, but the arguments it addressed are similar to those

raised here. While the current claims allege that partisan gerrymandering violates

our state constitution, we find the reasoning of the Supreme Court in *Rucho*

persuasive because the same arguments, concerns, and predictions have arisen here.

Thus, we now turn our analysis to reviewing the applicable fundamental principles

under our state constitution.

### III.    Fundamental Principles

### A.  Separation of Powers

The separation-of-powers clause is located within the Declaration of Rights of Article I of our constitution. The Declaration of Rights is an expressive yet non-exhaustive list of protections afforded to citizens against government intrusion, along with "the ideological premises that underlie the structure of government." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 46 (2d ed. 2013) [hereinafter *State Constitution*]. "The abstractness of the Declaration of Rights has allowed most of it to survive" in our current constitution. *Id.* at 6. The placement of the separation-of-powers clause in the Declaration of Rights suggests that keeping each branch within its described spheres protects the people by limiting overall governmental power. The clause does not establish the various powers but simply states that the powers of the branches are "separate and distinct." N.C. Const. art. I, § 6. The constitutional text develops the nature of those powers. *State Constitution* 46 ("Basic principles, such as popular sovereignty and separation of powers, are first set out in general terms, to be given specific application in later articles."). Thus, the separation-of-powers clause "is to be considered as a general statement of a broad, albeit fundamental, constitutional principle," *State v. Furmage*, 250 N.C. 616, 627, 109 S.E.2d 563, 571 (1959), and must be considered with the related, more specific

provisions of the constitution that outline the practical workings for governance, *see* N.C. Const. art. II (providing the framework for legislative power); *id.* art. III (providing the framework for executive power); *id.* art. IV (providing the framework for judicial power). "Nowhere was it stated that the three powers or branches had to be equal. In fact, although the balance occasionally shifted, the preponderant power has always rested with the legislature." *State Constitution* 50.

Given that "a constitution cannot violate itself," *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997), a branch's exercise of its express authority by definition comports with separation of powers. A violation of separation of powers only occurs when one branch of government exercises, or prevents the exercise of, a power reserved for another branch of government. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 660, 781 S.E.2d 248, 265 (2016) (Newby, J., concurring in part and dissenting in part). Understanding the prescribed powers of each branch, as divided between the branches historically and by the text itself, is the basis for stability, accountability, and cooperation within state government. *See State v. Emery*, 224 N.C. 581, 584, 31 S.E.2d 858, 861 (1944) ("[Constitutions] should receive a consistent and uniform construction . . . even though circumstances may have so changed as to render a different construction desirable.").

Since 1776, our constitutions have recognized that all political power resides in the people, N.C. Const. art. I, § 2; N.C. Const. of 1868, art. I, § 2; N.C. Const. of 1776, Declaration of Rights, § I, and is exercised through their elected officials in the General Assembly, N.C. Const. art. II, § 1; N.C. Const. of 1868, art. II, § 1; N.C. Const. of 1776, § I; *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895). "The legislative power is vested in the General Assembly, so called because all the people are present there in the persons of their representatives." *State Constitution* 95. Accordingly, the General Assembly possesses plenary power as well as the responsibilities explicitly recognized in the text of the state constitution. *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891−92 (1961). The structure of the bicameral legislative branch itself diffuses its power, *see Berger*, 368 N.C. at 653, 781 S.E.2d at 260–61 (Newby, J., concurring in part and dissenting in part), and the people themselves limit legislative power by express constitutional restrictions, *see Baker v. Martin*, 330 N.C. 331, 338–39, 410 S.E.2d 887, 891–92 (1991).

Most accountable to the people, *see* N.C. Const. art. II, §§ 3, 5, through the most frequent elections, *id.* art. II, §§ 2, 4, "[t]he legislative branch of government is without question 'the policy-making agency of our government. . . .' The General Assembly is the 'policy-making agency' because it is a far more appropriate forum

than the courts for implementing policy-based changes to our laws," *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004) (quoting *McMichael v. Proctor,* 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956)); *see also Berger*, 368 N.C. at 653, 781 S.E.2d at 261 (Newby, J., concurring in part and dissenting in part) ("The diversity within the [legislative] branch . . . ensures healthy review and significant debate of each proposed statute, the enactment of which frequently reaches final form through compromise."). The constitutional text provides various express checks on legislative power. *See, e.g.*, N.C. Const. art. II, § 11 ("Neither house shall proceed upon public business unless a majority of all of its members are actually present."); *id.* art. II, § 22 (providing that, with certain exceptions, all bills shall be subject to the Governor's veto); *id.* art. II, § 24 (prohibiting the General Assembly from enacting various types of "local, private, or special act[s] or resolution[s]").

## B. Standard of Review

Unlike the United States Constitution, the North Carolina Constitution "is in no matter a grant of power." *McIntyre*, 254 N.C. at 515, 119 S.E.2d at 891 (quoting *Lassiter v. Northampton Cnty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd*, 360 U.S. 45, 79 S. Ct. 985 (1959)). Rather, "[a]ll power which is not limited by the Constitution inheres in the people." *Id.* at 515, 119 S.E.2d at 891 (quoting *Lassiter*, 248 N.C. at 112, 102 S.E.2d at 861). Because the General Assembly

serves as "the agent of the people for enacting laws," it has the presumptive power to act, *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989), and possesses plenary power along with the responsibilities explicitly recognized in the constitution, *McIntyre*, 254 N.C. at 515, 119 S.E.2d at 891−92. The General Assembly's textual and plenary power is limited only by the express text of the constitution. *Baker*, 330 N.C. at 338–39, 410 S.E.2d at 891–92.

Therefore, the idea of the judiciary "preventing . . . the legislature, through which the people act, from exercising its power is the most serious of judicial considerations." *Berger*, 368 N.C. at 650, 781 S.E.2d at 259 (Newby, J., concurring in part and dissenting in part). Accordingly, this Court presumes that legislation is constitutional. *Id.* at 639, 781 S.E.2d at 252 (majority opinion). A constitutional limitation upon the General Assembly must be explicit and a violation of that limitation must be proved beyond a reasonable doubt. *Id.* at 639, 781 S.E.2d at 252. A statute cannot abrogate an express provision of the constitution because the constitution represents the fundamental law and the express will of the people. *Bayard*, 1 N.C. (Mart.) at 7. The judiciary performs this role of judicial review by determining whether a law conflicts with an express provision of the constitution. *See id.* at 6.

When this Court looks for constitutional limitations on the General Assembly's authority, it looks to the plain text of the constitution just as it would look to the plain text of a statute. *State v. Webb*, 358 N.C. 92, 97, 591 S.E.2d 505, 510 (2004). Thus, a claim that a law is unconstitutional must surmount the high bar imposed by the presumption of constitutionality and meet the highest quantum of proof, a showing that the statute is unconstitutional beyond a reasonable doubt.[8] *Baker*, 330 N.C. at 334–37, 410 S.E.2d at 889–90.

A proper application of this standard of review is illustrated by the landmark case of *Bayard v. Singleton*, the first reported case of judicial review in the nation. *Bayard* involved judicial review of a statute that conflicted with an express provision of the 1776 Declaration of Rights. 1 N.C. (Mart.) at 5. In 1785 the General Assembly enacted a law that abolished the right to a trial by jury for certain property disputes. *Id.* At that time, however, the Declaration of Rights expressly provided for a right to a trial by jury "in all Controversies at Law respecting property." N.C. Const. of 1776, Declaration of Rights, § XIV.

---

[8] The majority in *Harper I* and *Harper II* and the dissent here largely ignore the well-established standard of review that our courts apply when reviewing the constitutionality of a statute. Notably, courts apply different standards of review when adjudicating other matters that do not involve the constitutionality of a statute.

The Court in *Bayard* held that the act was unequivocally unconstitutional and void because it directly conflicted with a clear and express provision of the constitution. *Bayard*, 1 N.C. (Mart.) at 7. The Court reasoned that the General Assembly could not "repeal or alter" an express provision of the constitution by statute because the constitution represents the fundamental law and the express will of the people. *Id.* If the General Assembly could violate the constitution in this manner, it could defy the express will of the people who are the source of all political power. *Id.*; *see* N.C. Const. art. I, § 2. Thus, this Court declared the statute at issue unconstitutional. *Bayard*, 1 N.C. (Mart.) at 7.

This Court, however, did not lightly take on the role of declaring an act of the General Assembly unconstitutional. The Court noted that it felt "great reluctance" in involving itself "in a dispute with the Legislature" and took "every reasonable endeavor" to avoid "a disagreeable difference between" the two branches. *Id.* at 6. But in this instance, the Court determined that it had to declare the act void because the constitution was explicit: "That by the Constitution every citizen had undoubtedly a right to a decision of his property by a trial by jury." *Id.* at 7. Accordingly, the holding of *Bayard* is clear: the judiciary performs the role of judicial review, but it only declares an act of the General Assembly void when it directly conflicts with an express provision of the constitution.

Thus, plainly stated and as applied to this case, the standard of review asks whether the redistricting plans drawn by the General Assembly, which are presumed constitutional, violate an express provision of the constitution beyond a reasonable doubt. When we cannot locate an express, textual limitation on the legislature, the issue at hand may involve a political question that is better suited for resolution by the policymaking branch. As "essentially a function of the separation of powers," the political question doctrine operates to check the judiciary and prevent its encroaching on the other branches' authority. *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 710 (1962). Under this doctrine, courts must refuse to review political questions, that is, issues that are better suited for the political branches. Such issues are considered nonjusticiable.

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S. Ct. at 710; *see also Bacon v. Lee*, 353 N.C. 696, 716–17, 549 S.E.2d

840, 854 (2001). Accordingly, out of respect for separation of powers, a court must refrain from adjudicating a claim when any one of the following is present: (1) a textually demonstrable commitment of the matter to another branch; (2) a lack of judicially discoverable and manageable standards; or (3) the impossibility of deciding a case without making a policy determination of a kind clearly suited for nonjudicial discretion. All three of these factors are present here.

## IV.    Political Question

The claims and arguments at issue in this case are the same as those in *Rucho*, only this time they arise under the state constitution instead of the Federal Constitution. The Declaration of Rights provisions invoked by plaintiffs in this case— the free elections clause, the equal protection clause, and the freedom of speech and assembly clauses, N.C. Const. art. I, §§ 10, 12, 14, 19,—are our state constitution's counterparts to the Federal Constitutional provisions invoked in *Rucho*—Article I, Section 4 (Elections Clause); Article I, Section 2 (composition of the U.S. House of Representatives); the Equal Protection Clause of the Fourteenth Amendment; and the First Amendment, which protects the rights to free speech and freedom of association, *see Rucho*, 139 S. Ct. at 2491. The dissent in *Harper I* explained in great detail that, due to the striking similarities between this case and *Rucho*, we should have followed the Supreme Court's guidance and declared plaintiffs' claims

nonjusticiable. *See Harper I*, 380 N.C. at 414–24, 868 S.E.2d at 566–72 (Newby, C.J.,

dissenting). The dissent in *Harper II* reiterated that *Rucho* was persuasive precedent

from our nation's highest court and illustrated how all of the justiciability pitfalls

warned of in *Rucho* permeated the remedial proceedings in this case. *See Harper II*,

383 N.C. at 166–70, 881 S.E.2d at 206–08 (Newby, C.J., dissenting).

Four justices on this Court "misapprehended" the *Rucho* analysis in *Harper I.*

*See* N.C. R. App. P. 31(a). The remedial proceedings at issue in *Harper II* confirm

that those four justices were wrong to condemn *Rucho* as inapplicable to the case at

hand. *See Harper II*, 383 N.C. at 144–66, 881 S.E.2d at 193–206; *Harper I*, 380 N.C.

at 356–62, 868 S.E.2d at 529–33 (majority opinion). Today we correct that error.

Under the North Carolina Constitution, redistricting is explicitly and exclusively

committed to the General Assembly by the text of the constitution. The executive

branch has no role in the redistricting process, and the role of the judicial branch is

limited by the principles of judicial review. Moreover, like the Federal Constitution,

our constitution does not provide any judicially discernible or manageable standards

for determining how much partisan gerrymandering is too much. *See Rucho*, 139 S.

Ct. at 2500. Any attempt to adjudicate such claims forces this Court to make

numerous policy determinations for which there is no constitutional guidance. We

are not authorized or equipped to make these determinations. For all of these

reasons, we hold that claims of partisan gerrymandering are nonjusticiable, political questions under the North Carolina Constitution.

## A. Textual Commitment

One prominent characteristic of a political question is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Bacon*, 353 N.C. at 717, 549 S.E.2d at 854 (quoting *Baker*, 369 U.S. at 217, 82 S. Ct. at 710). The text of our state constitution, as well as that of the Federal Constitution, expressly assigns the task of redistricting[9] to the General Assembly. Reviewing the historical context of our redistricting and elections process is necessary to properly understand that our state constitution has committed the issue of redistricting to the General Assembly for hundreds of years.

North Carolina has had some form of elected, representative body since 1665. As early as 1663, the Lords Proprietors could enact laws in consultation with the freemen settled in their province. Charter Granted by Charles II, King of England to the Lords Proprietors of Carolina (Mar. 24, 1663), in 1 *Colonial and State Records of North Carolina* 20–23 (William L. Sanders ed., 1886) [hereinafter 1 *Colonial and State Records*]. In 1665 certain "concessions" by the Lords Proprietors allowed for the

---

[9] "Districting" and "redistricting" are sometimes referred to as "apportionment" and "reapportionment."

formation of the predecessor to the General Assembly and the election of freemen representatives. Concessions and Agreement Between the Lords Proprietors of Carolina and William Yeamans, et al. (Jan. 7, 1665), in 1 *Colonial and State Records* 79–81. The 1669 Fundamental Constitutions of Carolina apportioned those representatives into counties and the counties into precincts. The Fundamental Constitutions of Carolina (Mar. 1, 1669), in 1 *Colonial and State Records* 188. The assembly met and stood for election every two years. *Id.* at 199–200. Thus, long before the 1776 constitution, the qualified voters in Carolina were electing their representatives in districts.

Leading up to the enactment of the 1776 constitution, in 1774 the delegates of the First Provincial Congress were elected by geographic location, either by town, which were also known as boroughs, or by county. *See* Henry G. Connor & Joseph B. Cheshire, Jr., *The Constitution of North Carolina Annotated* xii–xiv (1911). The text of the 1776 constitution established the General Assembly, a gathering of the people through their elected representatives, as the Senate and the House of Commons. N.C. Const. of 1776, § I. Senators were elected annually by county without regard to the population size of that county. *Id.* § II. Representatives in the House of Commons were also elected annually, but each county received two representatives and certain enumerated towns received one as well. *Id.* § III. Only six towns were initially given

separate representation in the House of Commons, *id.*, but other towns were later added. The 1776 constitution did not contain a specific provision regarding redistricting. Nonetheless, redistricting occurred through the creation of new counties—as part of its plenary power, the General Assembly established the boundaries of the counties from which Senators and Representatives were elected. *See, e.g.*, Act of Apr. 8, 1777, An Act for dividing Rowan County, and other Purposes therein mentioned, ch. XIX, 1777 N.C. Sess. Laws 33 (dividing Rowan County to carve out a new Burke County). Notably, the 1776 Declaration of Rights contained the free elections and freedom of assembly clauses. N.C. Const. of 1776, Declaration of Rights, §§ VI, XVIII.

Through the years, the population of the state shifted radically from the east to the piedmont and west. John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1770–71 (1992) [hereinafter *Constitutional History*]. Nonetheless, the eastern region received additional representation through the strategic creation and division of counties. *Id.* at 1770. The General Assembly created smaller counties in the east and larger ones in the piedmont and west, keeping the distribution of representatives in favor of the east despite population growth trends in other areas. *Id.* This county-town approach, combined with the power of the General Assembly to divide existing counties to create new ones, resulted in superior political

power in the east. *See id.* This malapportionment led to civil unrest and a crisis that culminated with the 1835 constitutional convention. *State Constitution* 3, 13. During that time, no one argued that the provisions of the Declaration of Rights or the 1776 constitution made the legislative apportionment acts unconstitutional. Rather, North Carolinians ultimately recognized the need to amend the text itself to address the apportionment problem.

In 1835 a constitutional convention met to, among other things, change the representative system to better address differences in population. *See id.* That convention resulted in amendments that provided for a total of fifty senators and required senatorial districts to be drawn by the General Assembly based on the taxes paid by each county. N.C. Const. of 1776, amends. of 1835, art. I, § 1. These amendments also included the predecessor of the WCP, *see* N.C. Const. art. II, § 3(3), that prohibited a county from being divided to create the senatorial districts, N.C. Const. of 1776, amends. of 1835, art. I, § 1.

The 1835 amendments provided for 120 House seats. *Id.* art. I, § 2. These amendments eliminated representation for the borough towns, *see generally id.*, instead allotting all 120 House seats to counties based roughly on population, *id.* This framework allowed the more populated counties to have additional representatives, but each county was entitled to at least one representative. *Id.* These amendments

alleviated the problem of disproportionate representation in the eastern counties. The General Assembly was instructed to reconsider the apportionment of the counties every twenty years and to base reapportionment on population according to the census taken by order of Congress. *Id.* art. I, § 3. Likewise, the convention implemented other changes to representation such as lengthening legislative terms from one year to two years, *id.* art. I, §§ 1–2, and allowing the voters to elect the governor, *id.* art. II, § 1.

Following the constitutional convention of 1868, the Senate became apportioned by population. N.C. Const. of 1868, art. II, § 5. Along with the express limitation imposed by the WCP, the 1868 amendments required senatorial districts to be contiguous and to be redrawn in connection with the decennial census. *Id.* Apportionment of House seats remained the same—allotted to counties based on population with each county given at least one representative. *Id.* art. II, § 6. The convention lengthened the term of the governor to four years, *id.* art. III, § 1, and constitutionally created a separate judicial branch, *see id.* art. IV, with judges being elected by the voters for eight-year terms, *id.* art. IV, § 26. Previously, the General Assembly elected judges, N.C. Const. of 1776, § XIII, but now judges in North Carolina became directly accountable to the people through elections, N.C. Const. of 1868, art. IV, § 26.

For almost one hundred years, apportionment remained unchanged until the 1960s. At that time, the Speaker of the House received the authority to apportion House districts. N.C. Const. of 1868, amends. of 1961, art. II, § 5. Then, to comply with the federal decision in *Baker v. Carr*, the constitution was amended in 1968 to reflect the one-person, one-vote requirement. *State Constitution* 31. This change affected the structure of the House of Representatives in particular. *Id.* Significantly, the number of House members remained at 120, but the representatives were no longer apportioned by county; instead, the 120 representatives were allotted among districts now drawn based on equal population. N.C. Const. of 1868, amends. of 1967, art. II, § 5. By the end of the 1960s, the same criteria for proper districts—equal population, contiguous territory, the WCP, and reapportionment in conjunction with the decennial census—applied to both Senate and House districts. *See id.* art. II, §§ 4, 6.

The current version of our constitution, ratified by the people at the ballot box in 1970, took effect in 1971 and came about as a "good government measure." *State Constitution* 32. This 1971 constitution represented an attempt to modernize the 1868 constitution and its subsequent amendments with editorial and organizational revisions and amendment proposals. *See, e.g.*, N.C. State Const. Study Comm'n, *Report of the North Carolina State Constitution Study Commission* 8–12 (1968).

Today our constitution expressly assigns the legislative redistricting authority to the General Assembly subject to specific enumerated restraints:

> The Senators shall be elected from districts. The General Assembly, at the first regular session convening after the return of every decennial census of population taken by order of Congress, shall revise the senate districts and the apportionment of Senators among those districts, subject to the following requirements:
>
> (1) Each Senator shall represent, as nearly as may be, an equal number of inhabitants, the number of inhabitants that each Senator represents being determined for this purpose by dividing the population of the district that he represents by the number of Senators apportioned to that district;
>
> (2) Each senate district shall at all times consist of contiguous territory;
>
> (3) No county shall be divided in the formation of a senate district;
>
> (4) When established, the senate districts and the apportionment of Senators shall remain unaltered until the return of another decennial census of population taken by order of Congress.

N.C. Const. art. II, § 3. Article II, Section 5 establishes the same grant of authority and limitations for the state House of Representatives. Thus, while the constitution commits the redistricting responsibility to the General Assembly, it does not leave the General Assembly completely unrestrained. The constitution expressly requires that any redistricting plan conform to its explicit criteria.

Notably, there is no provision in the state constitution regarding redistricting of congressional districts. The Federal Constitution, however, commits drawing of congressional districts to the state legislatures subject to oversight by the Congress of the United States. "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. This provision makes clear that the redistricting power is expressly committed to the state legislative branch.

Additionally, both our constitution and the General Statutes expressly insulate the redistricting power from intrusion by the executive and judicial branches. The governor has no role in the redistricting process because the constitution explicitly exempts redistricting legislation from the governor's veto power.[10] N.C. Const. art. II, § 22(5)(b)−(d). Moreover, the General Statutes provide a limited role of judicial review for courts in reviewing redistricting plans. *See* N.C.G.S. §§ 120-2.3 to -2.4 (2021). The

---

[10] The North Carolina governor did not gain the veto power until the people approved an amendment to the North Carolina Constitution in 1996—over two hundred years after the adoption of our first constitution in 1776. *See* Act of Mar. 8, 1995, An Act to Provide For A Referendum to Amend the Constitution to Provide for a Gubernatorial Veto, ch. 5, 1995 N.C. Sess. Laws 6. At that time, the people of North Carolina extended to the governor the authority to veto many types of legislative enactments but specifically withheld the authority to veto redistricting legislation. *Id.* That provision remains unchanged today.

General Assembly enacted these statutory provisions in 2003 to clarify and codify the existing process by which courts already had been reviewing redistricting plans. Act of Nov. 25, 2003, An Act to Establish House Districts, Establish Senatorial Districts, and Make Changes to the Election Laws and to Other Laws Related to Redistricting, S.L. 2003-434, §§ 7−9, 2003 N.C. Sess. Laws (1st Extra Sess. 2003) 1313, 1415−16. The General Assembly drafted these statutes in response to this Court's decisions in *Stephenson I*, 355 N.C. 354, 562 S.E.2d 377, and *Stephenson v. Bartlett (Stephenson II)*, 357 N.C. 301, 582 S.E.2d 247 (2003). This Court unanimously upheld these statutory provisions as proper limitations on the judiciary's role in the redistricting process in *Stephenson v. Bartlett* (*Stephenson III*), 358 N.C. 219, 230, 595 S.E.2d 112, 119−20 (2004) ("[R]edistricting is a legislative responsibility . . . . Not only do these statutes allow the General Assembly to exercise its proper responsibilities, they decrease the risk that the courts will encroach upon the responsibilities of the legislative branch.").

Section 1-267.1 requires that a three-judge panel hear challenges to redistricting plans. N.C.G.S. § 1-267.1 (2021). Specifically, under Section 120-2.3, courts may review challenges regarding whether a redistricting plan is "unconstitutional or otherwise invalid." *Id.* § 120-2.3. If a court finds a redistricting plan is unconstitutional, it must specify the precise defects and give the General

Assembly an opportunity to remedy any identified defect by enacting a new redistricting plan. *Id.* § 120-2.4(a). By statute, a court may not impose a remedial redistricting plan of its own unless "the General Assembly does not act to remedy" those defects. *Id.* § 120-2.4(a1). Even then, a court-imposed redistricting plan may differ from the General Assembly's enacted plan "only to the extent necessary to remedy" the defects identified by the court and will only be used for the next general election. *Id.* After the next general election, the General Assembly will replace the court-imposed map with a new, legislatively enacted map. A court-imposed map is only used for one election cycle because it is not "established" as that term is used in Article II, Sections 3(4) and 5(4). *See* N.C. Const. art. II, §§ 3(4), 5(4) ("When established, the senate [and representative] districts and the apportionment of Senators [and Representatives] shall remain unaltered until the return of another decennial census of population taken by order of Congress."). This limited role of judicial review comports with the fact that our constitution expressly assigns the redistricting authority to the General Assembly. *See Stephenson III*, 358 N.C. at 230, 595 S.E.2d at 119.

Article II, Sections 3 and 5 commit the redistricting authority to the General Assembly and set express limitations on that authority. In the landmark case *Stephenson I*, this Court considered the express limitations on redistricting in Article

II, Sections 3 and 5, and applied them in conformity with federal law. *See Stephenson I*, 355 N.C. at 358, 562 S.E.2d at 381. That case dealt with the interplay between the objective restraints contained in the state constitution and federal redistricting authorities—namely, Section 2 of the Voting Rights Act (VRA) and the one-person, one-vote principle.[11] *See id.* at 359, 562 S.E.2d at 382.

The plaintiffs challenged the 2001 state legislative redistricting plans (2001 Plans) as unconstitutional in violation of the WCP of Article II, Sections 3 and 5. *Id.* at 358, 562 S.E.2d at 381; N.C. Const. art. II, §§ 3, 5 ("No county shall be divided in the formation of a senate [or representative] district."). The defendants argued that these constitutional provisions were "wholly unenforceable because of the requirements of the [VRA]." *Stephenson I*, 355 N.C. at 361, 562 S.E.2d at 383−84. Thus, before addressing whether the 2001 redistricting plans violated the WCP, this Court first had to address "whether the WCP is now entirely unenforceable, as [the] defendants contend, or, alternatively, whether the WCP remains enforceable

---

[11] "Section 2 of the VRA generally provides that states or their political subdivisions may not impose any voting qualification or prerequisite that impairs or dilutes, on account of race or color, a citizen's opportunity to participate in the political process and to elect representatives of his or her choice." *Id.* at 363, 562 S.E.2d at 385. The one-person, one-vote principle simply requires that districts, to the extent practicable, contain an equal number of voters. *Brown v. Thomson*, 462 U.S. 835, 841, 103 S. Ct. 2690, 2695 (1983).

throughout the State to the extent not preempted or otherwise superseded by federal

law." *Id.* at 369, 562 S.E.2d at 388. In doing so, we explained that

> an inflexible application of the WCP is no longer attainable
> because of the operation of the provisions of the VRA and
> the federal "one-person, one-vote" standard, as
> incorporated within the State Constitution. This does not
> mean, however, that the WCP is rendered a legal nullity if
> its beneficial purposes can be preserved consistent with
> federal law and reconciled with other state constitutional
> guarantees.
>
> . . . The General Assembly may consider partisan
> advantage and incumbency protection in the application of
> its discretionary redistricting decisions, *see Gaffney v.
> Cummings*, 412 U.S. 735, [93 S. Ct. 2321,] 37 L. Ed. 2d 298
> (1973), but it must do so in conformity with the State
> Constitution. To hold otherwise would abrogate the
> constitutional limitations or "objective constraints" that
> the people of North Carolina have imposed on legislative
> redistricting and reapportionment in the State
> Constitution.

*Id.* at 371–72, 562 S.E.2d at 389–90. In other words, we recognized that the WCP is

one of the clear and express limitations or "objective constraints" on legislative

redistricting in our constitution. *Id.* at 371, 562 S.E.2d at 390. We concluded that the

WCP was enforceable to the extent it did not conflict with the one-person, one-vote

principle or the VRA because "the people of North Carolina" expressly chose to limit

the General Assembly in this way. *Id.* at 371, 374−75, 562 S.E.2d at 390, 391−92; *id.*

at 372−74, 562 S.E.2d at 390−91 ("[T]he WCP remains valid and binding upon the

General Assembly during the redistricting and reapportionment process . . . except to the extent superseded by federal law. . . . Where . . . the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible.").

Notably, we stated that "[t]he General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions." *Id.* at 371, 562 S.E.2d at 390. We supported this statement with a citation to the Supreme Court's decision in *Gaffney v. Cummings*, 412 U.S. 735, 93 S. Ct. 2321 (1973). In that case the Supreme Court observed that

> [i]t would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary. The very essence of districting is to produce a different—a more "politically fair"—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. *Politics and political considerations are inseparable from districting and apportionment.*

*Id.* at 752–53, 93 S. Ct. at 2331 (emphasis added) (citations omitted). Thus, in *Stephenson I* we recognized that partisan considerations are inherently a part of the redistricting process in our state. We then expressed that the discretionary consideration of partisan advantage and incumbency protection must be done "in conformity with the State Constitution." *Stephenson I*, 355 N.C. at 371, 562 S.E.2d at

390. In other words, the General Assembly's discretionary considerations are constrained by the express limitations found in Article II, Sections 3 and 5. "To hold otherwise," we explained, "would abrogate the constitutional limitations or 'objective constraints' that the people of North Carolina have imposed on legislative redistricting and reapportionment in the State Constitution." *Id.* at 371−72, 562 S.E.2d at 390. By "constitutional limitations," we meant the specific constraints in Article II, Sections 3 and 5.

Having held that the WCP remained enforceable to the extent not preempted by or otherwise superseded by federal law, we then held that the 2001 Plans violated the WCP by unduly dividing numerous counties. *Id.* at 371, 562 S.E.2d at 389–90. Specifically, the 2001 Plans divided fifty-one of the State's one hundred counties in the Senate plan and seventy of the one hundred counties in the House plan. *Id.* at 360, 562 S.E.2d at 383. We were able to make this determination because the standard provided by the WCP is express, clear, and easily applied.

Once we found that the 2001 Plans violated the still-valid WCP, we then crafted detailed criteria harmonizing the WCP and the other express constraints in Article II, Sections 3 and 5, with the VRA and the federal one-person, one-vote principle. These standards were clear and manageable because they were based on

the express provisions found in our constitution or in federal law. For example, one

of the *Stephenson I* criteria required that

> [i]n counties having a non-VRA population pool
> which cannot support at least one legislative district at or
> within plus or minus five percent of the ideal population for
> a legislative district or, alternatively, counties having a
> non-VRA population pool which, if divided into districts,
> would not comply with the at or within plus or minus five
> percent "one-person, one-vote" standard, the requirements
> of the WCP are met by *combining or grouping the
> minimum number of whole, contiguous counties* necessary
> to comply with the at or within plus or minus five-percent
> "one-person, one vote" standard.

*Id.* at 383–84, 562 S.E.2d at 397 (emphasis added). The requirement that the General

Assembly group "whole, contiguous" counties together when necessary to create a

district that meets the ideal population requirement is a function of the WCP and the

requirement that "[e]ach [legislative] district shall at all times consist of contiguous

territory." N.C. Const. art. II, §§ 3(3), 5(3), 3(2), 5(2). Similarly, this Court recognized

that when the General Assembly must group counties together in this way, the

resulting districts in that county grouping might cross over the "interior county

lines"—that is, the county lines that do not create the exterior boundaries of the

county grouping. *See Stephenson I*, 355 N.C. at 384, 562 S.E.2d at 397. Such

crossovers would violate the WCP but may be necessary to comply with the one-

person, one-vote principle. Thus, in order to enforce "[t]he intent underlying the

WCP . . . to the maximum extent possible," *Stephenson I* required that districts in multi-county groupings be "compact" and account for "communities of interest."[12] *Id.* at 384, 562 S.E.2d at 397. Compactness and communities of interest are also important factors under the VRA. *See Thornburg v. Gingles*, 478 U.S. 30, 50−51, 106 S. Ct. 2752, 2766 (1986).

*Stephenson I* also required that "[i]n forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements." 355 N.C. at 383, 562 S.E.2d at 397. This requirement is "relatively easy to administer as a matter of math."[13] *Rucho*, 139 S. Ct. at 2501. This requirement

---

[12] The Court in *Stephenson I* recognized that the "impetus" underlying the WCP was a long-standing respect for counties as "political subdivisions" that "provide essential services" and " 'effectuate the political organization and civil administration of the state' " at the local level. *Id.* at 365−66, 562 S.E.2d at 385−86 (quoting *White v. Comm'rs of Chowan Cnty.*, 90 N.C. 437, 438 (1884)). Accordingly, counties were kept whole because they naturally promote a "clear identity and common interests" among county residents. *Id.* at 366, 562 S.E.2d at 386. Recognizing that some counties would need to be divided or grouped together to comply with federal redistricting requirements, and in order to comply with the underlying intent of the WCP "to the maximum extent possible," *id.* at 384, 562 S.E.2d at 397, *Stephenson I* required the General Assembly to consider compactness and communities of interest whenever it had to group multiple counties together.

[13] *Stephenson I*'s plus or minus five percent standard is derived directly from Supreme Court precedent holding that a population deviation range of ten percent (plus or minus five percent) generally satisfies the federal one-person, one-vote requirement. *See Brown*, 462 U.S. at 842, 103 S. Ct. at 2696 (" '[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment . . . .' Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within

also ensures compliance with Article II, Sections 3(1) and 5(1), which provide that each senator and representative "shall represent, as nearly as may be, an equal number of inhabitants." N.C. Const. art. II, §§ 3(1), 5(1).

Although this Court was very detailed in stating its *Stephenson I* criteria, each criterion clearly reflects the fact that the constitution textually commits the redistricting authority to the General Assembly and only limits that authority in the ways enumerated in federal law and in Article II, Sections 3 and 5. This Court harmonized federal redistricting requirements and the directives of our state constitution, but it did not place any limitations on redistricting that were not derived from those two sources of law.

In sum, throughout our history our constitutions have invariably committed redistricting authority to our General Assembly. The General Assembly exercises that authority subject to the express limitations in our constitution and in federal

---

this category of minor deviations." (internal citations omitted) (quoting *Gaffney*, 412 U.S. at 745, 93 S. Ct. at 2327)); *see also Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259, 136 S. Ct. 1301, 1307 (2016) ("We have further made clear that 'minor deviations from mathematical equality' do not, by themselves, 'make out a prima facie case of invidious discrimination under the Fourteenth Amendment . . . .' We have defined as 'minor deviations' those in 'an apportionment plan with a maximum population deviation under 10%.'" (internal citations omitted) (first quoting *Gaffney*, 412 U.S. at 745, 93 S. Ct. at 2327; and then quoting *Brown*, 462 U.S. at 842, 103 S. Ct. at 2696)); *Evenwel v. Abbott*, 578 U.S. 54, 59−60, 136 S. Ct. 1120, 1124 (2016) (same); *Voinovich v. Quilter*, 507 U.S. 146, 160−61, 113 S. Ct. 1149, 1159 (1993) (same); *Connor v. Finch*, 431 U.S. 407, 418, 97 S. Ct. 1828, 1835 (1977) (same).

law. When the General Assembly acts within the scope of these express limitations, it is performing its constitutionally assigned role. When the General Assembly properly performs its constitutionally assigned role, its discretionary decisions present a political question that is nonjusticiable. Ultimately, the role of our courts is limited to identifying a redistricting plan that violates those express limitations and requiring the General Assembly to remedy the specified defects.

**B. Judicially Discoverable and Manageable Standards**

Another factor that indicates the presence of a political question is the lack of a judicially discoverable and manageable standard for assessing the matter at hand. Like the Federal Constitution, our constitution does not provide judicially discernible or manageable standards for adjudicating partisan gerrymandering claims. The North Carolina Constitution could contain a provision that expressly prohibits or limits partisan gerrymandering, and perhaps then our courts could be "armed with a standard that can reliably differentiate" between constitutional and unconstitutional partisan gerrymandering. *See Rucho*, 139 S. Ct. at 2499. Our constitution, however, contains no such provision.

Almost one hundred years ago, this Court's opinion in *Leonard v. Maxwell* indicated that courts should cautiously consider redistricting claims. 216 N.C. 89, 99, 3 S.E.2d 316, 324 (1939). In that case the plaintiff argued that the General Assembly

was malapportioned because it had not reapportioned itself at the first session after the 1930 census, as required by the constitution. *Id.* at 98, 3 S.E.2d at 324. As a result, the plaintiff argued that the 1937 General Assembly was powerless to act including, "it [wa]s suggested," to reapportion itself. *Id.* This Court rejected that argument, observing that "[t]he question is a political one, and there is nothing the courts can do about it. [Courts] do not cruise in nonjusticiable waters." *Id.* at 99, 3 S.E.2d at 324 (internal citation omitted).

Moreover, this Court has previously recognized that the Declaration of Rights generally does not provide judicially manageable standards for claims related to gerrymandering. In *Dickson I* a group of North Carolina voters challenged redistricting plans passed by the General Assembly in 2011 (2011 Plans) under both federal and state law. *Dickson I*, 367 N.C. at 546, 766 S.E.2d at 242, *vacated and remanded on federal grounds*, 575 U.S. 959 (2015) (mem.). Among other claims, the plaintiffs argued that the 2011 Plans violated the " 'Good of the Whole' clause found in Article I, Section 2" of the North Carolina Constitution's Declaration of Rights. *Id.* at 575, 766 S.E.2d at 260. Article I, Section 2 states:

> All political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.

N.C. Const. art. I, § 2. The plaintiffs argued that the last clause of this provision

constitutes "a specific limitation on the powers of the General Assembly with regard

to redistricting" because the General Assembly " 'institutes' a new form of

government" when it reapportions the legislative districts after every decennial

census. Pl.-Appellants' Br. at 178−79, *Dickson I*, No. 201PA12-2, 2013 5669654 (N.C.

Sup. Ct. Oct. 11, 2013).

This Court rejected that claim as nonjusticiable, however, determining that

Article I, Section 2 of the Declaration of Rights did not provide a judicially

manageable standard:

> We do not doubt that plaintiffs' proffered maps represent
> their good faith understanding of a plan that they believe
> best for our State as a whole. However, the maps enacted
> by the duly elected General Assembly also represent an
> equally legitimate understanding of legislative districts
> that will function for the good of the whole. Because
> plaintiffs' argument is not based upon a justiciable
> standard, and because acts of the General Assembly enjoy
> "a strong presumption of constitutionality," *Pope v. Easley,*
> 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam)
> (citation omitted), plaintiffs' claims fail.

*Dickson I*, 367 N.C. at 575, 766 S.E.2d at 260. We affirmed the trial court's conclusion

that "the General Assembly applied traditional and permissible redistricting

principles to achieve partisan advantage and that no constitutional violations

resulted." *Id.* at 546, 766 S.E.2d at 242. Notably, the trial court in that case

specifically stated that partisan gerrymandering is nonjusticiable:

> Redistricting in North Carolina is an inherently political and intensely partisan process that results in political winners and, of course, political losers. . . .
>
> Political losses and partisan disadvantage are not the proper subject for judicial review, and those whose power or influence is stripped away by shifting political winds cannot seek a remedy from courts of law, but they must find relief from courts of public opinion in future elections. Our North Carolina Supreme Court has observed that "[w]e do not believe the political process is enhanced if the power of the courts is consistently invoked to second-guess the General Assembly's redistricting decisions."

*Dickson v. Rucho*, Nos. 11 CVS 16896, 11 CVS 16940, 2013 WL 3376658, at *1–2

(N.C. Super. Ct. Wake County July 8, 2013) (quoting *Pender County v. Bartlett*, 361

N.C. 491, 506, 649 S.E.2d 364, 373 (2007), *aff'd sub nom. Bartlett v. Strickland*, 556

U.S. 1, 129 S. Ct. 1231 (2009)). We affirmed the trial court's analysis. *See Dickson I*,

367 N.C. at 575, 766 S.E.2d at 260; *see also Dickson v. Rucho* (*Dickson II*), 368 N.C.

481, 534, 781 S.E.2d 404, 440–41 (2015) (reiterating our prior holding that Article I,

Section 2 of the North Carolina Declaration of Rights does not provide a justiciable

standard).

The four-justice majority in *Harper I* should have followed the analysis in

*Dickson I*. Nevertheless, the *Harper I* majority departed from this precedent and

insisted that our Declaration of Rights plainly provides a standard for identifying partisan gerrymandering. Even within that opinion, however, the majority could not consistently enunciate what that standard supposedly is. The Court described a "constitutional right[ ] of the people to vote on equal terms and to substantially equal voting power," as well as an "individual right[ ] of voters to cast votes that matter equally." *Harper I*, 380 N.C. at 323–24, 868 S.E.2d at 510. The *Harper I* majority also stated that the constitution protects "the opportunity to aggregate one's vote with likeminded citizens to elect a governing majority of elected officials who reflect those citizens' views." *Id.* at 378, 868 S.E.2d at 544. In another part of the *Harper I* opinion, the majority noted a districting plan violates the constitution when it "systematically makes it harder for one group of voters to elect a governing majority than another group of voters of equal size." *Id.* at 379, 868 S.E.2d at 544. In other parts of *Harper I*, however, the majority characterized the standard as a right to aggregate votes "on the basis of partisan affiliation." *Id.* at 390, 392, 868 S.E.2d at 551, 552.

These vague and inconsistent standards are not derived from any express provision in the constitution. Instead, these standards seem to be grounded in a desire for some form of proportionality and reflect a judicially created notion of how much representation is "fair" without explaining what fairness is or how to manage it. The Supreme Court reached the same conclusion regarding the claims in *Rucho*:

> Partisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence. Explicitly or implicitly, a districting map is alleged to be unconstitutional because it makes it too difficult for one party to translate statewide support into seats in the legislature. . . .

> Partisan gerrymandering claims invariably sound in a desire for proportional representation. As Justice O'Connor put it, such claims are based on "a conviction that the greater the departure from proportionality, the more suspect an apportionment plan becomes."

*Rucho*, 139 S. Ct. at 2499 (quoting *Bandemer*, 478 U.S. at 159, 106 S. Ct. at 2824 (O'Connor, J., concurring in the judgment)). These vague notions of fairness do not answer how to measure whether groups of voters are treated "fairly" or how to predict the results an election would produce. Moreover, as forewarned by the Supreme Court in *Rucho*, these vague notions of fairness did not produce a discernable or workable standard during the remedial proceedings in this case. *See id.* at 2499–500 (" 'Fairness' does not seem to us a judicially manageable standard . . . . Some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion [and] to meaningfully constrain the discretion of the courts . . . ."(first alteration in original) (quoting *Vieth*, 541 U.S. at 291, 124 S. Ct. at 1784 (plurality opinion))).

In the remedial phase, the General Assembly attempted to apply the *Harper I*

standard in drawing the Remedial House Plan (RHP), Remedial Senate Plan (RSP), and Remedial Congressional Plan (RCP). The General Assembly followed the same process in enacting each plan, yet the Special Masters recommended, and the three-judge panel concluded, that only the RHP and RSP met the *Harper I* standard. Accordingly, the three-judge panel struck the RCP. On appeal, however, the same four justices from *Harper I* also struck the RSP as unconstitutional, *see Harper II*, 383 N.C. at 94, 881 S.E.2d at 162, indicating that neither the General Assembly, the three-judge panel, the three Special Masters, nor three justices of this Court could properly understand and apply their standard set forth in *Harper I*. Constitutional compliance should not be so difficult. *See Rucho*, 139 S. Ct. at 2499 (noting that courts can only adjudicate partisan gerrymandering claims if they are "armed with a standard that can reliably differentiate unconstitutional from 'constitutional political gerrymandering.'" (quoting *Cromartie*, 526 U.S. at 551, 119 S. Ct. 1545)).

The four-justice majority in *Harper I* did not explain what its standard means or how it could be reliably met because it could not answer basic questions like how much partisan gerrymandering is too much and how can courts consistently and reliably measure partisanship in a redistricting plan. *See Harper I*, 380 N.C. at 384, 868 S.E.2d at 547 ("We do not believe it prudent or necessary to, at this time, identify an exhaustive set of metrics or precise mathematical thresholds which conclusively

demonstrate or disprove the existence of an unconstitutional partisan gerrymander."). Nevertheless, just as the plaintiffs in *Rucho* argued, *see Rucho*, 139 S. Ct. at 2503, the *Harper I* majority indicated that political science metrics could serve as "possible bright-line standards" for measuring partisan fairness. 380 N.C. at 385–86, 868 S.E.2d at 548 (stating that "a [M]ean-[M]edian [D]ifference of 1% or less when analyzed using a representative sample of past elections is presumptively constitutional" and "[i]t is entirely workable to consider the seven percent [E]fficiency [G]ap threshold as a presumption of constitutionality").

Although the *Harper I* majority insisted that "[l]ower courts can and assuredly will work out more concrete and specific standards," *id.* at 384, 868 S.E.2d at 547 (alteration in original) (quoting *Reynolds*, 377 U.S. at 578, 84 S. Ct. at 1390), on remand, the selected tests and corresponding scores—as predicted—proved insufficient as a clear and manageable standard. The General Assembly and the three-judge panel attempted to use the Mean-Median Difference and Efficiency Gap metrics to review the General Assembly's Remedial Plans. But the majority's application of these two seemingly straightforward tests led to inconsistent results.

For example, because the *Harper I* majority indicated that a 1% Mean-Median Difference and a 7% Efficiency Gap could serve as "possible bright-line standards" for measuring partisan fairness, *id.* at 385, 868 S.E.2d at 548, the three-judge panel

relied heavily on the advisors' findings regarding each plan's Mean-Median Difference and Efficiency Gap scores in making its findings of fact on remand. Four out of seven advisors and experts calculated a Mean-Median Difference of less than 1% for both the RHP and the RSP, and all seven advisors and experts calculated an Efficiency Gap of less than 7% for both plans. *Harper II*, 383 N.C. at 153, 881 S.E.2d at 198 (Newby, C.J., dissenting). Accordingly, the three-judge panel held that both plans were "satisfactorily within the statistical ranges set forth in [*Harper I*]."

Similarly to the RSP and RHP, five out of eight advisors and experts found that the RCP had a Mean-Median Difference of less than 1% and an Efficiency Gap of less than 7%. *Id.* at 158, 881 S.E.2d at 201. The three-judge panel, however, concluded without explanation that the RCP was "not satisfactorily within the statistical ranges set forth in [*Harper I*]." A majority of advisors and experts found that all three plans fell within the thresholds set by the *Harper I* majority, yet for some reason—a reason that the three-judge panel did not articulate—only the RCP was unconstitutional. Why was this range of data acceptable for the RSP and RHP, but not for the RCP? The three-judge panel could not explain its inconsistent results because these tests do not provide a clear, judicially manageable standard. Instead, as cautioned by *Rucho*, these tests "ask[ ] judges to predict how a particular districting map will perform in future elections [which] risks basing constitutional

holdings on unstable grounds outside judicial expertise." *Rucho*, 139 S. Ct. at 2503–04.

Just like the three-judge panel, the same four-justice majority from *Harper I* found their own standard unmanageable when they tried to apply it in *Harper II*. For example, in declaring the RSP unconstitutional, the *Harper II* majority believed that "all but one [a]dvisor" calculated the RSP's Mean-Median Difference score as greater than 1%. *Harper II*, 383 N.C. at 121, 881 S.E.2d at 178.[14] According to those four justices, this evidence supported a conclusion that the RSP did not meet the statistical thresholds identified in *Harper I*. *Id.* The same number of advisors, however, found that the RHP scored above the 1% Mean-Median Difference threshold as well. Inexplicably, the four-justice majority in *Harper II* concluded that this fact weighed against a finding that the RSP was constitutional but supported a finding that the RHP was constitutional. Those justices did not say why the same evidence supported contrary conclusions for two different maps.

Similarly, the *Harper II* majority believed that the RHP was constitutional because, collectively, "[t]he [ ] [a]dvisors determined that the RHP yields an average

---

[14] This statement that "all but one [a]dvisor" calculated a Mean-Median Difference greater than 1% is inaccurate. Half of the advisors, not one, calculated the RSP's Mean-Median Difference score as less than 1%.

[E]fficiency [G]ap of about 2.88%, [and] an average [M]ean-[M]edian [D]ifference of about 1.27%." *Id.* at 119−20, 881 S.E.2d at 177. The advisors' average scores for the RSP were very close to their averages for the RHP. For the RSP, the average of the advisors' Efficiency Gap scores was 3.81% and the average of their Mean-Median Difference scores was 1.29%. Thus, both plans had an average Efficiency Gap score that was well below the 7% threshold identified in *Harper I* as presumptively constitutional. *Harper I*, 380 N.C. at 386, 868 S.E.2d at 548. Moreover, the average Mean-Median Difference scores for the RSP and RHP were within two-one-hundredths of a percentage point of each other. The *Harper II* majority did not say why an average Mean-Median Difference of 1.27% weighed in favor of the RHP's constitutionality but an average Mean-Median Difference of 1.29% weighed against the RSP's constitutionality. If there was something significant about that minute difference, the *Harper II* majority did not or could not explain it.[15]

This standard is not "clear" or "judicially manageable" because, during the

---

[15] Both the RHP and RSP were used during the 2022 election cycle. Significantly, under the RHP approved by the four-justice majority in *Harper II*, Republican candidates won 59% of the house races while receiving about 58% of the aggregate statewide vote. *See* North Carolina State Board of Elections, https://er.ncsbe.gov/?election_dt=11/08/2022&county_id=0&office=NCS&contest=0 (last visited Apr. 13, 2023) . Under the RSP, which the *Harper II* majority found unconstitutional, Republican candidates won 60% of the Senate races while receiving about 59% of the aggregate statewide vote. *Id.* It is unclear why this small difference of approximately one percentage point rendered the RHP constitutional and the RSP unconstitutional.

remedial phase of this case, no one—not even the four justices who created it—could apply it to achieve consistent results. *Rucho*, 139 S. Ct. at 2500, 2499 (internal citations and quotations omitted). A constitutional standard must be clear and easily applied by the branch assigned the duty in question. The approach created by the four justices in *Harper I* is neither. *See id.* at 2498, 2499 (noting that a justiciable issue has a "clear, manageable, and politically neutral" standard that can "reliably differentiate" an unconstitutional from a constitutional action (quoting *Vieth*, 541 U.S. at 306–08, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment))). The remedial proceedings in this case demonstrate that neither the criteria created in *Harper I* nor our constitution provide a judicially discoverable or manageable standard to address claims of partisan gerrymandering.

The dissent argues that a court's reviewing a legislatively enacted redistricting statute for claims of partisan gerrymandering is similar to a court's examining a speedy trial claim under the constitution or determining a motion to dismiss criminal charges. This approach, however, contains a fundamental error: it fails to recognize that the constitution assigns the responsibility of redistricting to the General Assembly, not to the courts. It forgets this Court's time-honored standard of review for legislation. The dissent seems to ignore that the General Assembly fulfills its redistricting responsibility by enacting laws. Such legislation is entitled to a

presumption of constitutionality and requires a showing that the legislation violates an express provision of the constitution beyond a reasonable doubt. A court's applying a constitutional provision to particular facts or evaluating the quality of certain evidence is fundamentally different than assessing the constitutionality of a statute through judicial review.

Perhaps the dissent's analogies reveal a more fundamental misunderstanding of a court's role in the redistricting process. The majority in *Harper I* and the dissent here seem to imagine a future where redistricting is a court-managed process: a future where courts endlessly supervise the redistricting process and impose their own standards in the same way that courts assess which criminal trials are speedy enough. As previously explained, however, our framers chose a different approach. They committed redistricting decisions to the wisdom and judgment of the legislative branch. In short, the dissent's analogies further reinforce that there is no judicially discoverable and manageable standard.

A judicially discoverable and manageable standard is necessary for resolving a redistricting issue because such a standard "meaningfully constrain[s] the discretion of the courts[ ] and [ ] win[s] public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking." *Rucho*, 139 S. Ct. at 2500 (first quoting *Vieth*, 541 U.S. at 306−08, 124 S. Ct. at 1793 (Kennedy, J.,

concurring in the judgment); and then quoting *id.* at 291, 124 S. Ct. at 1784 (plurality opinion)). Here the standard set forth in *Harper I* does not constrain the discretion of our courts at all. Instead, it invites limitless judicial involvement because it is so difficult to apply and leads to inconsistent results. Only the four justices who enunciated the *Harper I* standard can say for certain whether their standard has been met. Accordingly, under the *Harper I* framework, every redistricting decision the General Assembly makes would be subject to judicial oversight. This framework does not constrain judicial discretion; rather, it requires that judicial decisionmaking dominate the entire redistricting process.

The approach mandated by *Harper I* would not simply apply to statewide redistricting decisions. At oral argument, counsel for plaintiffs stated that the *Harper I* principles would apply to "all elections" throughout the State because "it stems from a constitutional principle that speaks to all elections." *See* Oral Argument at 49:35, *Harper v. Hall,* (413PA21-2) (Mar. 14, 2023), https://www.youtube.com/watch?v=cp-zlPxuu2I (last visited Apr. 20, 2023). This result would embroil the judiciary in every local election in every county, city, and district across the state.[16] Municipalities,

---

[16] North Carolina has 100 counties, 552 municipalities, numerous "special districts," such as sewer and water districts, and many local boards of education. *See How NC Cities Work*, N.C. League of Municipalities, https://www.nclm.org/advocacy/how-nc-cities-work (last visited Apr. 20, 2023).

counties, local boards of education, and special districts frequently hold hundreds, if not thousands, of local elections. Under the *Harper I* standard, our courts would need to ensure that each of these elections provides each member of the relevant local electorate a sufficient "opportunity to aggregate [his or her] vote with likeminded citizens to elect a governing majority of elected officials who reflect those citizens' views." 380 N.C. at 383, 868 S.E.2d at 546. This process would involve endless litigation that would task our judges with ensuring that the political makeup of every city council, county commission, or local board of education adequately reflected the distribution of Republicans and Democrats in the corresponding locality.

In addition to involving our courts in countless redistricting lawsuits, the *Harper I* standard does not provide any guidance for several potential issues that could arise in these cases. Where the standard does not provide guidance, our courts would have to utilize their own policy preferences. For example, the *Harper I* standard does not tell courts how to account for voters who are affiliated with a political party other than Republican or Democrat or who are not affiliated with a party at all. Our judges would have to address these concerns without any "clear, manageable, [or] politically neutral" guidance. *Rucho*, 139 S. Ct. at 2498 (quoting *Vieth*, 541 U.S. at 306–08, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment)). *Harper I* provides no guidance to courts on these issues. Instead, it

requires courts to use their discretion to "work out" these questions in future litigation. *Harper I*, 380 N.C. at 384, 868 S.E.2d at 547. This type of unmoored discretion is a quintessential characteristic of an unmanageable standard and a nonjusticiable, political question. As the Supreme Court has noted:

> Nor is the goal of fair and effective representation furthered by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by [ ] courts which themselves must make the political decisions necessary to formulate a plan or accept those made by reapportionment plaintiffs who may have wholly different goals from those embodied in the official plan. From the very outset, we recognized that the apportionment task, dealing as it must with fundamental "choices about the nature of representation," *Burns v. Richardson*, 384 U.S. [87,] 92, [1965], is primarily a political and legislative process.

*Gaffney*, 412 U.S. at 749, 93 S. Ct. at 2329.

### C. Policy Decisions

Along with failing to provide a discernible and manageable standard, the approaches created in *Harper I* and *Harper II* involve a host of "policy determination[s] of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217, 82 S. Ct. at 710. Initially, since the state constitution does not mention partisan gerrymandering, the four justices in *Harper I* first had to make a policy decision that the state constitution prohibits a certain level of partisan gerrymandering. Tellingly,

the majority was unable to articulate how much partisan gerrymandering is too much. Essentially, the majority chose to insert into our constitution a requirement for some type of statewide proportionality based on their view of political "fairness." Like the Federal Constitution, however, our constitution does not contain a proportionality requirement. *See Rucho*, 139 S. Ct. at 2499. Instead, the creation of this proportionality requirement was a monumental policy determination made by the *Harper I* majority on its own initiative and equated to a judicial amendment to our constitution.

Then, those four justices determined that our constitution mandates the use of certain political science tests as a measure of this newly created constitutional requirement. As the Supreme Court noted in *Rucho*, however, the definition of "fairness" and how to measure it "poses basic questions that are political, not legal." *Id.* at 2500. For example, the *Harper I* majority stated that political science tests could identify an unconstitutional redistricting plan when "using a representative sample of past elections." 380 N.C. at 386, 868 S.E.2d at 548. In doing so, the four-justice majority in *Harper I* unilaterally determined that past election results can accurately predict how individual voters will vote in the future. But there is no reason to presume this is true because individual voters may vote inconsistently at different times in their life for a variety of reasons. As the Supreme Court noted in *Rucho*,

voters select candidates based on "the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other considerations." 139 S. Ct. at 2503. Each of these factors is different for each election, and it is not clear how past election results can possibly predict how each of these factors may affect individual voters in future elections. The decision to use certain political science tests, which tests to use, which scores are required, and which past election results are most predictive of future electoral behavior involve policy choices that are untethered to the law.

Additionally, in determining that past election results should be used to calculate political science metrics, the *Harper I* majority made the policy determination that past elections are a "better" source of partisan election data than other potential sources. The *Harper I* majority even preferred certain past elections over others. Some might argue, however, that data from past elections does not measure the distribution of voters among various political groups, but that instead, it measures the rate of voter turnout. Instead of using past election results, the *Harper I* majority might have required partisan data from current voter registration information. In theory this data set might be a more accurate representation of how voters might vote in an upcoming election because it reflects current party affiliation

statistics instead of past voter turnout. Selecting between past elections, current voter registration information, or some other data as the "best" source for garnering partisan election data, however, is exactly the sort of non-judicial policy determination warned of in *Rucho*. *See Rucho,* 139 S. Ct. at 2500 ("Deciding among just these different visions of fairness (you can imagine many others) poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral.").

Moreover, simply the decision to use these political science metrics at all requires policy determinations that are not grounded in any constitutional guidance. Because these tests purport to measure "partisan fairness," use of these tests assumes that the chosen past election results are the most relevant factor for predicting future election results and assumes that voters will continue to vote for the same party that they have in the past. This is not true since many other considerations influence a voter's selection of a candidate. For example, representative government is grounded in the concept of geographic representation. Though partisanship may influence a representative's attention to certain political issues, the representative is likely to attend to numerous other issues important to the shared community interests that affect his or her constituents. Indeed there are

countless policy issues, and voters and representatives of the same political party may be likeminded on some issues but not others. The constitution cannot guarantee that a representative will have identical political objectives as a given constituent because that is an impossible requirement. Representatives are individuals with their own beliefs and who pursue their own motivations, often in opposition to other members of their own party. Partisan fairness metrics do not—and cannot—measure or quantify these intangible characteristics. The decision to use these "partisan fairness" tests is a policy determination because it presumes that a voter's or a candidate's partisan affiliation—over all other factors—is the most relevant factor in predicting future election outcomes.

After making the policy decision that political science tests must be used to measure partisan fairness, the *Harper I* majority made yet another policy choice by selecting two particular political science tests—the Mean-Median Difference and Efficiency Gap metrics—to serve as its "bright-line standards." *See Harper I*, 380 N.C. at 385, 868 S.E.2d at 548. The *Harper I* majority was aware of numerous other potential tests; yet it chose these two as the best measures of its definition of fairness. *See id.* at 384, 868 S.E.2d at 547 (recognizing "close-votes, close-seats analysis" and "partisan asymmetry analysis" as other potential fairness metrics).

Furthermore, utilization of these two tests—Mean-Median Difference and Efficiency Gap—requires a host of policy determinations. During the remedial process, the General Assembly and each of the four advisors calculated a Mean-Median Difference and Efficiency Gap score for each of the Remedial Plans. Each calculated slightly different scores, however, because each utilized different redistricting software, partisan election data, and calculation methods. The General Assembly, for example, calculated their scores using Maptitude, a "widely accepted" redistricting software, and a set of twelve statewide elections selected by plaintiffs' expert, Dr. Mattingly (Mattingly Election Set). Notably, neither the Special Masters, the three-judge panel, nor the *Harper II* majority gave any deference to the General Assembly's approach. Each of the advisors selected different redistricting software and elections sets from those chosen by the General Assembly and by each other. In turn, the three-judge panel had to weigh each combination of redistricting software, partisan election data, and calculation methods and determine which was "best." Each of these choices constitutes a policy determination that courts are not equipped to make.

For example, each of the advisors used different redistricting software from the others, and none chose to use Maptitude, as had the General Assembly. Dr. Grofman used Dave's Redistricting App to calculate the Remedial Plans' Mean-Median

Difference and Efficiency Gap scores, and Dr. McGhee used a web-based redistricting software called PlanScore. It is not clear from Dr. Grofman's or Dr. McGhee's reports how these technologies calculate the relevant metrics or whether they do so differently from Maptitude.

Likewise, each of the advisors used different sets of elections as their sources of partisan data to measure the Remedial Plans. Once again, none chose the same set of elections as each other or as the General Assembly. The General Assembly used the Mattingly Election Set, which consisted of twelve statewide elections from 2016 and 2020 chosen by one of plaintiffs' experts. Alternatively, Dr. Jarvis pulled partisan election data from eleven statewide elections. Nine of these elections matched the General Assembly's Mattingly Election Set, but two others did not. Dr. Grofman used "major statewide races [in] 2016–2020" but did not specify how many elections or which ones. Dr. Wang, on the other hand, varied the vote totals in each of these elections "above and below an average [vote total]" in order to "evaluat[e] a range of future [vote total] scenarios that may arise in the coming decade." Dr. Wang also created a composite of vote totals by averaging together three data points: (1) the average two-party vote share of the 2016 and 2020 presidential elections; (2) the average two-party vote share of the 2016 and 2020 United States Senate elections;

and (3) the average two-party vote share of the 2020 elections for Governor and Attorney General.

Additionally, Dr. McGhee took a very "different approach" to calculating the Mean-Median Difference and Efficiency Gap scores. Instead of analyzing which party's candidate would win a proposed new district under prior election contests, Dr. McGhee used PlanScore to "predict" potential partisan outcomes in the future. Dr. McGhee did not explain which elections PlanScore applied to predict future election results, nor did he explain the criteria used by PlanScore to make such predictions. Dr. McGhee also calculated two sets of Mean-Median Difference and Efficiency Gap scores. He calculated one set from a simulated election that assumed that no incumbents ran for reelection and another set from a simulated election that assumed that all incumbents ran for reelection in the proposed district containing their residence. He did not explain why he made these unrealistic assumptions.

As a result, the General Assembly and each advisor calculated different scores for the Remedial Plans, even though they all used the same tests. These varying results prove that the use of two seemingly straightforward fairness metrics actually involves a multitude of policy choices—the kind of policy choices the Supreme Court warned of in *Rucho*. *Rucho*, 139 S. Ct. at 2503−04 ("For all of those reasons, asking judges to predict how a particular districting map will perform in future elections

risks basing constitutional holdings on unstable ground outside judicial expertise."). Because there are "no legal standards discernible in the [c]onstitution" that describe statewide proportionality or that instruct which tests to use or how to calculate them, each party and expert simply calculated his scores in whatever way he saw fit. *Id.* at 2500. Each of these differences illustrates the numerous policy choices that are inherent in applying the metrics selected in *Harper I*.

The standard set forth in *Harper I* is clearly rife with policy determinations that our courts are not equipped to make. *See Baker*, 369 U.S. at 217, 82 S. Ct. at 710. Accordingly, the claims at issue—partisan gerrymandering claims—are nonjusticiable. Moreover, when a court engages in policy determinations like these, it ignores our long-standing standard of review that presumes that acts of the General Assembly are constitutional. *See Berger*, 368 N.C. at 639, 781 S.E.2d at 252. In part, the existence of policy choices indicates that a given issue may be nonjusticiable because the legislative branch—not the judicial branch—is "without question 'the policy-making agency of our government.' " *Rhyne*, 358 N.C. at 169, 594 S.E.2d at 8 (quoting *McMichael*, 243 N.C. at 483, 91 S.E.2d at 234). If a court engages in policy questions that are better suited for the legislative branch, that court usurps the role of the legislature by deferring to its own preferences instead of the discretion of the people's chosen representatives. For this reason, and to protect against this result,

the proper starting point in cases challenging an act of the General Assembly is to assume the General Assembly's policy choices are constitutional unless proved otherwise "beyond any reasonable doubt." *Jenkins v. State Bd. of Elections*, 180 N.C. 169, 172, 104 S.E. 346, 348 (1920).

Thus, all the policy choices made by the four-justice majority in *Harper I* and *Harper II* demonstrate how that majority utterly ignored the well-established presumption of constitutionality. By making these policy choices, the majority replaced the General Assembly's discretionary policymaking authority with its own.[17] This approach flipped the presumption of constitutionality on its head and usurped the role of the General Assembly—the policymaking branch of government.

In sum, a matter is nonjusticiable if the constitution expressly assigns responsibility to one branch of government, or there is not a judicially discoverable or manageable standard by which to decide it, or it requires courts to make policy determinations that are better suited for the policymaking branch of government. All three elements are present in the claims at issue in this case. In addition to the

---

[17] As illustrated here, reliance on the tests set forth in *Harper I* invariably results in redistricting by a judicial redistricting commission made up of court-appointed special masters and advisors, which is not authorized anywhere in the constitution. Notably, the only North Carolina races that did not reflect the statewide voting trends in the 2022 election cycle were North Carolina's congressional races held under the Interim Congressional Plan drawn by the Special Masters and Dr. Grofman.

legislature's plenary power, the constitution expressly assigns the General Assembly redistricting authority subject only to express limitations. The decision to implement a proportionality or political fairness requirement in the constitution without explicit direction from the text inherently requires policy choices and value determinations and does not result in a neutral, manageable standard. Accordingly, plaintiffs' claims of partisan gerrymandering are nonjusticiable, political questions that are "beyond the reach of" our courts. *Rucho*, 139 S. Ct. at 2506.

## V. Declaration of Rights

Like the plaintiffs in *Rucho*, plaintiffs here allege that various constitutional provisions prohibit partisan gerrymandering. In place of the Federal Constitutional provisions invoked in *Rucho,* plaintiffs instead argue that comparable state constitutional provisions expressly limit partisan considerations in redistricting. Plaintiffs are mistaken; these state constitutional provisions do not expressly limit the General Assembly's redistricting authority or address partisan gerrymandering in any way. Where there is no express limitation on the General Assembly's authority in the text of the constitution, this Court presumes an act of the General Assembly is constitutional. *Berger*, 368 N.C. at 639, 781 S.E.2d at 252. As previously stated, courts determine the meaning of a constitutional provision by discerning the intent of its drafters when they adopted it. Courts look first to the plain language of the text,

keeping in mind the historical context of the text's adoption.

Our Declaration of Rights first appeared in the 1776 constitution and provides "a statement of general and abstract principles." *State Constitution* 6. The "abstractness" of the Declaration of Rights has "allowed most of it to survive." *Id.* "Because of their abstractness," many provisions of the Declaration of Rights do not give rise to "justiciable rights." *Id.* at 48; *see, e.g., Dickson I*, 367 N.C. at 575, 766 S.E.2d at 260 (stating that the "Good of the Whole" clause in Article I, Section 2 of the constitution does not provide a "justiciable standard"). Rather, the Declaration of Rights sets out "[b]asic principles" in "general terms," and these basic terms are "given specific application in later articles." *State Constitution* 46. Here two of the provisions cited by plaintiffs—the free elections clause and the freedom of assembly clause—are from our 1776 Declaration of Rights. The other two—the equal protection clause and free speech clause—first appeared in our 1971 constitution.

## A. Free Elections Clause

Article I, Section 10 states that "[a]ll elections shall be free." N.C. Const. art. I, § 10. The clause first appeared in the 1776 constitution, which stated that the "Elections of Members, to serve as Representatives in [the] General Assembly, ought to be free." N.C. Const. of 1776, Declaration of Rights, § VI. The 1868 constitution restated the free elections clause as "[a]ll elections ought to be free." N.C. Const. of

1868, art. I, § 10. In the 1971 constitution, the provision became "[a]ll elections shall be free," N.C. Const. of 1971, art. I, § 10, the form that it retains today. *See* N.C. Const. art. I, § 10. Even though the word "ought" in both the 1776 and 1868 constitutions was changed to "shall" in the 1971 constitution, this change was not a substantive revision to the free elections clause. *See Report of the North Carolina State Constitution Study Commission* 73−75; *see also Smith v. Campbell*, 10 N.C. (3 Hawks) 590, 598 (1825) (declaring that "ought" is synonymous with "shall" and noting that "the word *ought*, in this and other sections of the [1776 constitution], should be understood imperatively").

"Free" means having political and legal rights of a personal nature or enjoying personal freedom, a "free citizen," or having "free will" or choice, as opposed to compulsion, force, constraint, or restraint. *See Free*, Black's Law Dictionary (11th ed. 2019). As a verb, "free" means to liberate or remove a constraint or burden. *Id.* Therefore, giving the provision its plain meaning, "free" means "free from interference or intimidation." *State Constitution* 56.

As with all "[b]asic principles" contained within the Declaration of Rights, we must consider the free elections clause in the context of later articles that give more specific application to Article I, Section 10. *Id.* at 46. The terms "elections" and "free," N.C. Const. art. I, § 10, must be read, for example, in the context of Article VI, entitled

"Suffrage and Eligibility to Office," *see id.* art. VI. The first five sections of Article VI address the right to vote, and the last five sections concern eligibility to hold office. *See id.* Even though "elections shall be free," they are nonetheless restricted in many ways by Article VI. *See, e.g.*, N.C. Const. art. VI, § 1 (requiring a North Carolina voter to be a citizen of the United States and at least 18 years old); *id.* art. VI, § 2(1)–(2) (placing residency requirements on voters); *id.* art. VI, § 2(3) (placing restrictions on felons' voting rights); *id.* art. VI, § 3 (allowing for conditions on voter registration as prescribed by statute); *id.* art. VI, § 5 (requiring that votes by the people be by ballot); *id.* art. VI, § 7 (requiring public officials to take an oath before assuming office); *id.* art. VI, § 8 (outlining certain disqualifications from holding public office); *id.* art. VI, § 9 (prohibiting dual office holding); *id.* art. VI, § 10 (allowing an incumbent to continue in office until a successor is chosen and qualified).

Likewise, even though our 1776 constitution stated that elections were "free," N.C. Const. of 1776, Declaration of Rights, § VI, other provisions limited the scope of that phrase. Notably, "free elections" did not mean that everyone could vote, N.C. Const. of 1776, § VII (limiting the right to vote for senators to "freemen" who were at least twenty-one years old, lived in their county of residence for at least one year, and owned at least fifty acres of land in the same county for the preceding six months); *id.* § VIII (limiting the right to vote for Representatives in the House of Commons to

"freemen" who were twenty-one years old, lived in their county of residence for at least one year, and paid public taxes); that anyone could run for office, *id.* § V (only men who lived in their county of residence for one year and owned at least three hundred acres of land in fee for one year could serve in the Senate); *id.* § VI (only men who lived in their county for at least one year and owned at least one hundred acres of land in fee or for life for at least six months could serve in the House of Representatives); that the people were free to vote for all governmental officers, *see id.* § XIII (empowering the General Assembly to elect Judges of the Supreme Court and the Attorney General); *see also id.* § XV (empowering the General Assembly to elect the Governor); or that the General Assembly was restricted from apportioning itself by dividing existing counties, *id.* §§ II, III (providing each county one senator and two representatives with no limitations on the General Assembly's discretion to create new counties). Clearly, when our framers intended to limit or clarify the scope of "free elections," they did so with express provisions in the text. They did not, however, add anything to our 1776 constitution about partisan gerrymandering.

With respect to the history of the clause, its original intent and inclusion was to protect against abuses of executive power. Our free elections clause was not intended to protect the people from their representatives who frequently face election by the people. Under colonial rule, the English crown appointed the governor for an

indefinite period of time. Charles Lee Raper, *North Carolina: A Study in English Colonial Government* 27 (1904). As a result, the governor "was very naturally disposed," *id.* at 186, to indulge the interests of the crown as opposed to those of "the people whose affairs he was to administer," *id.* at 27.

Additionally, the governor exercised broad executive, judicial, and legislative functions. *See id.* at 28–32. The governor was the "head of the whole administrative machinery of the province," *id.* at 29, and could issue land grants that were legal "even against the king himself," *id.* at 28. He also possessed the authority to create and establish the colony's judicial system with any courts of law and equity that he saw fit and could remove any judge or justice for "sufficient reason." *Id.* at 37. In the legislative realm, the governor possessed a veto power as no law "could be passed without his assent." *Id.* at 35. The governor could call the General Assembly whenever "occasion demanded it," *id.* at 34, and could dissolve it if he saw fit, *id.* at 35. Additionally, as the three-judge panel found, the Royal Governor "could require counties and towns to obtain charters of incorporation prior to being able to elect representatives to the legislature," a power which inserted the governor squarely into the issue of apportionment. Moreover, North Carolina colonists were also accustomed to the English king exercising broad and oppressive executive powers as well. *See Our*

*First Revolution: The Remarkable British Upheaval that Inspired America's Founding Fathers* 167 (2007) [hereinafter *Our First Revolution*].

For these reasons, there were tensions between North Carolina's House of Burgesses and the governor between 1729 and 1776. The two clashed over representation in the General Assembly, *id.* at 90−91, the creation of counties, *id.* at 89−90, 217, the number of members needed to constitute a quorum in the General Assembly, *id.* at 216−18, the appointment of agents to England, *id.* at 206−08, and the appointment of judges, *id.* at 207−09, among other issues. Accordingly, by 1776 North Carolinians were inclined to replace "[o]verbearing colonial governors" with a much weaker executive officer. *Constitutional History* 1764. As the three-judge panel found in its 11 January 2022 Judgment,

> [i]t was the experience of the people of the State of North Carolina that was the most important source for the creation of the 1776 Constitution. By far, the greatest change in the structure of North Carolina's government, other than elimination of the parliament and the Crown, was the vast reduction in the powers of the Governor and the substantial increase in the powers of the General Assembly. These changes were made to make "the governor that figurehead in law which in fact the colonial legislature had long sought to make him."

(Quoting Earle H. Ketcham, *The Sources of the North Carolina Constitution of 1776*, 6 N.C. Hist. Rev. 215, 230 (1929).) Thus, under the 1776 constitution, the General Assembly, not the people, chose the governor, N.C. Const. of 1776, § XV, the members

-102-

of the council of state, *id.* § XVI, the state treasurer, *id.* § XXII, the state secretary, *id.* § XXIV, the attorney general, *id.* § XIII, and all judges, *id.* The governor had no veto power under the 1776 constitution, *see id.* §§ XVII–XX, and "he took no formal role in legislation" because "bills became laws when passed by both houses and signed by the speakers," *Constitutional History* 1764. Additionally, representation in both the Senate and House of Commons was by county. N.C. Const. of 1776, § II (granting each county one senator); *id.* § III (granting each county two representatives and the borough towns of Edenton, New Bern, Wilmington, Salisbury, Hillsborough, and Halifax one representative each). Because the General Assembly had the power to create counties, it also had the power to determine how much representation each portion of the State received. *See, e.g.*, Act of Apr. 8, 1777, An Act for dividing Rowan County, and other Purposes therein mentioned, ch. XIX, 1777 N.C. Sess. Laws 33 (splitting off part of Rowan County to create Burke County).

Our free elections clause was placed in the 1776 Declaration of Rights at the same time as other constitutional provisions that both limited executive power and increased legislative power. Accordingly, any argument that the people added the free elections clause to the 1776 constitution for the purpose of limiting the General Assembly's apportionment authority is inconsistent with this historical context. Instead, the free elections clause was intended to address abuses of executive power

and to protect against interference and intimidation in the voting process. The historical context occurring in England less than one hundred years earlier confirms this meaning of the free elections clause.

Our 1776 Declaration of Rights was modeled in part after the English Bill of Rights, a product of the Glorious Revolution in England in 1688. *See* Hugh Talmage Lefler & Albert Ray Newsome, *The History of a Southern State: North Carolina* 221 (3d ed. 1973). "Today everyone in Britain and the United States is in a sense a residuary beneficiary of the [Glorious] Revolution, although we can at present take this for granted since the issues involved now form the accepted bases of our institutions and societies." J.R. Jones, *The Revolution of 1688 in England* 8 (Jack P. Greene 1972) [hereinafter *Revolution of 1688*].

In the 1670s and 1680s, numerous European countries, including England, were moving towards absolutist monarchies. This trend "seemed the way of the future" throughout the continent. *Our First Revolution* 7. In England, however, conflict swelled between King James II and Parliament as the king took various actions beyond the limits of his authority in order to achieve his legislative agenda.[18]

---

[18] In the modern American context, we might refer to such encroachments as a separation-of-powers violation. *See Berger*, 368 N.C. at 660, 781 S.E.2d at 265 (Newby, J., concurring in part and dissenting in part) ("A violation of separation of powers occurs when one branch of government exercises the power reserved for another branch of government.").

King James II also sought to strengthen the crown by increasing the size of the standing army and continuing regiments that had been raised temporarily for the purpose of opposing rebellions. *Revolution of 1688* 61. James hoped to achieve these goals by creating a compliant Parliament; but by 1685, he realized he could not do so "without first changing the local officials . . . who conducted and effectively controlled the elections, and without changing the franchise in many boroughs."[19] *Our First Revolution* 109−10. King James shifted local authority by adjusting a county's or borough's charter to embed the king's agents and ensure a favorable outcome for the king in the 1685 election. R. H. George, A.M., Ph.D., Fellow of the Royal Hist. Soc'y, Parliamentary Elections and Electioneering in 1685 176−78 (Oct. 8, 1935). In some instances, these adjustments altered who could vote in order to limit the franchise to those most likely to support the king's preferred candidates. *See id.* at 176. In other cases, the adjustments secured for the king's agents the most powerful political offices

---

[19] The process for selecting members of Parliament varied greatly among counties and boroughs during this time. Some counties elected two members and others, one. *Our First Revolution* 55. Some boroughs elected as many as four members, while others only selected two or one. *Id.* There was also disparity between the localities regarding who could vote. "In some, the right to vote was attached to the ownership of certain pieces of property; in some it was limited to officers of the borough corporation; in many, all freemen, that is adult males not bound to service, could vote." *Id.* at 56. Moreover, in the boroughs, the size of the electorate varied widely. *Id.* at 57. Local officials and large landowners "exerted great influence over local elections" in both the counties and boroughs. *Id.* These local differences "were the result of ancient practice" that had "grown up in response to the demands of particular communities and private interests" and "reflected a bewildering variety of local customs." *Id.* at 58.

and gave them "complete control of the situation." *Id.* at 177. Once in power, the agents fully and immediately exercised their influence on behalf of the king. *See id.* at 177, 182, 194–95.

The king's agents used various tactics to manipulate and intimidate local officials, would-be parliamentarians, and local business leaders into supporting the king's plans. *See id.* at 168, 188. They intimidated locals through physical scuffles, threats, demonstrations of force, and beatings, *id.* at 173–75, and coerced businesses to support King James's preferred candidates, some altogether foreign to the locale, by promising gifts, bribes, or patronage in exchange for compliance or by threatening to revoke their license to operate, *id.* at 176–78, 184, 188–90. When the time for election came, local agents of the king who conducted the polling used devious polling practices to open, close, and reopen polling to ensure a certain electoral outcome. *Id.* at 182, 185, 188.

After the elections of 1685, the resulting Parliament was "agreeable" to King James at first, *id.* at 168, but once James presented his legislative agenda, many parliamentary representatives interpreted his goals "as a danger to constitution and liberties," *Revolution of 1688* 62. Accordingly, King James met with opposition and, as a result, he discontinued the session of Parliament in November 1685 so he could unilaterally act to achieve his legislative agenda. *See id.* at 64–66. Once he

discontinued the session of Parliament, he immediately put that agenda into motion. *See id.* at 65–74. He repeatedly postponed the next Parliamentary session in an effort to convince representatives to support his legislative objectives. *See id.* When those efforts proved unsuccessful, *id.*, however, he dissolved Parliament in July 1687 and began a second "campaign to pack" it with members that would support his legislative agenda, *id.* at 128, 131, 151; *see also Our First Revolution* 109. The king's campaign "represented a move to make this power complete, total, and permanent," *Revolution of 1688* 151, and was seen as "an attempt to move England toward 'some form of absolutism,'" *Our First Revolution* 109 (quoting *Revolution of 1688* 11–12).

King James once again set about intimidating and manipulating local officials. *Id.* at 109–10. He sent agents to canvass justices of the peace and other local officials to ascertain whether they would support the king's legislative goals. *Id.* The king used their responses to create his short list of "approved parliamentary candidates," *Revolution of 1688* 135, and to purge local officials who did not agree to support his plans, *see id.* at 132–33. King James dismissed thousands of county and borough officials who gave "unsatisfactory" responses. *Our First Revolution* 110. Additionally, the king's agents ensured that local sheriffs attended borough and county elections to intimidate candidates who were hostile to royal policies. *Revolution of 1688* 147.

King James's tactics of commandeering his subjects' support to ensure an obedient Parliament were entirely unfamiliar to the English people and their representatives.

> Contemporaries were well aware that James was ruling in a new way, a new way heavily modeled on the methods and practices of Louis XIV [of France]. Both James's enemies and his friends marveled at the rapid increase in royal power. James II's "power swelled so fast," recalled the Whig critic Lord Delamere, "that he quickly makes all people to feel the intolerable burden of an unbounded prerogative." Barillon agreed that "the royal authority increases everyday by means of the firm conduct of the King of England." James, all concurred, took his measures from Louis XIV. "The French precedent was too exactly followed," lamented one pamphleteer in 1688. "Our King in imitation of his brother of France," wrote another pamphleteer drawing a similar parallel, "strives to bring all the offices and magistracy of the kingdom, that were legally of the people's choice, to be solely and immediately depending on his absolute will for their being."

Steve Pincus, *1688: The First Modern Revolution* 160−62 (2009). Ultimately, however, King James II's absolutism did not prevail in England. *Our First Revolution* 7. Instead, through the Glorious Revolution and the English Bill of Rights, Englishmen chose an "alternative . . . constitutional monarchy with limits on government[ and] guaranteed rights." *Id.*

The drafters of the English Bill of Rights very clearly intended to address King James's overreaches of executive power and to return authority to Parliament. In the

eyes of the drafters, King James had, among other wrongdoings, subverted "the laws and liberties of th[e] kingdom" by "assuming and exercising [the] power of dispensing with and suspending of laws, and the execution of laws, without consent of [P]arliament." Bill of Rights 1689, 1 W. & M. Sess. 2 c. 2 (Eng.). King James had exercised "pretended power[s]" beyond the limits of his executive authority by levying taxes for "the use of the crown" without the permission of Parliament, "raising and keeping a standing army . . . without the consent of [P]arliament," "violating the freedom of election of members to serve in [P]arliament," prosecuting crimes that were within Parliament's jurisdiction in the "court of King's bench" instead, requiring "excessive bail" to "elude . . . laws made for the liberty of the subjects," and imposing "excessive fines" and "cruel and unusual punishments." *Id.* The drafters of the English Bill of Rights characterized James's actions as "utterly and directly contrary to the known laws and statutes, and freedom of this realm." *Id.*

Accordingly, after James fled England, the people selected new representatives, as was their "right," and the new representatives met "in a full and free representative of th[e] nation." Bill of Rights 1689, 1 W. & M. Sess. 2 c. 2 (Eng.). These new representatives drafted the English Bill of Rights to ensure that their "religion, laws, and liberties" would no longer "be in danger of being subverted" and to "vindicat[e] and assert[ ] their ancient rights and liberties." *Id.* In many instances,

they expressly prohibited the king from acting under "pretended power"—that is, power he never in fact possessed—without the consent of Parliament.[20]

The drafters of the English Bill of Rights not only clarified the limits on the king's executive power; they also memorialized their "ancient rights and liberties"— rights that King James had violated and that, the drafters declared, would no longer be subverted:

> [I]t is the right of the subjects to petition the King, and all commitments and prosecutions for such petitioning are illegal.
>
> . . . .
>
> [E]lection of members of parliament ought to be free.
>
> [T]he freedom of speech, and debates or proceedings in parliament, ought not to be impeached or questioned in any court or place out of parliament.
>
> . . . .
>
> [F]or the redress of all grievances, and for the amending, strengthening, and preserving of the laws, parliaments ought to be held frequently.

---

[20] Specifically, the English Bill of Rights clarified that the king could not "suspend[ ]" or "dispens[e] with" laws, levy money for his own use, or raise a standing army in times of peace without the consent of Parliament. *Id.* The king also could not require excessive bail, impose excessive fines, or inflict cruel and unusual punishments. *Id.*

*Id.* Each of these declarations responded to a specific behavior of King James. The enumeration of the right to petition the king "direct[ly] rebuke[d]" King James's violations of that right. *Our First Revolution* 192. Under King James, many who attempted to petition for exemption from certain laws were instead met with prosecution. *Id.* The demand for frequent meetings of Parliament responded to "James's practice of ruling during most of the 1680s without a Parliament." *Id.* The declaration that elections of Parliamentary members ought to be free had been the "central tenet" and rallying cry of King James II's political opponent, William of Orange, *id.* at 193:

> [A]ccording to the ancient constitution of the English government and immemorial custom, all elections of Parliament men ought to be made with an entire liberty, without any sort of force, or requiring the electors to choose such persons as shall be named unto them, and the persons, thus freely elected, ought to give their opinions freely upon all matters that are brought before them, having the good of the nation ever before their eyes, and following in all things, the dictates of their conscience . . . .

William Henry, Prince of Orange, Declaration of the Prince of Orange (Oct. 10, 1688), *reprinted* in *Our First Revolution* 265. By this declaration, the drafters of the English Bill of Rights sought to secure a "free [P]arliament," a Parliament where the electors could vote for candidates of their choice, and the members, once elected, could legislate according to their own consciences without threat of intimidation or coercion

from the monarch.[21] *Our First Revolution* 230. The Glorious Revolution ensured that Parliamentary elections would be frequent and free from threat and intimidation. For English citizens, the promises of the English Bill of Rights were fulfilled immediately and continuously: British Parliament has met every year since 1689. *Id.* at 231.

In the years leading up to the Glorious Revolution, King James II also sought to strengthen his control in the American colonies by using tactics similar to those he used in England, including the elimination of colonial representative assemblies. *Id.* The Glorious Revolution set the stage for similar conflicts in Carolina. After the Glorious Revolution, all colonies reinstated their representative assemblies but still endured authoritative royal governors. *Id.* This dynamic catalyzed the American Revolution because the British colonists saw themselves as Englishmen. They

---

[21] The historical context of the English Bill of Rights indicates that the English free elections clause was in no way intended to address gerrymandering in apportionment. Rotten Boroughs—boroughs containing very few residents that elected the same number of parliamentary members as heavily populated boroughs—existed in England for at least one hundred years prior to the framing of our constitution. Rotten Boroughs were prevalent in England before, during, and well after the Glorious Revolution and the signing of the English Bill of Rights in 1689. At that time, the English people added a free elections clause to their English Bill of Rights to address threats, coercion, and intimidation in their elections: "Th[e] election of members of Parliament ought to be free." Bill of Rights 1689, 1 W. & M. Sess. 2 c. 2 (Eng.). Nevertheless, the Rotten Boroughs continued to exist in England until at least 1832. As the three-judge panel found, the continued existence of these Rotten Boroughs at the time of the signing of the English Bill of Rights and their continued use thereafter suggests that the English people did not intend to address apportionment issues with their free elections clause.

understood that the English Bill of Rights protected them from overreaches of

executive power and secured for them a right to representative government and free

elections. *Id.* at 231−32.

Accordingly, Carolina colonists saw their Royal Governors' abuses of executive

power as exercises of the same "pretended power," Bill of Rights 1689, 1 W. & M.

Sess. 2 c. 2 (Eng.), that "had been stripped from" the king in the English Bill of Rights,

*Our First Revolution* 232. Thus, when the colonists rebelled and our framers drafted

the 1776 Declaration of Rights, "they were seeking to preserve in their own states

what they believed the [Glorious] Revolution had established."[22] *See id.* This

historical context produced our free elections clause and freedom of assembly clause.

---

[22] *Compare* Bill of Rights 1689, 1 W. & M., 2d sess., c. 2 ("That the pretended power of suspending of [and dispensing with] the laws, or the execution of laws, by regal authority, without consent of parliament, is illegal."), *and id.* ("That levying money for or to the use of the crown . . . without grant of parliament . . . is illegal."), *and id.* ("That the subjects which are protestants, may have arms for their defence suitable to their conditions, and as allowed by law."), *and id.* ("That election of members of parliament ought to be free."), *and id.* ("That excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted."), *and id.* ("And that for redress of all grievances, and for the amending, strengthening, and preserving of the laws, parliaments ought to be held frequently."), *with* N.C. Const. of 1776, Declaration of Rights, § V ("That all Powers of Suspending Laws, or the Execution of Laws, by any Authority, without Consent of the Representatives of the People, is injurious to their rights, and ought not to be exercised."), *and id.* § XVI ("That the People of this State ought not to be taxed . . . without the Consent of themselves, or their Representatives in General Assembly, freely given."), *and id.* § XVII ("That the People have a right to bear Arms, for the Defence of the State . . . ."), *and id.* § VI ("That Elections of Members, to serve as Representatives in General Assembly, ought to be free."), *and id.* § X ("That excessive Bail should not be required, nor excessive Fines imposed,

Given the historical context of the English Bill of Rights, our framers did not intend the adoption of the free elections clause to limit the General Assembly's redistricting authority or to address apportionment at all. As previously noted, North Carolina experienced issues with apportionment both before and well after the drafters first placed the free elections clause in the 1776 Declaration of Rights. These early issues continued until 1835 when the people held a constitutional convention to, among other things, address the apportionment issues. *State Constitution* 13. At that time, they made various changes to their system of representation, *see generally* N.C. Const. of 1776, amends. of 1835, but they did not alter the free elections clause, *see id.* Thus, the historical context of our free elections clause—both colonial and English—indicates that "free elections" refers to elections free from interference and intimidation.

Although the free elections clause has been a part of our constitution since 1776, this Court has rarely been called upon to interpret this provision because its language is plain: it protects voters from interference and intimidation in the voting process. We addressed the merits of a free election claim in *Clark v. Meyland*, 261

nor cruel or unusual punishments inflicted."), *and id.* § XX ("That, for redress of Grievances, and for amending and strengthening the Laws, Elections ought to be often held.").

N.C. 140, 134 S.E.2d 168 (1964). The plaintiff in *Clark* challenged a statute that required voters wishing to change their party affiliation to first take an oath that included the following language: "I will support the nominees of [the] party to which I am now changing my affiliation in the next election and the said party nominees thereafter until I shall, in good faith, change my party affiliation in the manner provided by law . . . ." *Id.* at 141, 134 S.E.2d at 169. We held that a portion of the statute requiring certain provisions of the oath was invalid, explaining that:

> Any elector who offers sufficient proof of his intent, in good faith, to change his party affiliation cannot be required to bind himself by an oath, the violation of which, if not sufficient to brand him as a felon, would certainly be sufficient to operate as a *deterrant* [sic] *to his exercising a free choice among available candidates at the election*— even by casting a write-in ballot. His membership in his party and his right to participate in its primary may not be denied because he refuses to take an oath to vote in a manner which violates the constitutional provision that elections shall be free. Article I, Sec. 10, Constitution of North Carolina.
>
> When a member of either party desires to change his party affiliation, the good faith of the change is a proper subject of inquiry and challenge. Without the objectionable part of the oath, ample provision is made by which the officials may strike from the registration books the names of those who are not in good faith members of the party. The oath to support future candidates violates the principle of *freedom of conscience*. It denies a free ballot—*one that is cast according to the dictates of the voter's judgment*. We must hold that the Legislature is without power to shackle a voter's conscience by requiring the objectionable part of

> the oath as a price to pay for his right to participate in his
> party's primary.

*Id.* at 142–43, 134 S.E.2d at 170 (emphases added) (citing N.C. Const. of 1868, art. I, § 10). Thus, we interpreted "free" to mean freedom to vote one's conscience without restriction by prior commitment. Nonetheless, an inquiry into the sincerity of one's desire to change parties did not violate the clause.

We also considered the free elections clause in *State ex rel. Swaringen v. Poplin*, 211 N.C. 700, 191 S.E. 746 (1937), in which the plaintiff, a candidate who ostensibly lost an election for the office of county commissioner of Wilkes County, brought a quo warranto action, alleging that the Wilkes County Board of Elections fraudulently deprived him of the office by altering the vote count. *Id.* at 700–01, 191 S.E. at 746. In response, the defendant argued the plaintiff's complaint failed to state facts sufficient to constitute a cause of action. *Id.* at 701, 191 S.E. at 746. After the trial court rejected the defendant's argument, the defendant appealed, arguing that it was the sole duty of the County Board of Elections, rather than the judiciary, "to judicially determine the result of the election from the report and tabulation made by the precinct officials." *Id.* at 701, 191 S.E. at 747. In affirming the trial court's decision, we provided the following rationale:

> One of the chief purposes of *quo warranto* or an information
> in the nature of *quo warranto* is to try the title to an office.
> This is the method prescribed for settling a controversy

between rival claimants when one is in possession of the office under a claim of right and in the exercise of official functions or the performance of official duties; and the jurisdiction of the Superior Court in this behalf has never been abdicated in favor of the board of county canvassers or other officers of an election.

In the present case fraud is alleged. The courts are open to decide this issue in the present action. In Art. I, sec. 10, of the Const. of North Carolina, we find it written: "All elections ought to be free." Our government is founded on the consent of the governed. A free ballot and a fair count must be held inviolable to preserve our democracy. In some countries the bullet settles disputes, in our country the ballot.

*Id.* at 702, 191 S.E. at 747 (internal citations omitted) (quoting N.C. Const. of 1868, art. I, § 10). We interpreted "free," therefore, to mean the right to vote according to one's conscience and to have that vote accurately counted.

Based upon its plain meaning as confirmed by its history and by this Court's precedent, the free elections clause means a voter is deprived of a "free" election if (1) a law prevents a voter from voting according to one's judgment, *see Clark*, 261 N.C. at 142, 134 S.E.2d at 170, or (2) the votes are not accurately counted, *see Poplin*, 211 N.C. at 702, 191 S.E. at 747. Thus, we hold that the meaning of the free elections clause, based on its plain language, historical context, and this Court's precedent, is that voters are free to vote according to their consciences without interference or

intimidation. Plaintiffs' partisan gerrymandering claims do not implicate this provision.

## B. Equal Protection Clause

Article I, Section 19 provides, in relevant part, that "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. The equal protection clause was added as part of the ratification of the 1971 constitution. *State Constitution* 68. The addition of the equal protection clause, while a substantive change, was not meant to "bring about any fundamental change" to the power of the General Assembly. *Report of the North Carolina State Constitution Study Commission* 10.

Our understanding of the equal protection clause has been informed by federal case law interpreting the Federal Equal Protection Clause. *See Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 10–11, 269 S.E.2d 142, 149 (1980) (relying almost entirely on Federal Equal Protection jurisprudence in analyzing a claim under Article I, Section 19).

Here plaintiffs present the same arguments under our equal protection clause as were made under the Federal Equal Protection Clause in *Rucho. Compare* Verified Compl. for Declaratory J. and Injunctive Relief ¶ 189, *Harper I*, No. 21 CVS 015426,

2021 WL 6884973 (N.C. Super. Ct. Wake County Dec. 16, 2021) ("Partisan gerrymandering violates the State's obligation to provide all persons with equal protection of the law . . . by seeking to diminish the electoral power of supporters of a disfavored party."), *with Rucho,* 139 S. Ct. at 2492 ("[Plaintiffs] alleged that the Plan violated the Equal Protection Clause of the Fourteenth Amendment by intentionally diluting the electoral strength of Democratic voters."). In *Rucho* the Supreme Court determined that the plaintiffs' partisan gerrymandering claims did not implicate the Federal Equal Protection Clause. *See* 139 S. Ct. at 2502–04. As the Supreme Court observed, "judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Id.* at 2507. We find this analysis persuasive. Under our constitution, a claim of vote dilution allegedly based on one's affiliation with a political party does not raise a claim under our equal protection clause.

This Court has previously explained that "[t]he right to vote *on equal terms* is a fundamental right." *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990) (emphasis added) (citations omitted). Several of our cases indicate that the fundamental right to vote on equal terms simply means that each vote must have the same weight. This historic understanding of equal

voting power is stated in Article II, Sections 3(1) and 5(1), requiring that legislators "represent, as nearly as may be, an equal number of inhabitants." N.C. Const. art. II, §§ 3(1), 5(1). This is a simple mathematical calculation. *See Rucho*, 139 S. Ct. at 2501. Party affiliation, however, is not mentioned in Article II, Sections 3 or 5.

Early on in its history, North Carolina moved towards representation roughly based on population, first in the House, *see* N.C. Const. of 1776, amends. of 1835, art. I, § 2, and later in the Senate, *see* N.C. Const. of 1868, art. II, § 5. It was not until after *Baker v. Carr* instituted the one-person, one-vote requirement based on the Federal Equal Protection Clause, *see Baker*, 369 U.S. at 210, 82 S. Ct. at 706, however, that apportionment became a strictly population-based system in North Carolina, *see* N.C. Const. of 1868, amends. of 1967, art. II, § 5. The 1971 North Carolina Constitution incorporated these concepts into the text of Article II, *see* N.C. Const. of 1971, art. II, §§ 3(1), 5(1), and our courts have applied these concepts in interpretating our equal protection clause in the context of apportionment, *see* N.C. Const. art. II, § 19. Several cases arising after this chronological progression are helpful when reviewing equal protection claims arising in the context of apportionment.

This Court's decision in *Northampton County* illustrates the concept of numerically equal voting strength. In that case, a certain drainage district lay partly

in Northampton County and partly in Hertford County. 326 N.C. at 744, 392 S.E.2d

at 354. By statute, the Clerk of Superior Court in Northampton County—who was

elected only by Northampton County residents—appointed all the drainage district

commissioners. *Id.* at 744, 392 S.E.2d at 354. In a suit brought by the drainage

district to recover assessments made against the landowners in Hertford County, this

Court held that the electoral scheme of this drainage district violated the equal

protection clause of Article I, Section 19 because the Hertford County landowners

could not vote for the elected official who appointed all the commissioners, but the

landowners in Northampton County could. *Id.* at 746, 392 S.E.2d. at 355. This

arrangement infringed on the Hertford County landowners' fundamental right "to

vote on equal terms" because some members of the district could vote for their elected

official, and some could not. *See id.* at 746, 392 S.E.2d at 355.

Likewise, in *Blankenship v. Bartlett*, the plaintiffs demonstrated a "gross

disparity in voting power between similarly situated residents of Wake County" by

making the following showing:

> In Superior Court District 10A, the voters elect one judge
> for every 32,199 residents, while the voters of the other
> districts in Wake County, 10B, 10C, and 10D, elect one
> judge per every 140,747 residents, 158,812 residents, and
> 123,143 residents, respectively. Thus, residents of District
> 10A have a voting power roughly five times greater than
> residents of District 10C, four and a half times greater than

residents of District 10B, and four times greater than residents of District 10D.

363 N.C. 518, 527, 681 S.E.2d 759, 766 (2009). We explained that the above showing implicated the fundamental "right to vote on equal terms in representative elections—a one-person, one-vote standard," *id.* at 522, 681 S.E.2d at 762–63, and we thus employed a heightened scrutiny analysis, *id.* at 523, 681 S.E.2d at 763.

Similarly, in *Stephenson I* this Court addressed what the fundamental right to vote on equal terms means when considering the use of multi-member and single-member districts. *See* 355 N.C. at 378, 562 S.E.2d at 393. In that case we first found that the challenged legislative plans—the 2001 Plans—violated the WCP. *Id.* at 371, 562 S.E.2d at 389–90. Out of respect for the legislative branch, we then sought to give the General Assembly detailed criteria for fashioning remedial maps. The plaintiffs "contend[ed] that remedial compliance with the WCP requires the formation of multi-member legislative districts in which all legislators would be elected 'at-large.' " *Id.* at 376, 562 S.E.2d at 392. As such, we "turn[ed] to address the constitutional propriety of such districts." *Id.* at 377, 562 S.E.2d at 393. In doing so, we noted that "[t]he classification of voters into both single-member and multi-member districts . . . necessarily implicates the fundamental right to vote on equal terms." *Id.* at 378, 562 S.E.2d at 393. We explained that

> voters in single-member legislative districts, surrounded by multi-member districts, suffer electoral disadvantage because, at a minimum, *they are not permitted to vote for the same number of legislators* and may not enjoy the same representational influence or "clout" as voters represented by a slate of legislators within a multi-member district.

*Id.* at 377, 562 S.E.2d at 393 (emphasis added). Thus, we concluded that the "use of both single-member and multi-member districts within the same redistricting plan" infringes upon "the fundamental right of each North Carolinian to substantially equal voting power." *Id.* at 379, 562 S.E.2d at 394–95. In other words, "substantially equal voting power" meant that each legislator should represent a similar number of constituents, which was impossible when using both single-member and multi-member districts in the same map. This is an application of the one-person, one-vote concept.

In *Harper I*, however, four justices expanded the scope of "substantially equal voting power" from mathematically equal representation under the one-person, one-vote concept and misconstrued it to create an "opportunity to aggregate one's vote with likeminded citizens" based on partisan affiliation. 380 N.C. at 378, 868 S.E.2d at 544. This idea is not supported by our precedent.

*Stephenson I* recognized that partisan considerations are permitted in the redistricting process. 355 N.C. at 371, 562 S.E.2d at 390 ("The General Assembly may consider partisan advantage and incumbency protection in the application of its

discretionary redistricting decisions, but it must do so in conformity with the State Constitution." (internal citation omitted)); *Rucho*, 139 S. Ct. at 2497 (recognizing that legislators must be permitted to take some "partisan interests into account when drawing district lines"). The ultimate holding of our *Stephenson I* decision was that the WCP of Article II, Sections 3 and 5 must be enforced to the extent compatible with the VRA and one-person, one-vote principles. Thus, when understanding *Stephenson I* in context, it becomes clear that the Court's statement—that the General Assembly's practice of partisan gerrymandering must still conform with the constitution—refers to the express objective limitations present in Article II, Sections 3 and 5, not to a prohibition or limitation on partisan considerations.

Unlike the classifications in *Northampton County*, *Blankenship*, and *Stephenson I*, partisan gerrymandering has no impact upon the right to vote on equal terms under the one-person, one-vote standard. In other words, an effort to gerrymander districts to favor a political party does not alter individual *voting power* so long as each voter is permitted to (1) vote for the same number of representatives as voters in other districts, and (2) vote as part of a constituency that is similar in size to that of the other districts. Therefore, following the guidance of the Supreme Court in *Rucho*, we hold that a partisan gerrymandering claim does not trigger review under our equal protection clause. *See Gaffney*, 412 U.S. at 745 (holding that certain

claims were "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State"). Claims that a redistricting plan diminishes the electoral power of members of a particular political party do not violate Article I, Section 19 of our constitution.

### C.  Free Speech and Freedom of Assembly Clauses

The freedom of assembly and free speech clauses are found in Article I, Section 12 and Article I, Section 14 respectively. These sections provide as follows:

> **Sec. 12. Right of assembly and petition.**
>
> The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances; but secret political societies are dangerous to the liberties of a free people and shall not be tolerated.
>
> **Sec. 14. Freedom of speech and press.**
>
> Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse.

N.C. Const. art. I, §§ 12, 14. Like the equal protection clause, the free speech clause was added to our Declaration of Rights as part of the 1971 constitution. N.C. Const. of 1971, art. I, § 14. The addition of the free speech clause, while a substantive change, was not meant to "bring about any fundamental change" to the power of the General

Assembly. *Report of the North Carolina State Constitution Study Commission* 10. Our understanding of the free speech clause is informed by federal interpretation of the similar provision in the First Amendment to the Federal Constitution. *See State v. Petersilie*, 334 N.C. 169, 183, 432 S.E.2d 832, 840 (1993) (adopting "doctrines developed by the United States Supreme Court in interpreting the Free Speech Clause of the United States Constitution . . . for purposes of applying the Free Speech Clause of the North Carolina Constitution").

The freedom of assembly clause first appeared in the 1776 Declaration of Rights and provided "that the People have a right to assemble together, to consult for their common good, to instruct their Representatives, and to apply to the Legislature, for Redress of Grievances." N.C. Const. of 1776, Declaration of Rights, § XVIII. The freedom of assembly clause was modified by the 1868 constitution by deleting "that," the first word of the clause. N.C. Const. of 1868, art. I, § 25. In the 1971 constitution, the freedom of assembly clause was re-written to the form it has today. N.C. Const. of 1971, art. I, § 12. As with the 1971 changes to the free speech clause, the most recent change to the freedom of assembly clause was not meant as a substantive change, nor was it meant to "bring about any fundamental change" to the power of the General Assembly. *Report of the North Carolina State Constitution Study Commission* 10.

The right to free speech is violated when "restrictions are placed on the espousal of a particular viewpoint," *Petersilie,* 334 N.C. at 183, 432 S.E.2d at 840, or where retaliation motivated by the content of an individual's speech would deter a person of reasonable firmness from engaging in speech or association, *Toomer v. Garrett,* 155 N.C. App. 462, 478, 574 S.E.2d 76, 89 (2002) (explaining that a viable retaliation claim requires a showing "that the plaintiff . . . suffer[ed] an injury that would likely chill a person of ordinary firmness from continuing to engage" in a "constitutionally protected activity," including First Amendment activities), *appeal dismissed and disc. rev. denied,* 357 N.C. 66, 579 S.E.2d 576 (2003); *see Evans v. Cowan,* 132 N.C. App. 1, 11, 510 S.E.2d 170, 177 (1999) (determining "there was no forecast of evidence" to support a retaliation claim).

It is apparent that a person of ordinary firmness would not refrain from expressing a political view out of fear that the General Assembly will place his residence in a district that will likely elect a member of the opposing party. *See Toomer*, 155 N.C. App. at 477–78, 574 S.E.2d at 89. It is plausible that an individual may be less inclined to voice his political opinions if he is unable to find someone who will listen. Article I, Sections 12 and 14, however, guarantee the rights to speak and assemble without government intervention, rather than the right to be provided a receptive audience. *See Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 286,

104 S. Ct. 1058, 1066 (1984) (stating that individuals "have no constitutional right as members of the public to a government audience for their policy views"); *Johnson v. Wisc. Elections Comm'n*, 967 N.W.2d 469, 487 (Wis. 2021) ("Associational rights guarantee the freedom to *participate in* the political process; they do not guarantee a favorable outcome." (emphasis added)).

Partisan gerrymandering plainly does not place any restriction upon the espousal of a particular viewpoint. Rather, redistricting enactments in North Carolina are subject to the typical policymaking customs of open debate and compromise. *See Berger*, 368 N.C. at 653, 781 S.E.2d at 261 (Newby, J., concurring in part and dissenting in part). As such, opponents of a redistricting plan are free to voice their opposition.

Article I, Sections 12 and 14 do not limit the General Assembly's presumptively constitutional authority to engage in partisan gerrymandering. As with the prior Declaration of Rights clauses, there is nothing in the history of the clauses or the applicable case law that supports plaintiffs' expanded interpretation of them. This Court and the Court of Appeals have interpreted speech and assembly rights in alignment with federal case law under the First Amendment. *See Petersilie*, 334 N.C. at 184, 432 S.E.2d at 841; *Feltman v. City of Wilson*, 238 N.C. App. 246, 252–53, 767 S.E.2d 615, 620 (2014); *State v. Shackelford*, 264 N.C. App. 542, 552, 825 S.E.2d 689,

696 (2019). As discussed at length in *Rucho*, the Supreme Court of the United States found no manageable standards for assessing partisan considerations in redistricting despite the existence of similar express protections for speech and assembly rights in the Federal Constitution. *Rucho*, 139 S. Ct. at 2505–07.

In summary, none of the constitutional provisions cited by plaintiffs prohibit the practice of partisan gerrymandering. Each provision must be read in harmony with the more specific provisions that outline the practical workings for governance. Notably, Article II, Sections 3 and 5 outline the practical workings of the General Assembly's redistricting authority. These provisions contain four express limitations on the General Assembly's otherwise explicit redistricting authority, none of which address partisan gerrymandering.

## VI. *Stephenson I* and the VRA

Because we are overturning *Harper I*, we must briefly revisit another of Common Cause's claims that was based on a holding in that opinion. In its 11 January 2022 Judgment, the three-judge panel concluded that although *Stephenson I* requires the General Assembly to draw VRA districts prior to non-VRA districts, it does not require the General Assembly to conduct an RPV analysis "prior to making a decision as to whether VRA districts are necessary." Accordingly, the three-judge panel dismissed this claim with prejudice. In *Harper I* the four-justice majority

reversed this portion of the 11 January 2022 Judgment and held that our constitution and *Stephenson I* require the General Assembly to conduct an RPV analysis before drawing any legislative districts. *See Harper I*, 380 N.C. at 401, 868 S.E.2d at 558. Accordingly, on remand, the General Assembly performed an RPV analysis, and the three-judge panel found that this analysis satisfied this Court's directive from *Harper I*. Common Cause challenged this finding of fact in its appeal from the three-judge panel's remedial order.

The holding from *Harper I* that required the General Assembly to perform an RPV analysis before drawing any legislative districts was based on an inaccurate reading of *Stephenson I*. In *Stephenson I* we explained that "Section 2 of the VRA generally provides that states or their political subdivisions may not impose any voting qualification or prerequisite that impairs or dilutes, on account of race or color, a citizen's opportunity to participate in the political process and to elect representatives of his or her choice." 355 N.C. at 363, 562 S.E.2d at 385 (first citing 42 U.S.C. §§ 1973a, 1973b (1994); and then citing *Gingles*, 478 U.S. at 43, 106 S. Ct. at 2762). We then stated that "[o]n remand, to ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Id.* at 383, 562 S.E.2d at 396−97. We provided this approach to alleviate the tension between the WCP and the VRA because the legislative

defendants in *Stephenson I* argued that "the constitutional provisions mandating that counties not be divided are wholly unenforceable because of the requirements of the [VRA]." *Id.* at 361, 562 S.E.2d at 383–84. Thus, the Court in *Stephenson I* was not forcing the legislative defendants to conduct an RPV analysis. Rather, the Court was merely stating that if Section 2 requires VRA districts, those districts must be drawn first so that the remaining non-VRA districts can be drawn in compliance with the WCP.

Because the North Carolina Constitution does not require the General Assembly to conduct an RPV analysis before enacting a redistricting plan, Common Cause's arguments regarding the General Assembly's RPV analysis are inapposite. Plaintiffs essentially ask this Court to "impose a judicially-mandated preclearance requirement" where no such requirement exists in our constitution. If Common Cause believed that the General Assembly was incorrect that no VRA districts were required, it could have brought a claim under Section 2 of the VRA. Common Cause did not bring such a claim in this case. Accordingly, the holding in *Harper I* that required the General Assembly to undertake an RPV analysis is overruled, and the

portion of the 11 January 2022 Judgment dismissing Common Cause's declaratory judgment claim with prejudice is affirmed. [23]

## VII. Petitions for Rehearing Under Rule 31 and Stare Decisis

Rule 31 of the North Carolina Rules of Appellate Procedure states that

> [a] petition for rehearing may be filed in a civil action within fifteen days after the mandate of the court has been issued. The petition shall state with particularity the points of fact or law that, in the opinion of the petitioner, the court has overlooked or misapprehended and shall contain such argument in support of the petition as petitioner desires to present.

N.C. R. App. P. 31(a). This rule contemplates that, at times, this Court may need to revisit a recent decision to correct a mistake. We have never hesitated to rehear a case when it is clear that the Court "overlooked or misapprehended" the law. *See, e.g.*, *Jones v. City of Durham*, 360 N.C. 367, 367, 629 S.E.2d 611, 611 (2006) (order granting rehearing); *Smith Chapel Baptist Church v. City of Durham* (*Smith Chapel I*), 349 N.C. 242, 242, 514 S.E.2d 272, 272 (1998) (same); *Whitford v. Gaskill*, 345 N.C. 762, 762, 489 S.E.2d 177, 178 (1997) (same); *Clay v. Emp. Sec. Comm'n*, 340 N.C. 83, 87, 458 S.E.2d 198, 199 (1995) (same); *Alford v. Shaw*, 318 N.C. 703, 703, 351 S.E.2d

---

[23] While we do not specifically address the issue of standing here, we note this Court has addressed the test for standing in *Community Success Initiative v. Moore*, ___ N.C. ___, ___ S.E.2d. ___ (2023), issued concurrently with this opinion. We overrule the analysis of standing set forth in *Harper I* to the extent it conflicts with the decision in *Community Success. See Harper I*, 380 N.C. at 353–55, 868 S.E.2d at 528–29.

738, 738 (1987) (same); *Lowe v. Tarble*, 313 N.C. 176, 176, 326 S.E.2d 32, 32 (1985) (same); *Hous., Inc. v. Weaver*, 304 N.C. 588, 588, 289 S.E.2d 832, 832 (1981) (same). Several of these rehearings resulted in new opinions that differed substantially from the Court's initial opinion in the case. *See, e.g.*, *Jones v. City of Durham*, 361 N.C. 144, 146, 638 S.E.2d 202, 202 (2006) (per curiam); *Smith Chapel Baptist Church v. City of Durham* (*Smith Chapel II*), 350 N.C. 805, 806, 517 S.E.2d 874, 876 (1999); *Clay v. Emp. Sec. Comm'n*, 340 N.C. 83–84, 457 S.E.2d 725, 726 (1995); *Alford v. Shaw*, 320 N.C. 465, 467, 358 S.E.2d 323, 324 (1987) (on rehearing, withdrawing the Court's original opinion and reviewing the case "de novo"). It is not uncommon that rehearing of a case coincides with a change in personnel on the Court who provide a fresh legal perspective. *See, e.g.*, *Smith Chapel II*, 350 N.C. at 807, 821, 517 S.E.2d at 876, 883–84. Our decision today simply adheres to these principles. *See Sidney Spitzer & Co. v. Comm'rs of Franklin Cnty.*, 188 N.C. 30, 32, 123 S.E. 636, 638 (1924) ("There should be no blind adherence to a precedent which, if it is wrong, should be corrected at the first practical moment." (internal citations omitted)). A petition for rehearing is particularly appropriate here because the four-justice majority in *Harper I* expedited the consideration of this matter over the strong dissent of the other three justices on this Court. *See Harper v. Hall*, 382 N.C. 314, 316, 874 S.E.2d 902, 904–05 (2022) (order granting motion to expedite hearing and consideration). There was no

"jurisprudential reason" to force an expedited consideration of this case. *Id.* at 317, 874 S.E.2d at 904 (Barringer, J., dissenting) ("Given the absence of any identifiable jurisprudential reason, the majority's decision today appears to reflect deeper partisan biases that have no place in a judiciary dedicated to the impartial administration of justice and the rule of law.").

The "doctrine of *stare decisis . . .* proclaims, in effect, that where a principle of law has become settled by a series of decisions, it is binding on the courts and should be followed in similar cases." *State v. Ballance*, 229 N.C. 764, 767, 51 S.E.2d 731, 733 (1949) (internal citations omitted). This doctrine reflects the idea that "the law must be characterized by stability," and courts should not change the law to reach particular results. *Id.* at 767, 51 S.E.2d at 733. When adhering to the doctrine would "perpetuate error," however, this Court has never hesitated to refuse to apply it. *Sidney Spitzer & Co.*, 188 N.C. at 32, 123 S.E. at 638 ("There is no virtue in sinning against light or in persisting in palpable error, for nothing is settled until it is settled right."); *see also Mial v. Ellington*, 134 N.C. 131, 139, 46 S.E. 961, 964 (1903) (noting the necessity of overturning a prior decision of this Court where it stood "without support in reason" and was "opposed to the uniform, unbroken current of authority" in the state); *Ballance*, 229 N.C. at 767, 51 S.E.2d at 733 ("[S]tare decisis will not be applied in any event to preserve and perpetuate error and grievous wrong."); *Rabon*

*v. Rowan Mem'l Hosp., Inc.*, 269 N.C. 1, 29, 152 S.E.2d 485, 502 (1967) (Lake, J., dissenting) (conceding that "a proper exercise of [judicial] power . . . is the result of its determination that its former decision was an erroneous statement of the law when the decision was rendered"); *Wiles v. Welparnel Constr. Co.*, 295 N.C. 81, 85, 243 S.E.2d 756, 758 (1978) ("[S]*tare decisis* will not be applied when it results in perpetuation of error or grievous wrong, since the compulsion of the doctrine is . . . moral and intellectual, rather than arbitrary and inflexible." (internal citation omitted)).

Sometimes this Court explicitly overrules prior decisions. *See, e.g.*, *State v. Elder*, 383 N.C. 578, 603, 881 S.E.2d 227, 245 (2022) (overruling a portion of this Court's prior decision in *State v. Hall*, 305 N.C. 77, 286 S.E.2d 552 (1982)); *Cedarbrook Residential Ctr., Inc. v. N.C. DHHS*, 383 N.C. 31, 56−57, 881 S.E.2d 558, 576−77 (2022) (overruling *Nanny's Korner Day Care Ctr., Inc. v. N.C. DHHS*, 264 N.C. App. 71, 825 S.E.2d 34 (2019)); *State v. Kelliher*, 381 N.C. 558, 581−83, 873 S.E.2d 366, 383−84 (2022) (abrogating *State v. Green*, 348 N.C. 588, 502 S.E.2d 819 (1998)); *Connette ex rel. Gullatte v. Charlotte-Mecklenburg Hosp. Auth.*, 382 N.C. 57, 71−72, 876 S.E.2d 420, 430−31 (2022) (reversing, with three votes, which is less than a majority of this Court, the ninety-year-old opinion in *Byrd v. Marion Gen. Hosp.*, 202 N.C. 337, 162 S.E. 738 (1932)). Other times this Court overrules prior decisions

by implication. *See, e.g., McAuley v. N.C. A&T State Univ.*, 383 N.C. 343, 355, 881 S.E.2d 141, 149 (2022) (Barringer, J., dissenting) (noting that the majority opinion "refuse[d] to follow . . . [ninety] years of this Court's precedent established in *Wray v. Carolina Cotton & Woolen Mills Co.*, 205 N.C. 782, 783, 172 S.E. 487, 488 (1934)); *State v. Styles*, 362 N.C. 412, 415−16, 665 S.E.2d 438, 440−41 (2008) (effectively abrogating *State v. Ivey*, 360 N.C. 562, 633 S.E.2d 459 (2006)).

As demonstrated, this Court has not hesitated to revisit and overrule prior decisions that are erroneous. Regardless, *Harper I* does not meet any criteria for adhering to *stare decisis*—it is neither long-standing nor has it been relied upon in other cases. *See Ballance*, 229 N.C. at 767, 51 S.E.2d at 733. *Harper I* was wrongly decided and, as a result, *Harper II* was also wrongly decided. Legislative Defendants filed a timely petition under Rule 31 of the Rules of Appellate Procedure, and *Harper II* was properly reheard. *Harper I* is overruled, and *Harper II* is withdrawn and superseded by this opinion.

## VIII. Remedy

In their petition for rehearing, Legislative Defendants asked that if this Court concludes that plaintiffs' partisan gerrymandering claims are nonjusticiable, that the Court also address the appropriate remedy—in other words, what set of maps, if any, were constitutionally "established" and, therefore, must be used. Article II, Sections

3(4) and 5(4) provide that "[w]hen *established*, the senate [and representative] districts shall . . . remain unaltered" until the next federal census. N.C. Const. art. II, §§ 3(4), 5(4) (emphasis added). Because "a constitution cannot violate itself," *Leandro*, 346 N.C. at 352, 488 S.E.2d at 258, we must construe the meaning of the phrase "[w]hen established," N.C. Const. art. II, §§ 3(4), 5(4), in harmony with the rest of the constitution.

Looking first to the plain meaning, to "establish" means "[t]o settle, make, or fix firmly; to enact permanently." *Establish*, Black's Law Dictionary (11th ed. 2019). This meaning connotes something more than the passage of a redistricting act by the General Assembly. The General Assembly could certainly amend a redistricting act up until the time it is used. Once passed and used in the next election, however, the districts are "established" until the next decennial census unless a court finds them constitutionally infirm. This understanding of "[w]hen established" is consistent with our precedent that allows the General Assembly an opportunity to redraw districts when necessary to remedy court-identified infirmities. *See, e.g.*, *Pender County*, 361 N.C. at 510, 649 S.E.2d at 376 ("leav[ing] to the General Assembly the decision" of how to redraw a district that was held to be constitutionally infirm and declining "to specify the exact configuration" of how the districts should be redrawn). Accordingly, "[w]hen established" refers to establishment consistent with the constitution. *See*

N.C. Const. art. II, §§ 3, 5 (providing textual limitations); N.C.G.S. §§ 120-2.3 to -2.4 (providing for limited judicial review); *see also* N.C. Const. art. II, §§ 22(5)(b)-(d) (exempting restricting legislation from gubernatorial veto).

In our order granting Legislative Defendants' petition for rehearing, we specifically asked for briefing on appropriate remedies. *See Harper*, ___ N.C. at ___, 881 S.E.2d at 550 (order granting Legislative Defendants' petition for rehearing). As we did in *Stephenson I*, "we must now consider the practical consequences of our holding and address any required remedial measures." *Stephenson I*, 355 N.C. at 375, 562 S.E.2d at 392; *see also Scott v. Germano*, 381 U.S. 407, 409, 85 S. Ct. 1525, 1527 (1965) ("The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged."). Legislative Defendants maintain that neither the remedial 2022 Plans nor the original 2021 Plans were "established" as intended in Article II, Sections 3(4) and 5(4). We agree.

In *Harper I* four members of this Court wrongly held that partisan gerrymandering claims are justiciable and violate provisions of the Declaration of Rights in the North Carolina Constitution. This Court then also erroneously declared that the 2021 Plans were unconstitutional partisan gerrymanders and "enjoin[ed] the

use of [the 2021 Plans] in any future elections." The 2021 Plans should not have been enjoined, and this Court should not have ordered the General Assembly to draw remedial plans using the erroneous standards set forth in *Harper I*. Nonetheless, this Court's *Harper I* decision forced redistricting criteria upon the General Assembly that our constitution does not require. Accordingly, the 2022 Plans are a product of a misapprehension of the law and of *Harper I*'s violation of separation of powers.

Because *Harper I*'s misapprehension of our constitutional law generated the 2022 Plans, they were never "established" as that word is used in Article II, Sections 3(4) and 5(4). Additionally, by statute the General Assembly is not required to utilize the 2022 Plans for future elections. *See also* N.C.G.S. § 120-2.4(a1) (providing that a court-imposed remedial map may only be used in the next general election).

Thus, if the 2022 Plans are no longer in force, the question arises whether the original 2021 Plans are reinstated. In their petition for rehearing and supplemental brief, Legislative Defendants argued that the 2021 Plans were likewise never "established" pursuant to Article II, Sections 3(4) and 5(4). Legislative Defendants point out that the 2021 Plans lasted just over a month before this Court enjoined their use in the remedial order in *Harper I* and that the 2021 Plans were never used in an election. As a direct result of the *Harper I* decision, the 2022 Plans were drawn, elections were held based on those remedial districts, and new legislators took their

seats in the General Assembly. Legislative Defendants point out that because the 2022 Plans were used in the 2022 election cycle, use of the 2021 Plans for the next election cycle would "double-bunk" many legislators.[24] Legislative Defendants point to the long history of our cases directing that, when necessary, the General Assembly must be given the opportunity to redraw constitutionally compliant districts. *See, e.g.*, *Stephenson II*, 357 N.C. at 303, 582 S.E.2d at 248–49; *Stephenson I*, 355 N.C. at 385, 562 S.E.2d at 398. We agree with Legislative Defendants' analysis.

Moreover, when reviewing the history behind the General Assembly's adoption of the first set of redistricting plans challenged in this case (2021 Plans), it becomes clear that these plans are also a product of a misapprehension of North Carolina law. In 2018, just a few years before the enactment of the 2021 Plans, the North Carolina Democratic Party and a group of North Carolina voters brought a state court action challenging remedial legislative redistricting plans drawn by the General Assembly the previous year (2017 Plans).[25] *See generally* Compl., *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584 (N.C. Super. Ct. Wake County Sept. 3, 2019). The

---

[24] The dissent concedes that incumbency protection—that is, avoiding the double-bunking of incumbent legislators, is a permissible, neutral redistricting criteria.

[25] The General Assembly enacted the 2017 Plans after a federal district court found that several of the legislative districts in the 2011 Plans were racially gerrymandered. *See Covington v. North Carolina*, 283 F. Supp. 3d 410, 413 (M.D.N.C. 2018), *aff'd in part and rev'd in part*, 138 S. Ct. 2548 (2018) (per curiam).

plaintiffs in that case brought the exact claims that are at issue in this case—they argued that the 2017 Plans were partisan gerrymanders in violation of the free elections clause, the equal protection clause, and the freedom of speech and assembly clauses of North Carolina's Declaration of Rights. *Id.* at 60−68.

Despite having the benefit of the Supreme Court's decision in *Rucho*, the three-judge panel in *Common Cause v. Lewis* agreed with the plaintiffs that these Declaration of Rights provisions prohibit partisan gerrymandering, *Lewis*, 2019 WL 4569584, at *3, *108−24, *129, and that the General Assembly's use of partisan election data to assign voters to districts violated these provisions. *See id.* at *121. The panel in *Lewis* concluded that partisan gerrymandering claims are justiciable under the North Carolina Declaration of Rights.[26] *Id.* at *126. The *Lewis* order clearly represents a mistaken understanding of the North Carolina Constitution—the same mistaken understanding made by four members of this Court in *Harper I* and corrected by this Court today.

---

[26] The *Lewis* panel reached these conclusions even though it had the benefit of the Supreme Court's *Rucho* opinion, which was issued slightly over two months before the *Lewis* order. These conclusions also conflicted with this Court's holdings in *Dickson I* and *Dickson II* that suggested that the Declaration of Rights generally does not provide judicially manageable standards for claims related to gerrymandering. *See Dickson I*, 367 N.C. at 575, 766 S.E.2d at 260; *Dickson II*, 368 N.C. at 534, 781 S.E.2d at 440−41. Of note, the three-judge panel in *Lewis* and the three-judge panel in *Dickson I* consisted of the same three superior court judges.

The panel in *Lewis* ordered the General Assembly to redraw the 2017 Plans using specific redistricting criteria and methods enumerated in the *Lewis* order. *Id.* at *136. Many of the required or prohibited criteria in the *Lewis* order are not derived from the express language of the constitution. Notably, to prevent partisan gerrymandering, the *Lewis* panel explicitly prohibited the General Assembly from considering any partisan election data in its remedial process.[27] *Id.* As demonstrated by our opinion today, however, this proscription on the use of partisan data constituted judicial error because our constitution does not address the use of partisan data in the redistricting process.

Nevertheless, to comply with the *Lewis* order the General Assembly proceeded under the assumption that it could not consider any partisan election data in its redistricting process without risking a constitutional violation. In 2021, when the General Assembly first began drawing the 2021 Plans, it convened a Joint Meeting of the Senate Redistricting and Elections Committee and the House Redistricting Committee. For purposes of discussing the criteria that would govern the 2021 redistricting process, each Committee member received a copy of the criteria mandated by the *Lewis* panel in 2019. One week later, the Joint Redistricting

---

[27] Ironically, the *Harper I* majority struck the 2021 Plans and then required the General Assembly to use partisan data in redrawing the plans.

Committee adopted finalized criteria for its 2021 map drawing process (Adopted Criteria). The Adopted Criteria were nearly identical to the criteria mandated by the *Lewis* panel. Specifically, the Adopted Criteria, just like the criteria from *Lewis*, included a prohibition on consideration of partisan election data. Legislative Defendants suggest that the Joint Redistricting Committee incorporated this requirement into its Adopted Criteria because it believed that requirement was necessary to create constitutionally compliant redistricting plans. *See* Legislative Defendants-Appellees' Brief at 20−21, *Harper v. Hall*, 380 N.C. 317 (2022) (No. 413PA21-1) (noting that "[t]o avoid violations identified in the 2010 [redistricting] cycle," including those identified in the *Lewis* order, the General Assembly included prohibition on the consideration of partisan election data in its Adopted Criteria).

As demonstrated by today's opinion, however, that prohibition does not exist. Our constitution does not speak to partisan considerations—or any other considerations not explicitly addressed in the text of our constitution or federal law— in the redistricting process. Just as this Court's *Harper I* decision forced the General Assembly to draw the 2022 Plans under a mistaken interpretation of our constitution, the *Lewis* order forced the General Assembly to draw the 2021 Plans under the same mistaken interpretation of our constitution. Accordingly, the districts were not constitutionally "established." To hold otherwise would perpetuate the same violation

of separation of powers that we have attempted to cure today. Thus, the 2021 Plans are not "established," as that phrase is used in Article II, Sections 3(4) and 5(4).

The General Assembly shall have the opportunity to enact a new set of legislative and congressional redistricting plans, guided by federal law, the objective constraints in Article II, Sections 3 and 5, and this opinion. "When established" in accordance with a proper understanding of the North Carolina Constitution, the new legislative plans "shall remain unaltered until the return of" the next decennial census. N.C. Const. art. II, §§ 3(4), 5(4).

## IX. Conclusion

For 200 years our Supreme Court has faithfully sought to implement the intent of the drafters of our state constitution by interpreting that foundational document based on its plain language and the historical context in which each provision arose. Recently, this Court has strayed from this historic method of interpretation to one where the majority of justices insert their own opinions and effectively rewrite the constitution. Today we return to the text of the state constitution, correct our course, and come back to the proper understanding and application of our fundamental constitutional principles. Apportionment is textually committed to the General Assembly, and apportionment legislation is entitled to our long-standing standard of review—a presumption of constitutionality and a required showing that the

legislation is unconstitutional beyond a reasonable doubt. There is no judicially manageable standard by which to adjudicate partisan gerrymandering claims. Courts are not intended to meddle in policy matters. In its decision today, the Court returns to its tradition of honoring the constitutional roles assigned to each branch.

This case is not about partisan politics but rather about realigning the proper roles of the judicial and legislative branches. Today we begin to correct course, returning the judiciary to its designated lane.

> The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements.

*Baker*, 369 U.S. at 267, 82 S. Ct. at 737−38 (Frankfurter, J., dissenting).

We have recognized that our constitution allows the General Assembly to enact laws unless expressly prohibited by the constitutional text. This Court will no longer change the time-honored meaning of various portions of our constitution by interpreting the text with the singular aim of reaching a desired outcome. As explicitly stated in our constitution, the people have the authority to alter their foundational document, not this Court. The people alone have the final say.

This Court's opinion in *Harper I* is overruled. We affirm the three-judge panel's

11 January 2022 Judgment concluding, *inter alia*, that claims of partisan gerrymandering present nonjusticiable, political questions and dismissing all of plaintiffs' claims with prejudice. This Court's opinion in *Harper II* is withdrawn and superseded by this opinion. The three-judge panel's 23 February 2022 order addressing the Remedial Plans is vacated. Plaintiffs' claims are dismissed with prejudice.

VACATED.

Justice EARLS dissenting.

Following the 2010 census and prior to the United States Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), one of the Republican co-chairs of the General Assembly's redistricting committee, Representative David Lewis, explained his rationale in presenting redistricting plans that disproportionately favored Republicans: "I think electing Republicans is better than electing Democrats. So I drew this map to help foster what I think is better for the country." *Id.* at 2491. Though jarring in its irreverence to democracy, Representative Lewis simply admitted what all of the evidence subsequently showed about redistricting maps enacted by the North Carolina General Assembly in recent years: They stifle the will of North Carolina voters by rigging the system against one party in favor of another. Representative Lewis's views carried the day. The General Assembly adopted a "partisan advantage" redistricting criterion that required the districts to maintain a ten to three Republican/Democrat congressional delegation. *See Common Cause v. Rucho*, 318 F. Supp. 3d 777, 807 (M.D.N.C. 2018), *overruled by Rucho*, 139 S. Ct. 2484. Those maps were ultimately held to be unconstitutional under the North Carolina Constitution in a ruling that was never appealed to this Court. *See Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *2 (N.C. Super. Ct. Sept. 3, 2019) (holding that, when these maps were created, "partisan

intent predominated over all other redistricting criteria resulting in extreme partisan gerrymander[s]").

When the General Assembly attempted to enact a new extreme partisan gerrymander just a few years later following the release of 2020 census data, this Court rejected the idea that the voters of this state must be hostage to the partisan objectives of the ruling party in the General Assembly. And for a brief window in time, the power of deciding who is elected to office was given to the people, as required by the state constitution. *See Harper v. Hall* (*Harper I*), 380 N.C. 317, 339, *cert. granted sub nom. Moore v. Harper*, 142 S. Ct. 2901 (2022), *vacated, Harper v. Hall*, No. 413PA21-2 (N.C. Apr. 28, 2023); *Harper v. Hall* (*Harper II*), 383 N.C. 89 (2022), *vacated, Harper v. Hall*, No. 413PA21-2 (N.C. Apr. 28, 2023). In *Harper I*, this Court ensured that all North Carolinians, regardless of political party, were not denied their "fundamental right to vote on equal terms." *Harper I*, 380 N.C. at 378 (cleaned up).

Today, the majority strips the people of this right; it tells North Carolinians that the state constitution and the courts cannot protect their basic human right to self-governance and self-determination. In so doing, the majority ignores the uncontested truths about the intentions behind partisan gerrymandering and erects an unconvincing façade that only parrots democratic values in an attempt to defend its decision. Despite its lofty prose about the need for principled adherence to the state constitution, the majority follows none of these principles today. Nor does the majority even pay passing reference to the anti-democratic nature of extreme

partisan gerrymandering. These efforts to downplay the practice do not erase its consequences and the public will not be gaslighted. Our constitution provides that "[a]ll political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only." N.C. Const. art. I, § 2. But when Republican lawmakers are free to gerrymander redistricting plans without constitutional guardrails to ensure their party's indefinite political domination, this constitutional requirement is abandoned.

Unchecked partisan gerrymandering allows the controlling party of the General Assembly to draw legislative redistricting plans in a way that dilutes the voting power of voters in the disfavored party. In so doing, those who hold political power can guarantee that they remain in office for decades, making them impervious to the popular will. Thus, rather than allowing "the people . . . [to] choose whom they please to govern them," as Alexander Hamilton once described as "the true principle of a republic," 2 Debates on the Constitution 257 (J. Elliot ed. 1891), members of the General Assembly make this choice for the people, favoring Republicans because they believe that electing Republicans is better for the country. This is not how democracy should function.

What is more, the majority abolishes the fundamental right to vote on equal terms regardless of political party through a process driven by partisan influence and greed for power. Let there be no illusions about what motivates the majority's decision to rewrite this Court's precedent. Today's result was preordained on 8 November

2022, when two new members of this Court were elected to establish this Court's conservative majority. To the Court's new majority, the parties' briefing after rehearing was granted did not matter.[1] The oral argument held after rehearing was granted did not matter. The merits of Plaintiffs' arguments do not matter. For at stake in this case is the majority's own political agenda. Today, the Court shows that its own will is more powerful than the voices of North Carolina's voters.

To be clear, this is not a situation in which a Democrat-controlled Court preferred Democrat-leaning districts and a Republican-controlled Court now prefers Republican-leaning districts. Here, a Democratic-controlled Court carried out its sworn duty to uphold the state constitution's guarantee of free elections, fair to all voters of both parties. This decision is now vacated by a Republican-controlled Court seeking to ensure that extreme partisan gerrymanders favoring Republicans are established.[2]

---

[1] Exhibiting its disregard for the merits of the arguments like those presented by Plaintiffs, the Court denied two parties' motions for leave to file amicus curie briefs in support of Plaintiffs. *See Harper v. Hall*, 2022-NCSC-121 (March 9, 2023) (order on motion of Governor Roy Cooper and Attorney General Joshua H. Stein for leave to file amicus brief in support of plaintiffs-appellants); *Harper v. Hall*, 2022-NCSC-121 (March 9, 2023) (order on motion of the Brennan Center for Justice at N.Y.U. School of Law for leave to file amicus curiae brief in support of plaintiffs-appellants on rehearing). I would have allowed the motions.

[2] For instance, the majority in *Harper I* recognized that "our responsibility is to determine whether challenged apportionment maps encumber the constitutional rights of the people to vote on equal terms and to substantially equal voting power." *Harper I*, 380 N.C. at 323. By contrast, today's majority believes that its responsibility is to protect the plans that the trial court found to be "egregious and intentional partisan gerrymanders, designed to enhance Republican performance, and thereby give a greater voice to those voters than to any others." *Id.* at 324.

In a single blow, the majority strips millions of voters of this state of their fundamental, constitutional rights and delivers on the threat that "our decisions are fleeting, and our precedent is only as enduring as the terms of the justices who sit on the bench." *See Harper v. Hall*, No. 413PA21, 2023 WL 1516190 (N.C. Feb. 3, 2022) (order allowing motion for rehearing) (Earls, J., dissenting) [hereinafter *Harper Order*].

## I.    Background

Though the majority explains the history of this case in depth, it neglects to make any mention of the practical effect of the maps that sparked and perpetuated this litigation. In the cases that the majority vacates and overturns today, *Harper I* and *Harper II*, the Court explained at great length the severity of the partisan gerrymanders that the General Assembly crafted. *See Harper I*, 380 N.C. at 333–46; *Harper II*, 383 N.C. at 100–111, 114–23. I therefore summarize only briefly where this litigation began.

Following the 2020 Decennial Census, the North Carolina General Assembly enacted new redistricting plans for the North Carolina House of Representatives, the North Carolina Senate, and the U.S. House of Representatives (2021 Plans). In November 2021, North Carolina League of Conservation Voters, Inc. (NCLCV) and Harper Plaintiffs challenged the plans as unconstitutional partisan gerrymanders in separate suits that were assigned to the same three-judge panel and consolidated in

December 2021. That same month, Plaintiff Common Cause moved to intervene in the litigation, and the three-judge panel granted the motion.

In a 258-page opinion issued in January 2022, the three-judge panel unanimously found that the 2021 Plans constituted extreme partisan gerrymanders. Specifically, the trial court found that the 2021 Congressional Plan was an "intentional, and effective, pro-Republican partisan redistricting" that all but guaranteed Republicans ten out of fourteen seats in the U.S. House of Representatives. The trial court further found that "the enacted congressional map is more carefully crafted to favor Republicans than at least 99.9999% of all possible maps" using nonpartisan redistricting criteria. *Harper I*, 380 N.C. at 339. These results were no accident, the trial court concluded. Instead, "the 2021 Congressional Plan is a partisan outlier intentionally and carefully designed to maximize Republican advantage in North Carolina's Congressional delegation." The trial court further explained that "Legislative Defendants offered no defense of the 2021 Congressional Plan. No expert witness opined that it was not the product of an intentional partisan redistricting."

The state legislative districts fared no better. For example, the trial court found that the enacted State Senate Plan

> effectuate[d] the same sort of partisan advantage as the Enacted Congressional Plan. The Enacted Senate Plan consistently creates Republican majorities and precludes Democrats from winning a majority in the Senate even when Democrats win more votes. Even in an essentially tied election or a close Democratic victory, the Enacted

> Senate Plan gives Republicans a Senate majority, and
> sometimes even a veto-proof 30-seat majority. And that
> result holds even when Democrats win by larger margins.

*Harper I*, 380 N.C. at 341.

Similarly, the trial court concluded that "the Enacted House Plan is also designed to systematically prevent Democrats from gaining a tie or a majority in the House. In close elections, the Enacted House Plan always gives Republicans a substantial House majority. That Republican majority . . . persists even when voters clearly express a preference for Democratic candidates." *Id.* The trial court also concluded that "[t]he 2021 House Plan's partisan bias creates firewalls protecting the Republican supermajority and majority in the House."

So, this is where we started. And when confronted with three different legislative redistricting plans that were all found to have been intentional attempts to consolidate Republican power and suppress the will of the voters, this Court chose to protect the democratic ideals enshrined in our state constitution and the voters themselves over the political and partisan motivations of a select few in the General Assembly. Today, the Court reverses course and chooses the latter. Even beyond this particular decision, the majority has already repeatedly revealed itself to be on a mission to pursue the agenda of this select few in the legislature. *See Holmes v. Moore*, No. 342PA19-3 (N.C. Apr. 28, 2023); *Cmty. Success Initiative v. Moore*, No. 331PA21 (N.C. Apr. 28, 2023). Its allegiances need no further explanation.

## II.   Analysis

### A. Remedy

Though it may seem out of order, I begin by addressing the remedy the majority provides Legislative Defendants today as it is a primer for the lawlessness that recurs throughout this opinion. The majority makes repeated declarations that "[t]he constitution is interpreted based on its plain language"—that "[t]he constitution was written to be understood by everyone, not just a select few." But the majority also consistently struggles to apply those principles itself. Nowhere is this more evident than in the remedy the majority awards Legislative Defendants.

What Legislative Defendants want is a do over—a chance to go back in time and draw even more egregiously gerrymandered maps than they did before this litigation began. Because of the majority's decision today, they now have the assurance that they will get away with it. And as they correctly predicted, what Legislative Defendants want, the majority will provide. The majority's self-congratulatory exercise of judicial restraint suddenly vanishes when Legislative Defendants seek a remedy that the state constitution expressly prohibits. Though the constitutional text may be an inconvenience to the majority's desire to carry out Legislative Defendants' political agenda, it is not something that can be so easily disregarded at will.

There is a strict constitutional limitation on the General Assembly's power to draw state legislative districts. Article II, sections 3 and 5 expressly provide that

"[t]he General Assembly, *at the first regular session convening after the return of every decennial census of population taken by order of Congress*, shall revise [the senate and the representative] districts and the apportionment of [senators and representatives] among those districts." N.C. Const. art. II, §§ 3, 5 (emphasis added). But these sections further provide that, "[w]hen established," both the apportionment of members of the state senate and house of representatives and their districts "shall remain unaltered until the return of another decennial census of population taken by order of Congress." N.C. Const. art. II, §§ 3(4), 5(4). The meaning of this requirement is simple: Once the districts have been established, or passed, by the General Assembly, the districts and apportionment of members of the General Assembly are fixed until the next census.

This Court has applied the provisions strictly. Shortly after the provisions were ratified in their original form, this Court held that they prohibited the mid-decade redrawing of the border between Franklin County and Granville County, even though the border as drawn violated another constitutional provision requiring that "no county shall be divided in the formation of a Senate district." N.C. Const. of 1868, art. II, § 5; *Comm'rs of Granville Cnty. v. Ballard*, 69 N.C. 18, 20–21 (1873). But the plain text of article II, sections 3(4) and 5(4) and the history of these provisions simply will not do for the majority.

Step one in the majority's scheme is therefore to do away with the remedial maps (2022 Plans) that *Harper I* ordered the General Assembly to draw. To that end,

the majority must first redefine what the word "established" means. The majority relies on Black's Law dictionary to define the term "established" as "[t]o settle, make, or fix firmly; to enact permanently." *Establish*, Black's Law Dictionary (11th ed. 2019). The majority reasons that, using this definition, the 2022 Plans were not "established" for purposes of article II, sections 3(4) and 5(4) because this definition "connotes something more than the passage of a redistricting act by the General Assembly" because the General Assembly was free to amend the maps until they were used in an election.

But this definition creates a problem for the majority. Not only were the 2022 Plans validly enacted by the General Assembly during its first regular session following the 2020 Census, they were also *used* in the 2022 primaries and general election. That means that the 2022 Plans fall squarely within the majority's own definition of the word "established" as used in article II, sections 3(4) and 5(4). Thus, the majority must create an exception to its definition of the term "established" that lacks any basis in the constitutional text. Specifically, the majority reasons that, because the 2022 plans were based on a misapprehension of law, "they were never 'established' as that word is used in article II, sections 3(4) and 5(4)."

Interestingly, nowhere in the majority's definition of the term "established" is there an exception for such a misapprehension of law—the majority itself holds that a redistricting plan is established when, as here, it is enacted by the General Assembly and used in an election. The majority does not provide any legal support

for the idea that a change in the law justifies the redistricting redo that Legislative

Defendants seek, nor that such a permission is consistent with the text, purpose, or

history of the state constitution's mid-decade redistricting prohibition. That is

because there is no legal basis for throwing out the 2022 Plans in the middle of the

decade.[3]

But the majority does not stop there. Cue step two in the majority's efforts to

carry out Legislative Defendants' bidding. The majority concludes that, not only must

the 2022 Plans be thrown out, so too must the 2021 Plans that the General Assembly

enacted following the 2020 census *before* this litigation ever began. Its reasoning is

stunning—the 2021 Plans must be thrown out, it explains, because both because

using the 2021 maps would not sufficiently protect seats for incumbent candidates

and because these plans were allegedly based on a misapprehension of law from a

*different* case decided years earlier. *See Common Cause v. Lewis*, No. 18 CVS 014001,

2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019). As to the first point, that

incumbents could be better protected through a different map is not a basis for

---

[3] The majority also makes the false assertion that "by statute[,] the General Assembly is not required to utilize the 2022 Plans for future elections." *See* N.C.G.S. § 120-2.4(a1). This is a blatant mischaracterization of the statute. N.C.G.S. § 120-2.4(a1) provides that, when the legislature is required to enact a remedial map but fails to "act to remedy any identified defects" within the timeframe that has been prescribed by a court, the court may impose an interim plan that will be used in the next election only. N.C.G.S. § 120-2.4(a1). The court-imposed plan is only "interim" if the General Assembly fails to enact a remedial map on its own accord. That is not what happened here, as the General Assembly itself passed the remedial 2022 Plans during its first regular legislative session. Its enacted remedial plans have the same force and effect as any other redistricting plans that it validly enacts, and they are treated the same.

ignoring the constitutional mandate against mid-decade redistricting. The state constitution does not authorize legislative districts to be redrawn in the middle of a decade simply to allow the General Assembly to better account for a particular redistricting criteria and certainly not for the dubious purpose of better protecting incumbent legislators.

With the respect to the majority's latter point that the 2021 maps were based on a misapprehension of law, it relies on a superior court decision that was never heard by a North Carolina appellate court. *Lewis*, 2019 WL 4569584 at *2–3. In *Lewis*, the plaintiffs brought similar partisan gerrymandering claims against different legislative maps. *Id.* The trial court held that the maps were extreme partisan gerrymanders and violated the state constitution. *Id.* at 3. But according to the majority, because of that decision, which is unrelated to this litigation, unrelated to the 2021 Plans, and was not decided by this Court, when Legislative Defendants enacted the 2021 Plans over a year later, they were enacted under "a mistaken understanding of the North Carolina Constitution." Somehow this mistaken understanding equates to a failure to establish the legislative plans. In other words, the majority believes that because it might be possible to enact an even more extreme partisan gerrymander than was enacted in 2021, the General Assembly should be allowed to do so, despite the prohibition on mid-decade redistricting of state legislative districts.

The majority points to the fact that in 2021, when the General Assembly

started the map drawing process after census data was first released, among the districting criteria that the General Assembly adopted was the requirement that partisan election data not be considered in defining legislative districts. The majority credits Legislative Defendants assertion to this Court in *Harper I* that the General Assembly adopted "this requirement . . . because it believed that requirement was necessary to create constitutionally compliant redistricting plans." Notably, Legislative Defendants' single, vague assertion that the majority hinges its conclusion on does not argue that the 2021 maps were free of intentional partisan bias. Such a claim would have been untrue. But the majority refuses to examine any of the evidence in the record that demonstrates the role partisan considerations played in the creation of the 2021 Plans and proves that this this criterion was adopted in name only. This is not surprising—recognizing as much would require the majority to acknowledge that the General Assembly already took advantage of the opportunity to enact maps containing extreme partisan gerrymanders.

As has been discussed, almost every shred of evidence in the record shows that the 2021 maps were extreme partisan gerrymanders, which is why the trial court specifically found as much. But not only did the 2021 Plans themselves evince that they were drawn to disproportionately favor Republicans, so too did the events leading to their enactment. For example, Legislative Defendants claimed that potential maps must be drawn and submitted in committee hearing rooms using software that did not account for partisan election data. Defendant Representative

Destin Hall, the Chair of the House Redistricting Committees assured his colleagues that the "House as a whole" would "only consider maps that are drawn in this committee room, on one of the four stations" located in the committee room.

Contrary to these assurances, however, legislators and their staff were able to use partisan data to draw gerrymandered maps on unofficial devices both inside and outside of the committee rooms. Evidence at trial revealed that Representative Hall repeatedly met with members of his staff to review "concept maps" that were created on unofficial computers using unknown redistricting software and data. Representative Hall testified that he would then rely on these concept maps when drawing proposed maps on the committee room computers. In fact, on several occasions, when drawing maps on the official terminals in the committee rooms, Representative Hall even brought along a smartphone containing images of the concept maps so that he could copy the concept map into the public terminal.

Legislative Defendants denied that they used any non-public materials as part of their map-drawing activities at first, but they were eventually forced to admit that this was false. The trial court ordered Legislative Defendants to produce the "concept maps" and related materials. Legislative Defendants failed to do so, and instead claimed that "the concept maps that were created were not saved, are currently lost and no longer exist." Based on this history as well as the extremity of the maps themselves, the majority's suggestion that the 2021 Plans were based on the "incorrect" notion that partisan gerrymandering violates the state constitution is

plainly false.

Even if it were true that the General Assembly did not consider partisan data in drawing the 2021 Plans, it would not matter. As already explained, the constitution proscribes mid-decade redistricting after districts are *established*. There is no constitutional caveat providing that a district might become "un-established" if a change in the law means the districts could have been drawn differently the first time around. If this were true, legislative redistricting plans would never officially be established for purposes of article II, sections 3 and 5. The potential for a future hypothetical change in the law would permanently leave every redistricting plan enacted by the General Assembly in a state of limbo. The state constitution does not afford Legislative Defendants a do-over simply because they believe that they can do a better job of manipulating election outcomes this time around.

Finally, the General Assembly has already expressed its intent that the 2021 Plans should take effect if the 2022 Plans were to be thrown out. Specifically, the 2022 enactments establishing the 2022 Plans (*i.e.*, the remedial plans) for both the North Carolina Senate and House of Representatives explained that should the Court's decision in *Harper I* be "made inoperable . . . or ineffective," the 2021 Plans would, by operation of law, become "again effective." An Act to Realign the North Carolina Senate Districts Pursuant to the Order of the North Carolina Supreme Court in Harper v. Hall, S.L. 2022-2, § 2, 2022 N.C. Sess. Laws 14, 19 (Senate plan); An Act to Realign North Carolina House of Representatives Districts Pursuant to

Order of the North Carolina Supreme Court in Harper v. Hall, S.L. 2022-4, § 2, 2022 N.C. Sess. Laws 30, 43 (House plan). Thus, this Court need not speculate about what the General Assembly intended if, for some reason, the 2022 Plans became "ineffective." By ordering that the 2021 Plans be disregarded, this Court violates the intent of the General Assembly expressed by the body as a whole through formal legislation, rather than a few of its members involved in this litigation.

None of this matters to the majority. Reason, common sense, and the rule of law are lost on those who do not care about interpreting the constitution in good faith. This holding is not a mere error in legal interpretation—I do not think that even the majority believes itself to be complying with the constitutional text where this remedy is concerned, as demonstrated by its lack of effort in attempting to support its radical decision. The remedy afforded here demonstrates how divorced from the law the majority's decision is in its entirety. It shatters the notion that the majority is applying the constitution "based on its plain language" or that "[t]his case is not about partisan politics." Put simply, the majority today instructs the General Assembly to violate the North Carolina constitution. In so doing, it puts on display just how far this Court has fallen.

## B. Partisan Gerrymandering Violates the State Constitution

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Blankenship v. Bartlett*, 363 N.C. 518, 522 (2009) (quoting *Wesberry v. Sanders*, 376

U.S. 1, 17 (1964)). As James Madison explained in the Federalist Papers, "[R]epublican liberty" requires "not only that all power should be derived from the people; but that those entrusted with it should be kept in dependence on the people." *Rucho*, 139 S. Ct. at 2512 (Kagan, J., dissenting) (quoting The Federalist No. 37, at 4 (James Madison) (J. & A. McLean ed., 1788)). This principle applies not just to the federal government but to our state as well, for it "is the foundation of democratic governance." *Id.* at 2511–12. Indeed, this very principle is enshrined in our state constitution, which commands that "[a]ll political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I, § 2.

The extreme partisan gerrymanders that this Court addressed in *Harper I* and *Harper II* made a mockery of those principles and "enabled politicians to entrench themselves in office as against voters' preferences. They promoted partisanship above respect for the popular will. They encouraged a politics of polarization and dysfunction." *Rucho*, 139 S. Ct. at 2509 (Kagan, J., dissenting). In so doing, these partisan gerrymanders "deprived citizens of the most fundamental of their constitutional rights: the rights to participate equally in the political process, to join with others to advance political beliefs, and to choose their political representatives." *Id.* By violating these rights, the plans at issue and the politicians who manipulated them "debased and dishonored our democracy, turning upside-down the core American idea that all governmental power derives from the people." *Id.* With the

practice now condoned by this Court's current majority, the select few in the General Assembly who crafted the plans, themselves elected under gerrymandered maps, will make every attempt to entrench their party in the General Assembly indefinitely, regardless of what North Carolinians have to say about it. *See, e.g.*, *Lewis*, 2019 WL 4569584, at *8–9, *14–18.

Not only does the majority fail to recognize the anti-democratic nature of these realities. It goes a step further than any opinion of the full U.S. Supreme Court has gone before and concludes that, not only is partisan gerrymandering nonjusticiable, it is actually *permitted* by the state constitution. As James Madison once cautioned, the majority misplaces political power "in the Government over the people." 4 Annals of Cong. 934 (1794).

*Harper I* painstakingly laid out the history, requirements, and guarantees of the constitutional rights that are implicated here—the free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause. I do not here repeat *Harper I*'s correct interpretation of these rights, as the principles and history that *Harper I* articulated are far more enduring than the majority's monopoly on the judicial power. I do, however, address the butchered and curtailed definition of the free elections clause the majority adopts today and share a few additional observations about the state's equal protection clause.

### 1. *The Free Elections Clause*

The majority proclaims that "[t]he constitution is interpreted based on its plain

language" and that "[t]he constitution was written to be understood by everyone, not just a select few." It appears that the majority and I agree on at least two points, in principle at least; we just disagree about what these concepts look like in practice. The majority's interpretation of the free elections clause highlights the point. Article I, section 10 of the North Carolina constitution, known as the free elections clause, states very simply that "[a]ll elections shall be free." N.C. Const. art. I, § 10. That is all. While this clause may seem easy enough for "everyone" to make sense of, not so in the majority's view. It takes the Court over twenty pages of convoluted legal reasoning to explain why the word "free" does not actually mean what one might think it does. This does not mean that brevity begets accuracy. But neither does the majority's odyssey to redefine a simple and explicit requirement in the North Carolina constitution.

I begin where the majority does: with the dictionary definition of the word "free." Moreover, I use the same dictionary definition as does the majority, as the Court omits a few notable considerations. Black's Law Dictionary defines the term "free" as, among other things, "[h]aving legal and political rights; enjoying political and civil liberty"; "[n]ot subject to the constraint or domination of another; enjoying personal freedom; emancipated"; "[c]*haracterized by choice*, rather than by compulsion *or* constraint." *Free*, Black's Law Dictionary (11th ed. 2019) (emphases added). Merriam Webster's provides additional guidance, encapsulating the definitions identified above but adding that "free" means "not determined by anything

beyond its own nature or being: choosing or capable of choosing for itself." *Free*,

Merriam-Webster's Collegiate Dictionary (11ᵗʰ ed. 2022).

With this in mind, we can explore what the free elections clause demands on

its face. In violation of the concept of "free" elections, partisan gerrymandering is a

form of vote dilution—"the devaluation of one citizen's vote as compared to others,"

*Rucho*, 139 S. Ct. at 2513 (Kagan, J., dissenting)—that imposes a "constraint" on a

voter's will. *See Free*, Black's Law Dictionary. Justice Kagan explained this process

succinctly in her dissent in *Rucho*:

> A mapmaker draws district lines to "pack" and "crack"
> voters likely to support the disfavored party. He packs
> supermajorities of those voters into a relatively few
> districts, in numbers far greater than needed for their
> preferred candidates to prevail. Then he cracks the rest
> across many more districts, spreading them so thin that
> their candidates will not be able to win. Whether the
> person is packed or cracked, his vote carries less weight—
> has less consequence—than it would under a neutrally
> drawn (non-partisan) map. In short, the mapmaker has
> made some votes count for less, because they are likely to
> go for the other party.

*Id.* at 2513–14 (citations omitted). And when done properly, which modern technology

all but assures, it puts representatives, like Legislative Defendants here, in the

business of "rigging elections." *Vieth v. Jubelirer*, 541 U.S. 267, 317 (2004) (Kennedy,

J., concurring in the judgment).

A rigged election is not, in any sense of the word, a free election. Nor is an

election in which a voter's voice is worthless because the election's results have been

preordained by whoever wields political power in the General Assembly. The majority

itself acknowledges that the free elections clause was inspired by the English Bill of Rights, which in turn sought to respond to practices that attempted "to ensure a certain electoral outcome." Though the modes of "ensur[ing]" certain electoral outcomes may have improved with the advent of technology, an election in which the result is determined by advanced and manipulative map drawing is not, "[c]haracterized by choice," as the term "free" requires, but by "constraints" that are contrived by the legislature alone. *See Free*, Black's Law Dictionary.

The majority next turns to the history of the free elections clause. Notably, the majority does not challenge much of the history surrounding the clause as recounted in *Harper I*. In fact, it reiterates much of what *Harper I* already explained. Instead, it disagrees with some of the conclusions that *Harper I* drew from that history. Because *Harper I* already successfully completed the task of explaining the historical underpinnings of the free elections clause, I do not rehash these events here. *See Harper I*, 380 N.C. at 373–76. I note only that history cannot be retroactively modified by the majority.

The majority's historical analysis warrants a brief comment, however. Specifically, in analyzing the roots of the free elections clause, the majority examines a narrow political issue that preceded the clause and the 1776 Declaration of Rights, namely the tension between North Carolina's governor and the House of Burgesses from 1729 until 1776. According to the majority, the free elections clause "was placed in the 1776 Declaration of Rights at the same time as other constitutional provisions

that both limited executive power and increased legislative power." As a result of these contemporaneous provisions, the majority concludes that "any argument that the people added the free elections clause to the 1776 constitution for the purpose of limiting the General Assembly's apportionment authority is inconsistent with this historical context."

This conclusion presents two glaring problems. First, it ignores that the free elections clause, when first adopted, spoke to the elections of members to the General Assembly specifically; it did not concern the various disputes that the majority describes between the governor and the House of Burgesses. Any provisions adopted to address the balance of power between the governor and the legislative body are distinct from a provision that demanded the free "election[ ] of members . . . to [the] General Assembly." N.C. Const. of 1776, Declaration of Rights, § 6.

Second, and relatedly, was this ongoing feud really the only historically relevant event that happened in the years leading up to 1776? Can the majority truly not conceive of *anything* else that may have driven the people of North Carolina to embrace the words "election[ ] of members to serve as Representatives in the General Assembly, ought to be free," as the clause provided in 1776? N.C. Const. of 1776. Moreover, might other historical events have inspired an evolved understanding of the clause as it as well as other constitutional provisions were modified and added throughout the state's history, including in 1868? *See Harper I*, 380 N.C. at 369 ("North Carolina's Declaration of Rights as it exists today in article I was forged not

only out of the revolutionary spirit of 1776 but also the reconstruction spirit of 1868.").

History can, when used properly and appropriately, be useful in giving context to a constitution. But the majority demonstrates how historical analysis can be weaponized to paint a distorted picture of a constitution's historical understanding. In this way, "it is a magnificent disguise. The judge can do the wildest things, all the while presenting himself as the passive agent of the sainted Founders—don't argue with me, argue with Them." Richard A. Posner, *Bork and Beethoven*, 42 Stan. L. Rev. 1365, 1379 (1990). But "bad originalism" has never been a legitimate means of constitutional interpretation. *See id.* at 1378.

Finally, the majority attempts to use precedent to support its constrained view of the free elections clause. As the majority notes, there are few cases that have interpreted the clause. First, there was *Clark v. Meyland*, 261 N.C. 140 (1964). There, the plaintiff sought to change his party affiliation in order to vote in the Republican primary. *Id.* at 141. But in order to do so, he was required by statute to take an oath pledging his allegiance to the new party, including by supporting the nominees from that party in the subsequent election. *Id.* Any individual who took the oath falsely was guilty of a felony. *Id.* This Court struck down the part of the oath that required an individual to support the party's nominees in the future because it "violate[d] the principle of freedom of conscience. It denies a free ballot—one that is cast according to the dictates of the voter's judgment." *Id.* at 142. The Court concluded that "the Legislature is without power to shackle a voter's conscience by requiring the

objectionable part of the oath as a price to pay for his right to participate in his party's primary." *Id.*

Next, the majority cites *State ex rel. Swaringen v. Poplin*, 211 N.C. 700 (1937), in which the plaintiff—a candidate for office—claimed that the Wilkes County Board of Elections fraudulently altered the vote count, leading to the plaintiff's defeat. *Id.* at 700–01. Citing the free elections clause and rejecting the Board of Elections's argument that it had the sole authority to determine the result of an election, this Court held that judicial intervention was appropriate and explained that "[a] free ballot and a fair count must be held inviolable to preserve our democracy." *Id.* at 702.

Based on these two cases alone, the majority somehow concludes the free elections clause encompasses only the right to vote "according to one's conscience and to have that vote accurately counted." This interpretation is confounding. Neither of these cases in any way limits the free elections clause to the two situations identified by the majority. The cases that have happened to rule on a specific and limited issue do not, without more, define the entire scope of a constitutional provision. In attempting to justify its interpretation of the free elections clause with such an elementary error in interpreting this Court's precedent, the majority only emphasizes how baseless its decision today is. In fact, these errors are so egregious that they hardly need be explained—they are so glaring that the majority accomplishes the task on its own.

What is more, if the majority is correct that these cases limit the free elections

clause to only these two scenarios, then these cases would conflict with the majority's own historical analysis of the clause. Again, the majority explains that the Declaration of Rights was modeled after the English Bill of Rights, which was in turn an effort to respond to various abuses committed by King James II. But many of the abuses that the English Bill of Rights sought to address, and therefore the Declaration of Rights contemplates, do not fit in to the majority's cabined interpretation of the free elections clause. For example, the majority explained that, under King James II, "[w]hen the time for [an] election came, local agents of the king who conducted the polling used devious polling practices to open, close, and reopen polling places" to manipulate election outcomes. Under the majority's newly minted interpretation of the free elections clause, such a practice would not be proscribed, and it is certainly not addressed by any other provision in the Declaration of Rights.

### 2. *The Equal Protection Clause*

Not only does partisan gerrymandering obstruct the constitution's promise of free elections, it also deprives individuals of the "fundamental right to vote on equal terms," which is derived from North Carolina's equal protection clause.[4] *Stephenson*

---

[4] North Carolina's equal protection clause states that:

> [n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

N.C. Const. art. I, § 19.

*v. Bartlett* (*Stephenson I*), 355 N.C. 354, 378 (2002). That right "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The majority correctly notes that this Court has stepped in to prevent this consequence through its one-person, one-vote cases. *See Stephenson I*, 355 N.C. 354; *Blankenship v. Bartlett*, 363 N.C. 518 (2009); *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742 (1990). These cases recognize that "[e]qual protection 'requires that all persons similarly situated be treated alike.'" *Blankenship*, 363 N.C. at 521. Malapportionment—the practice of inequitably apportioning representatives, allowing certain voters to wield more influence than others—violates this principle because it deprives individuals of "substantially equal voting power." *Stephenson I*, 355 N.C. at 379.

The majority attempts to convince us that this principle of protecting "substantially equal voting power" is limited to the one-person, one-vote context because the state constitution specifically contemplates this requirement in article II, sections 3(1) and 5(1). These sections state that each state senator and each state representative "shall represent, as nearly as may be, an equal number of inhabitants, the number of inhabitants that each [senator or representative] represents being determined for this purpose by dividing the population of the district that he represents by the number of Senators apportioned to that district." N.C. Const. art. II, §§ 3(1), 5(1). The majority asserts that "[p]arty affiliation . . . is not mentioned in

Article II, Sections 3 or 5."

Interestingly, however, article II, sections 3(1) and 5(1) apply *only* to state senators and members of the North Carolina House of Representatives. Neither of these provisions nor any other constitutional provision requires that other statewide offices represent similarly sized constituencies. Even so, in *Blankenship*, this Court held that "the right to vote in superior court elections on substantially equal terms" is protected by North Carolina's equal protection clause. *Blankenship*, 363 N.C. at 526. Moreover, this Court reached this interpretation under the state equal protection clause even though "federal courts [had] articulated that the 'one-person, one-vote' standard [was] inapplicable to judicial elections." *Id.* at 522. Thus, this Court in *Blankenship* found that North Carolina's equal protection clause prohibits a certain practice that was neither mentioned in the state constitution explicitly nor prohibited by the Federal Constitution.[5]

Putting the majority's weak attempt at line drawing aside, partisan gerrymandering is, in effect, indistinguishable from malapportionment. The only practical difference is that, rather than diluting votes based on "where [a voter]

---

[5] What is more, article II, sections 3(1) and 5(1)—the provisions on which the majority relies—also textually contemplate the use of single-member and multi-member districts within the same redistricting plans. *See* N.C. Const. art. II, §§ 3(1), 5(1). But as discussed in depth, *see* Section II.C.3, in *Stephenson I*, this Court held that the use of multi-member districts violates the state constitution's equal protection clause "unless it is established that inclusion of multi-member districts advances a compelling state interest." *Stephenson I*, 355 N.C. at 381. Thus, *Stephenson I* further demonstrates that this Court has relied on the state constitution's equal protection clause previously in cabining a power that the state constitution explicitly assigns to the General Assembly.

happen[s] to reside," *see Reynolds*, 377 U.S. at 563, partisan gerrymandering dilutes votes based on whom an individual happens to vote for. Thus, as with malapportionment, partisan gerrymandering deprives voters of "substantially equal voting power" and violates the North Carolina constitution's equal protection clause.

The majority's equal protection analysis warrants one final correction. In particular, the majority implies that the U.S. Supreme Court in *Rucho* concluded that partisan gerrymandering does not implicate the federal Equal Protection Clause. This it did not do, and the majority's characterization is incorrect. The Supreme Court's decision in *Rucho* was limited to the question of justiciability. *Rucho* specifically held that, despite the fact that "such gerrymandering is incompatible with democratic principles . . . partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Rucho*, 139 S. Ct. at 2506–07 (cleaned up).[6] The majority may wish to downplay its legal extremism by analogizing its action today to that of the nation's highest court. But it may not accomplish this task by plainly misstating what the U.S. Supreme Court held.

## C. Partisan Gerrymandering is Justiciable

"It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution." *Leandro v. State*, 346 N.C. 336,

---

[6] In fact, the dissent in *Rucho* criticized the majority's refusal to address the claims at issue in light of the constitutional rights that were implicated by partisan gerrymandering. *See Rucho*, 139 S. Ct. at 2509 ("For the first time ever, this Court refuses to remedy a constitutional violation because it thinks the task beyond judicial capabilities.").

345 (1997). This duty holds true where partisan gerrymandering claims are concerned. The majority, however, invokes the political question doctrine to conclude that partisan gerrymanders are nonjusticiable political questions. The majority errs in applying the doctrine to such claims. Indeed, "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker v. Carr*, 369 U.S. 186, 217 (1962). The majority's conclusion otherwise was wrong when it was first drawn by the dissent in *Harper I*, and it is wrong today.

### 1. *A Brief History of Partisan Gerrymandering Jurisprudence*

Though the justiciability of partisan gerrymandering claims in the federal courts has long been debated, a majority of the U.S. Supreme Court only recently decided that such claims are nonjusticiable. In fact, for several decades, the opposite view prevailed, and partisan gerrymandering claims were considered justiciable. *See, e.g., Vieth*, 541 U.S. at 317 (Stevens, J., dissenting) ("[F]ive Members of the Court . . . share the view that . . . it would be contrary to precedent and profoundly unwise to foreclose all judicial review of [partisan gerrymandering] claims that might be advanced in the future."); *Davis v. Bandemer*, 478 U.S. 109, 143 (1986) (plurality opinion) (holding that "political gerrymandering claims are properly justiciable under the Equal Protection Clause"), *abrogated by Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). Then, in 2019, the U.S. Supreme Court changed course. In *Rucho*, the Court

held "that partisan gerrymandering claims present political questions beyond the reach of the federal courts." 139S. Ct. at 2506–07.

The evolution of the U.S. Supreme Court's partisan gerrymandering jurisprudence is not, of course, biding on this Court. *Rucho* itself was clear that "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply." *Id.* at 2507. But these cases demonstrate that for decades, U.S. Supreme Court Justices from both sides of the ideological spectrum agreed that "severe partisan gerrymanders [are incompatible] with democratic principles," *Vieth*, 541 U.S. at 292, and further that their "legislative classifications 'reflec[t] *no* policy, but simply arbitrary and capricious action[,]" *id.* at 316 (Kennedy, J., concurring in the judgment); *see id.* at 312 (Kennedy, J., concurring in the judgment) (recognizing that "the rapid evolution of technologies in the apportionment field suggests yet unexplored possibilities" with respect to the standards that may emerge to govern partisan gerrymandering claims).

Times have changed, however, and it is no secret that "ideology in Supreme Court appointments" has become increasingly important, ushering in a new era of political polarization on the nation's highest court. *See, e.g.*, Neal Devins and Lawrence Baum, *Split Definitive: How Party Polarization Turned the Supreme Court into a Partisan Court*, 2016 Sup. Ct. Rev. 301, 319–20 (2017) (explaining that "it appears that Republican-appointed Justices are more strongly conservative than the Court's Democratic-appointed Justices are liberal" and highlighting that, as of 2016,

legal scholars had "rank[ed] four Roberts Court Republican-appointed Justices as among the most conservative Justices ever to sit on the Court"). In light of this increased polarization, it is unsurprising that the previous understanding regarding partisan gerrymandering's justiciability became a position of the past by the time *Rucho* was decided.

But the U.S. Supreme Court is not the only institution in the country that has become collateral damage in increasingly partisan battles surrounding voting rights. Indeed, the decision today demonstrates that this Court has met the same fate. Just as *Rucho* followed closely on the heels of a shift in the U.S. Supreme Court's makeup, the Court's decision here follows a midterm election that altered its political composition. Notably, this Court's decision to vacate *Harper I* and *Harper II* is not based on a change in or misunderstanding of the controlling law or facts. Instead, the Court, now armed with the influence of a conservative majority, has an intellectual disagreement with *Harper I*'s interpretation of the law. Not only is such a disagreement not an appropriate basis to vacate a prior decision under these circumstances, the Court's decision, which was designed to protect the power of partisan legislators rather than North Carolina's voters, stamps a seal of approval on flagrant violations of the state constitution.

### 2. *Judicially Manageable Standards*

The majority reasons that "our constitution does not provide judicially discernable or manageable standards for adjudicating partisan gerrymandering

claims" as part of its conclusion that such claims are nonjusticiable political questions. The majority's reasoning is largely cribbed from the U.S. Supreme Court decision in *Rucho*. Given the majority's reliance on *Rucho*, I address the line of reasoning that was first adopted by the U.S. Supreme Court and is now echoed by this Court as to why political gerrymandering claims lack judicially manageable standards. Condensed to its simplest form, the reasoning proceeds as follows.

First, the thinking goes that the Framers of the state and federal constitutions were aware of the concept of gerrymandering, but neither constitution expressly prohibited the practice. *See Rucho*, 139 S. Ct. at 2494–96; *Harper I*, 380 N.C. at 417 (Newby, J., dissenting). Second, based on this historical practice, some amount of partisan gerrymandering must be constitutionally permissible, meaning that strict proportionality is not required by the state or federal constitution. *See Rucho*, 139 S. Ct. at 2499; *Harper I*, 380 N.C. at 417 (Newby, C.J., dissenting). Third, neither constitution prescribes the *exact* amount of partisan gerrymandering that is unconstitutional. *See Rucho*, 139 S. Ct. at 2501, 2506; *Harper I*, 380 N.C. at 421 (Newby, C.J., dissenting). This final point coupled with the notion that the "political science tests" that have been developed to expose partisan gerrymandering are insufficient yield the conclusion that there is no standard a trial court can reliably apply to determine whether a partisan gerrymander is unconstitutional. This line of reasoning can be reduced to a common refrain: "At what point does permissible partisanship become unconstitutional," or more simply, "[h]ow much is too much?"

*Rucho*, 139 S. Ct. at 2501. This question, the majority thinks, is simply too hard to answer.

Even if the question is too challenging for this Court's current majority to fully grapple with—this particular issue is addressed in more detail below—courts both in North Carolina and around the country that have successfully confronted this question as well similar questions in analogous contexts, demonstrating that the manufactured conundrum is not as mystifying as the majority would have us believe.

The majority attempts to obfuscate the standard laid out in *Harper I* by repeatedly asserting that *Harper I* simply requires a proportionality standard. *Harper I* was clear that "the fact that one party commands fifty-nine percent of the statewide vote share in a given election does not entitle the voters of that party to have representatives of its party comprise fifty-nine percent of the North Carolina House, North Carolina Senate, or North Carolina congressional delegation." *Harper I*, 380 N.C. at 387 (majority opinion). To clarify any confusion amongst the members of the majority, this means that *Harper I* acknowledged that proportionality is not the constitutional baseline.

Instead, *Harper I* explained that the state constitution provides that

> voters are entitled to have substantially the same opportunity to electing a supermajority or majority of representatives as the voters of the opposing party would be afforded if they comprised fifty-nine percent of the statewide vote share in that same election. What matters here, as in the one-person, one-vote context, is that each voter's vote carries roughly the same weight when drawing a redistricting plan that translates votes into seats in a

legislative body.

*Id.* To crystalize the point, when the voting strength of a particular group of voters is artificially diluted based purely on their political preferences, they are deprived of their "fundamental right to vote on equal terms," *Stephenson I*, 355 N.C. at 378, among other constitutional rights. When such constitutional violations are alleged, the state constitution requires an inquiry into whether maps enacted by the General Assembly systematically prevent a political party whose candidates receive a majority of the statewide votes from having a realistic opportunity to win at least half of the representative seats that are up for election. That does not mean that the party *must* win half of the seats. It simply means the party must not be deprived of the opportunity to do so though maps that are intended to suppress a particular kind of voter's voting power.

There are various empirical and statistical analyses that demonstrate whether unconstitutional partisan vote dilution has occurred. Relevant here, *Harper I* clearly outlined "multiple reliable ways of demonstrating the existence of an unconstitutional partisan gerrymander," including the mean-median difference analysis; the efficiency gap analysis; the close-votes, close seats analysis; and the partisan symmetry analysis. *Harper I*, 380 N.C. at 384. Through these analyses, "the same technologies and data that today facilitate extreme partisan gerrymanders also enable courts to discover them, by exposing just how much they dilute votes." *Rucho*,

139 S. Ct. at 2517 (Kagan, J., dissenting). [7]

"Once a plaintiff shows that a map infringes on their [constitutional rights]" through impermissible vote dilution, the legislature may still be able to justify the apparent anomalies by reference to constitutionally acceptable redistricting criteria, which amount to compelling governmental interests. *See Harper I*, 380 N.C. at 387. "[C]ompelling governmental interests in the redistricting context include the traditional neutral districting criteria expressed in article II, sections 3 and 5 of the North Carolina Constitution." *Id.* at 388. Additionally, incumbency, so long as "it is applied evenhandedly, is not perpetuating a prior unconstitutional redistricting plan, and is consistent with the equal voting power requirements of the state constitution," as well as other "widely recognized traditional neutral redistricting criteria, such as compactness of districts and respect for other political subdivisions, may also be compelling governmental interests."[8] *Id.*

The majority seems to have two primary objections to the standard laid out in

---

[7] *Harper I* was careful in declining to "identify an exhaustive set of metrics or precise mathematical thresholds which conclusively demonstrate or disprove the existence of an unconstitutional partisan gerrymander." *Harper I*, 380 N.C. at 384. As explained later, this approach exemplifies the understanding that a single case presenting an issue of first impression for the Court would be insufficient to establish all of the circumstances in which unconstitutional partisan gerrymandering might occur.

[8] "[W]hile adherence to neutral districting criteria primarily goes to whether the map is justified by a compelling governmental interest, the disregarding of neutral criteria such as compactness, contiguity, and respect for political subdivisions, particularly when the effect of the map subordinates those criteria to pursuit of partisan advantage, may also be some evidence a map burdens the fundamental right to equal voting power." *Harper I*, 380 N.C. 384 n.15.

*Harper I*. First, the majority is unsatisfied because, while outlining a number of "political science tests" whose results can evidence an unconstitutional partisan gerrymander, *Harper I* and *Harper II* did not define a single numeric threshold at which point a metaphoric line can be drawn and a court can conclude that a map enacted by the General Assembly is unconstitutional because it denies certain voters of "substantially equal voting power." This position ignores that "the law is 'full of instances' where a judge's decision rests on 'estimating rightly . . . some matter of degree.' " *Rucho*, 139 S. Ct. at 2522 (Kagan, J., dissenting) (alteration in original) (quoting *Johnson v. United States*, 576 U.S. 591, 604 (2015). And in these contexts, "[t]o the extent additional guidance has developed over the years . . . , courts themselves have been its author." *Id.*

Reviewing redistricting plans to determine whether certain voters have been deprived of "substantially equal voting power" is no different. Indeed, "courts all the time make judgments about the substantiality of harm without reducing them to particular percentages. If courts are no longer competent to do so, they will have to relinquish, well, substantial portions of their docket." *Id.* Countless claims require a court to determine when a harm is sufficiently substantial to constitute a constitutional violation. We need look no further than the Sixth Amendment of the U.S. Constitution for an example of this point.

The Sixth Amendment instructs that an "accused shall enjoy the right to a speedy and public trial," but what does that mean exactly? U.S. Const. amend. VI.

The U.S. Constitution certainly does not elaborate, presenting problems that resemble the majority's concern about partisan gerrymandering claims. Indeed, as this Court has explained, "it is impossible to determine precisely when the right [to a speedy trial] has been denied; it cannot be said precisely how long a delay is too long; [and] there is no fixed point when the accused is put to a choice of either exercising or waiving his right to a speedy trial." *State v. McKoy*, 294 N.C. 134, 140 (1978). But the constitutional text's omission of these details was not cause for the courts to eventually determine that they were helpless when faced with a claim that an individual had been denied the right to a speedy trial. I hope the majority would agree that such a decision would have been a baseless abdication of the judicial function that would itself defy the judiciary's role as contemplated by the Constitution.

Instead of abandoning this duty, a "difficult and sensitive balancing" of four factors has emerged to determine whether a violation has occurred. *State v. Farmer*, 376 N.C. 407, 414 (2020) (quoting *Barker v. Wingo*, 407 U.S. 514, 533 (1972)). This balancing test has developed over time and still provides no precise point at which the right has been violated. Even so, engaging in this "difficult and highly fact-specific evaluation" is a mandatory judicial function. *Id.* at 411. Just as neither the Sixth Amendment nor its corresponding four-part test define exactly "how long [of] a delay is too long" for purposes of the right to a speedy trial, *McKoy*, 294 N.C. at 140, the North Carolina constitution and the standard that was illuminated by *Harper I* do not answer precisely "how much partisan gerrymandering is too much." This was

never thought to be a justiciability issue in the Sixth Amendment context, and it is not a justiciability issue here.

The majority's only attempt to distinguish this example is based on the notion that, unlike the Sixth Amendment, "the constitution assigns the responsibility of redistricting to the General Assembly, not to the courts." This argument bears on the separate issue of whether the courts have a constitutionally contemplated role in presiding over partisan gerrymandering claims. In other words, it is a textual commitment argument, which is a distinct issue with respect to justiciability. This argument is not responsive to the point the Sixth Amendment example proves: judicially manageable standards have been adopted in the face of other constitutional questions that raise the same "how much is too much" question. The concern that the majority raises is discussed in full in Section II.C.3. For now, it is enough to respond that, contrary to the majority's assertion that "*Harper I* and the dissent . . . seem to imagine a future where redistricting is a court-managed process[,]" rather than exclusively in the hands of the General Assembly, "*Harper I* and the dissent" imagine only a future in which the constitutional guarantees of free elections and equal protection of the laws are enforced—a future in which this Court does not abdicate the judicial role for its own partisan ends.

With the majority's irrelevant argument aside, I turn to the capacity of the courts to interpret the constitutional mandate that voters be afforded "substantially equal voting power." Though this mandate is not defined purely in mathematical

terms, the requirement is grounded in language that courts are accustomed to interpreting. Most importantly, this Court gave the phrase meaning in the one-person, one-vote context in *Stephenson I.* 355 N.C. at 380, 383 (holding that, the right to "substantially equal voting power" as guaranteed by the state constitution's equal protection clause requires that, with respect to legislative apportionment, "any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements.")

The majority attempts to distinguish this example from partisan gerrymandering claims on the basis that the one-person, one-vote principle is "relatively easy to administer as a matter of math." Though lawyers and judges may not be widely renowned for their mathematical prowess, courts cannot abdicate the judicial function simply because a legal issue involves a detailed analysis. Both the state and federal constitutions "forbid[ ] 'sophisticated as well as simple-minded modes of discrimination.' " *Reynolds*, 377 U.S. at 563 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)). When faced with the one-person, one-vote issue in *Reynolds*, the U.S. Supreme Court opined:

> We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and

mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.

*Id.* at 566. As Justices on this state's highest court, our oath, our office, and the North Carolina electorate demanded the same. Today, a majority of this Court turns its back on those duties.

Similar language as that found in *Harper I*'s standard has been given meaning in other contexts as well. For example, when a criminal defendant seeks to have charges against him dismissed for insufficient evidence, a trial court ruling on the motion "need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417 (1998).

In defining this standard, this Court has explained that "[s]ubstantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *State v. Mann*, 355 N.C. 294, 301 (2002). And how much evidence is that exactly? Over time, the Court has come to recognize that it is something more than "suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator." *State v. Malloy*, 309 N.C. 176, 179 (1983). The standard is imprecise—reasonable minds regularly disagree about what constitutes substantial evidence. But one would be hard-pressed to find any member of the legal community who would insist that the judiciary identify a quantifiable amount of evidence that meets the standard in all future cases. Such an undertaking would

likely be impossible—criminal evidence comes in countless forms that serve different purposes and indicate guilt to varying degrees—and profoundly unwise. Instead of creating a definition with mathematical precision, over time, both this Court and lower courts have clarified what constitutes "substantial evidence" in a way that allows a court to consider the quantity and quality of evidence that might come before it in a particular case.

That is all that was required here. Unconstitutional partisan gerrymandering can be demonstrated or disproved through various forms of evidence, including the tests identified in *Harper I*, and each allegation involves unique facts that bear on whether a voter has been deprived of "substantially equal voting power." That *Harper I* allowed future cases to mete out the boundaries of unconstitutional partisan gerrymandering was not an infirmity indicating that this state's courts are incapable of determining what constitutes unconstitutional partisan gerrymandering. Rather, *Harper I* described a standard using terminology to which this Court has given meaning before—even if not with mathematical or scientific exactitude—and demonstrated the foresight that a single decision could not anticipate every future scenario in which a constitutional violation has occurred.

The majority takes great issue with *Harper I*'s promise that "[l]ower courts can and assuredly will work out more concrete and specific standards in the future." *Harper I*, 380 N.C. at 384 (alteration in original). Despite the majority's complaints, this forward-looking approach is not unique to *Harper I*. Though courts around the

country regularly decide cases based on standards that lack precise numerical thresholds, these thresholds may also develop over time. If such flexibility were not permitted and courts were forced to announce precise constitutional thresholds in the first instance, many important constitutional claims would have never been resolved. The one-person, one-vote principle provides an important example.

In *Baker v. Carr*, 369 U.S. 186, 209 (1962), the U.S. Supreme Court held that legislative apportionment claims under the Fourteenth Amendment of the U.S. Constitution were justiciable but did not provide any standard for resolving them. This decision paved the way for the one-person, one-vote principle itself, which was developed in broad terms two years later in *Reynolds v. Sims*. 377 U.S. 533, 578 (1964). *Reynolds* held that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577. But recognizing that "[m]athematical exactness or precision is hardly a workable constitutional requirement," *id.*, the Court "deem[ed] it expedient not to attempt to spell out any precise constitutional tests[,]" *id.* at 578.

Instead, *Reynolds* allowed lower courts leeway to determine those tests, explaining that "[l]ower courts can and assuredly will work out more concrete and specific standards for evaluating state legislative apportionment schemes in the context of actual litigation." *Id.* As the U.S. Supreme Court predicted, the one-person, one-vote principle took additional form in the years following *Reynolds*. *See, e.g.*,

*Brown v. Thomson*, 462 U.S. 835, 842 (1983) (holding that "an apportionment plan with a maximum population deviation under 10% falls within th[e] category" of "minor deviations . . . from mathematical equality among state legislative districts [that] are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment"); *see also Karcher v. Daggett*, 462 U.S. 725 (1983); *White v. Weiser*, 412 U.S. 783 (1973); *Mahan v. Howell*, 410 U.S. 315 (1973); *Avery v. Midland Cnty.*, 390 U.S. 474 (1968). As the majority recognizes, in *Stephenson I*, this Court eventually adopted the same threshold that the U.S. Supreme Court developed over time in its one-person, one-vote cases to analyze whether multi-member districts are constitutionally compliant. 355 N.C. at 383.

The second issue the majority appears to raise with the standard laid out in *Harper I* is that it permits reliance on "political science tests" that are not found within the text of the constitution itself. But the majority seems to misunderstand the difference between a constitutional right and the tests that determine whether such a right has been breached. The former is a cognizable guarantee that must be contained in the constitution itself whereas the latter is a means by which the courts assess whether a constitutional violation has occurred. Such tests are almost always created and adopted by the courts and are rarely found within the constitutional text.

Among the constitutional rights and principles that *Harper I* determined had been violated by the 2021 Plans were the free elections clause's promise that "[a]ll elections shall be free," N.C. Const. art I, § 10; *see Clark v. Meyland*, 261 N.C. 140,

143 (1964); and the guarantee that North Carolina citizens have "substantially equal voting power," "legislative representation," and "representational influence," *Stephenson I*, 355 N.C. at 377, 379; *see also* N.C. Const. art. I, § 19. Those principles are satisfied and the rights of North Carolinians are protected when a plan gives the party that wins a majority of the statewide vote a substantially equal opportunity as the opposing party to secure a majority of the open representative seats. The tests *Harper I* identified as "reliable ways of demonstrating the existence of an unconstitutional partisan gerrymander," namely the mean-median difference analysis; the efficiency gap analysis; the close-votes, close seats analysis; and the partisan symmetry analysis, provide credible *evidence* as to whether legislative apportionment plans violate those identified constitutional rights. 380 N.C. at 384.

Examples of courts relying on empirical, statistical, and social science analyses to resolve constitutional issues, despite the absence of these analyses from the text of the state and federal constitutions, are too numerous to count.[9] The majority criticizes

---

[9] *See, e.g., Cooper v. Harris*, 581 U.S. 285 (2017) (relying on expert statistical analysis finding that the General Assembly predominately relied on race in drawing 2011 redistricting plan because the plan disproportionately moved black voters into racially gerrymandered districts even when controlling for party registration to conclude that the plan constituted an unconstitutional racial gerrymander); *Brown v. Thomson*, 462 U.S. 835, 842–43 (1983) (holding that "an apportionment plan with a maximum population deviation under 10% falls within th[e] category" of "minor deviations . . . from mathematical equality among state legislative districts [that] are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment," even though the Constitution does not reference any such threshold); *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (relying on statistical and social science evidence to conclude that, if the allegations at issue were uncontradicted at trial, "the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the [challenged] legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so

the analyses adopted in *Harper I*, however, because they "are not grounded in any constitutional guidance." But if this state's courts were only permitted to act when the state (or federal) constitution provided a specific and explicit test for determining when a constitutional violation has occurred, courts would lack the authority to hear cases involving countless constitutional claims, meaning the courts would be prohibited from engaging in one of their core constitutional duties.

Finally, the majority attempts to seal the point that *Harper I* failed to provide a judicially manageable standard by pointing out that the Court in *Harper II* was forced to strike down one of the 2022 Plans that the trial court approved during the remedial phase because the trial court failed to properly apply *Harper I*'s standard. In relying on *Harper II* as evidence that *Harper I* failed to define a judicially manageable standard, the majority does not make the point it believes it does. In fact, just the opposite.

First, the majority claims that, after *Harper I* and during the remedial phase,

> the General Assembly attempted to apply the *Harper I* standard in drawing the Remedial House Plan (RHP), Remedial Senate Plan (RSP), and Remedial Congressional Plan (RCP). The General Assembly followed the same process in enacting each plan, yet the Special Masters recommended, and the three-judge panel concluded, that only the RHP and RSP met the *Harper I* standard.

The majority goes on to complain that, not only did the three-judge panel strike down

---

as to deprive them of their pre-existing municipal vote"); *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) (relying on academic studies of the psychological impact of segregation on youth *as evidence* that racially segregated educational facilities violate the Equal Protection Clause).

the RCP, the Court in *Harper II* struck down the RSP as well. What the majority declines to mention, however, is the blatantly partisan result of the maps that the General Assembly produced during the remedial phase. Since the majority has neglected to take on that task, distorting the evidence of partisan gerrymandering that was before both this Court and the trial court, I do so here.

First, take the RCP. One of the advisors to the Special Masters who were appointed to assess the constitutional compliance of the remedial 2022 Plans, Dr. Bernard Grofman, concluded in his report that the Plan "creates a distribution of voting strength across districts that is very lopsidedly Republican." *Harper II*, 383 N.C. at 101. He determined that "[b]ecause they all point in the same direction, the political effects statistical indicators of partisan gerrymandering strongly suggest the conclusion that this congressional map should be viewed as a pro-Republican gerrymander." *Id.* (alteration in original). Despite recognizing that "the RCP yielded an efficiency gap of 6.37%," he noted that that this was "not . . . proof that there is no vote dilution" because, applying the other measures identified in *Harper I*, "legislative map drawers have apparently sought to draw a congressional map that just narrowly pass[es] a supposed threshold test for partisan gerrymandering." *Id.* (alterations in original).

Another advisor, Dr. Eric McGhee:

> determined that the RCP yielded an efficiency gap of 6.4%, a mean-median difference of 1.1%, a partisan asymmetry of 4.9%, and a declination metric of 0.14, all favoring Republicans. He noted that "[t]he values with incumbency

factored in all lean more Republican . . . , and this incumbency effect is greater than it was in the [2021] enacted plan." Relatively, he noted that while the RCP shows improvement from the 2021 enacted plan on several measures of partisan symmetry, it is "clearly worse" than the remedial congressional plans proposed by Plaintiffs.

*Id.* (alterations in original).

Likewise, a third advisor, Dr. Samuel Wang, concluded that the RCP has "an average efficiency gap of 6.8% and an average mean-median difference of 1.2%, both favoring Republicans." *Id.* In nine out of ten sample elections, he found that the RCP would allow Republicans to win more seats than Democrats with the *same* vote share. *Id.* "Averaging across all 10 elections, the advantage was 1.7 more seats for Republicans, or 12% of the 14-seat Congressional delegation." *Id.*

Finally, a fourth advisor, Dr. Tyler Jarvis, "determined that the RCP 'consistently favors Republicans' across all applicable measures. He determined that the RCP yields an efficiency gap of 8.8%, a mean-median difference of 0.9%, a partisan bias of 5.2%, and a declination metric of 11.6%, all favoring Republicans." *Id.*

Though a less severe partisan gerrymander than the RCP, the RSP was also largely inconsistent with *Harper I*'s mandate. *Harper II* described these findings in depth:

> Dr. Grofman determined that the RSP "creates a distribution of voting strength across districts that is very lopsidedly Republican." He determined the RSP's vote bias indicates "a substantial pro-Republican bias" in which a statewide majority of Republican voters would be able to win a majority of the seats while "only a win by considerably more than 50% of the statewide vote can yield

the Democrats a majority of the seats." He determined that "[b]ecause they all point in the same direction, the political effects statistical indicators of partisan gerrymandering argue for the conclusion that th[e] [RSP] should be viewed as a pro-Republican gerrymander." He concluded that "the dilutive effects of th[e] RSP] . . . are still . . . quite substantial."

Dr. McGhee determined that the RSP "still favors Republicans when all seats are open." He concluded that the RSP yields an efficiency gap of 4.8%, a mean-median difference of 2.2%, a partisan asymmetry of 4.8%, and a declination metric of 0.20, all favoring Republicans. He observed that "[t]he [efficiency gap] value now clearly falls below the commonly identified threshold of 7%, though the [mean-median difference] value falls well above the 1% number cited by Legislative Defendants." He determined that "[a]ll the metric values for both the open seat and incumbency scenarios are more than 50% likely to favor Republicans throughout the decade." He concluded that the [mean-median difference] and [partisan symmetry] metrics, which are more relevant for a state legislative plan because they connect directly to control of the chamber, suggest that in a tied election Republicans would still hold 27 or 28 [of 50 total] seats, and that Democrats would need to win as much as 53 percent of the vote to claim 25 seats. The odds are about three to one that Republicans would maintain this advantage throughout the decade.

Relatively, Dr. McGhee observed that the Republican advantage within Plaintiffs' proposed RSP "is often less than half the size of the same advantage in the Legislative Defendants' [RSP]." "This suggests that there is nothing foreordained about the advantages in the Legislative Defendants' plan."

Dr. Wang determined that the RSP favors Republicans in all six metrics evaluated: seat partisan asymmetry, mean-median difference, partisan bias, lopsided wins, declination angle, and efficiency gap. Specifically, he determined that the RSP yields an efficiency gap of 2.2%, a mean-median difference of 0.8%, and an average partisan asymmetry of

2.1 seats, all favoring Republicans.

Finally, Dr. Jarvis determined that analysis of the RSP reveals that it "is often a significant outlier in favor of the Republicans." He determined that the RSP yields an efficiency gap of 4.0%, a mean-median difference of 1.4%, an average partisan bias of 4.0%, and a declination metric of 7.0%.

*Id.* at 103–04 (alterations in original).

By contrast, the advisors to the Special Masters made the following conclusions

about the RHP:

> Dr. Grofman determined that although the RHP "creates a distribution of voting strength across districts that is very lopsidedly Republican," it "is genuinely far more competitive than either of the other two legislatively proposed maps." He observed that under the RHP, "unlike the other maps, the Democrats do not have to win all of the competitive seats to win a majority in the House. Moreover, unlike the [RCP and RSP], . . . the competitive seats [in the RHP] are substantially Democrat in directionality." He further noted that: "quit[e] important in judging the constitutionality of this map in the full context are the facts that: (a) the Harper plaintiffs have not chosen to offer an alternative [RHP] but are apparently content to see the legislative map implemented by the Court, (b) the map was passed by a clear bipartisan consensus in the legislature, including members of the legislature who belong to particular minority communities, and (c) that while it still is further from being non-dilutive than the NCLCV [RHP] alternative, it is far closer to Plaintiffs' map than it is to the rejected [2021] enacted NC House map."
>
> He determined that while the RHP's efficiency gap "remains in a pro-Republican direction," it is "at the low level of 2.72[%]." In considering "the totality of the circumstances . . . and recognizing that this map is still not ideal (nor need it be)," he concluded that the RHP "simply lacks the same clear indicia of egregious bias found in the

previously rejected maps and still found . . . in the [RCP] and [RSP]."

Dr. McGhee likewise determined that the RHP "still favors Republicans when all seats are open, but substantially less [than the 2021 congressional map]." He determined that the RHP yields an efficiency gap of 3.0%, a mean-median difference of 1.4%, a partisan asymmetry of 2.9%, and a declination metric of 0.16, all favoring Republicans. Dr. McGhee concluded that the RHP "still favors Republicans: the party would likely hold about 64 of 120 seats with half the vote, and it would take the Democrats somewhere close to 52% of the vote to bring that number down to 60." Relatively, he determined that the RHP "is very similar to" NCLCV Plaintiffs' proposed remedial house map on metrics of partisan symmetry, that it "do[es] a reasonably good job of respecting traditional geographic principles," and that it reflects "very similar compactness" as Plaintiffs' proposed remedial House map. He concluded that the RHP's partisan symmetry is "closer [to NCLCV's proposed remedial plan] than was the case for either the [RSP] or the [RCP]," noting that the NCLCV Plaintiffs' plan is only "a little better." He concluded that this "relatively marginal improvement hints that it may be difficult to do better while still abiding by other constraints."

Dr. Wang determined that the RHP favors Republicans in all six metrics evaluated: seat partisan asymmetry, mean-median difference, partisan bias, lopsided wins, declination angle, and efficiency gap. Specifically, he determined that the RHP yielded an efficiency gap of 3.1%, a mean-median difference of 0.9%, a partisan asymmetry of 7.2 seats, and a declination angle of 4.5 degrees.

Finally, Dr. Jarvis determined that the RHP "appear[s] to be mostly typical in terms of the number of seats won." He determined that the RHP yields an efficiency gap of 2.7%, a mean-median difference of 1.5%, an average partisan bias of 2.7%, and a declination metric of 5.7%.

*Id.* at 102–03 (alterations in original).

Two observations follow from this evidence. First, contrary to the majority's suggestion that *Harper I* simply required a proportionality standard, the Court in *Harper II* approved the RHP, even though three of the four advisors to the Special Masters determined that the RHP maintained a pro-Republican bias. Though the majority appears to believe that there is no basis for *Harper II*'s decision to accept the RHP but reject the RSP, this conclusion rests solely on the majority's failure to consider the totality of the evidence presented for both plans, as discussed below.

Second, as to the RCP, the General Assembly's refusal to make a legitimate effort in applying *Harper I*'s mandate is not evidence that *Harper I* failed to delineate a manageable standard. The RCP was rejected by both the three-judge panel and this Court due to the General Assembly's own plain and intentional manipulation of the statistical data. As the Special Masters concluded, "there is substantial evidence from the findings of the advisors that the proposed congressional plan has an efficiency gap above 7% and a mean-median difference of greater than 1%." *Id.* at 105–106. More specifically, "none of the Special Masters' Advisors determined that the RCP yielded both an efficiency gap below 7% and a mean-median difference below 1%." *Id.* at 117. But this was not all. The evidence demonstrated that the RCP " 'consistently favor[ed] Republicans' across all applicable measures." *Id.* at 117.

Despite the strong evidence across metrics that the RCP represented an unconstitutional partisan gerrymander, the majority chastises the three-judge panel for applying this Court's precedent and concluding that the RCP was "not

satisfactorily within the statistical ranges set forth in [*Harper I*]." According to the majority "[a] majority of advisors and experts found that all three plans fell within the thresholds set by the *Harper I* majority, yet for some reason . . . only the RCP was unconstitutional." As an initial matter, this statement plainly misstates the advisors' findings, which are summarized above. Further, it commits the same error that *Harper I* and *Harper II* prohibited by relying exclusively on two of the empirical tests in isolation, rather than analyzing the evidence in its entirety. *See Harper II*, 383 N.C. at 93 (explaining that in *Harper I*, the Court expressly declined to "identify an exhaustive set of metrics or precise mathematical thresholds which conclusively demonstrate or disprove the existence of an unconstitutional partisan gerrymander.") (quoting *Harper I*, 380 N.C. at 384).

*Harper II* was clear that "[c]onstitutional compliance has no magic number." 383 N.C. at 114. Nor should it for the reasons already explained. Moreover, "[a]n individual statistical measure standing alone, though helpful, is not dispositive of constitutional compliance," *id.* at 93, because "individual datapoints are vulnerable to manipulation[,]" *id.* at 115. The majority proves this point. The majority concludes that *Harper I*'s standard must have been applied inconsistently because the Defendants' RCP was rejected, even though some of the advisors' results yielded *either* an efficiency gap value *or* a mean-median difference value within an acceptable—yet still pro-Republican—range, similarly to the RSP and RHP. In so concluding, the majority conveniently forgets to acknowledge the substantial amount

of evidence showing "a very lopsidedly Republican" gerrymander. *See id.* at 117. The majority's analysis shows exactly why *Harper II* explained that cherry picking individual tests as proof of constitutional compliance is not sufficient.[10]

That the trial court was required to evaluate a variety of evidence to determine whether the RCP as well as the other two maps violated the state constitution does not demonstrate that *Harper I*'s standard is judicially unmanageable. The obligation to weigh the totality of the evidence is a basic evidentiary issue. When overwhelming and varying evidence in the record points to the same conclusion, a court simply has a stronger foundation from which to render the correct decision. In fact, that there is a range of evidence that must be evaluated to reach the correct result does not bear on the constitutional standard delineated by *Harper I* in any respect. In the criminal context, for example, judges and juries must evaluate many different kinds of evidence, and in assessing guilt or innocence, *all* of the relevant evidence before the finder of fact should be considered and afforded the appropriate weight. So too here. The majority's refusal to engage in this analysis is not a shortcoming of *Harper I*—

---

[10] The majority similarly ignores the totality of the evidence demonstrating that the RSP was an extreme partisan gerrymander. For example, the majority takes umbrage with the fact that "[t]he *Harper II* majority did not say why an average Mean-Median Difference of 1.27% weighed in favor of the RHP's constitutionality but an average Mean-Median Difference of 1.29% weighed against the RSP's constitutionality." Actually, the majority did address this issue—several times. To repeat, a single data point such as the average mean-median calculation among the Advisors to the Special Masters is not dispositive of a plan's constitutionality. *Harper II*, 383 N.C. 89, 123 (2022) (explaining that, with respect to the RSP, "none of these datapoints are individually dispositive."). As a result, *Harper II*'s rejection of the RSP did not turn on the average of the mean-median values alone.

the failure belongs to the majority alone. [11]

As a final comment, a footnote buried in the majority's dissent demonstrates the majority's continued attempts to mischaracterize what is at stake in this case. In this footnote, the majority opines:

> Both the RHP and RSP were used during the 2022 election cycle. Significantly, under the RHP approved by the four-justice majority in *Harper II*, Republican candidates won 59% of the House races while receiving about 58% of the aggregate statewide vote. Under the RSP, which the *Harper II* majority found unconstitutional, Republican candidates won 60% of the Senate races while receiving about 59% of the aggregate statewide vote. It is unclear why this small difference of approximately one percentage point rendered the RHP constitutional and the RSP unconstitutional.

(Citations omitted). As an initial matter, this data appears nowhere in the record, and it is inappropriate for an appellate court to reach to outside sources for statistical

---

[11] This Court's decision in *Stephenson v. Bartlett*, 357 N.C. 301 (2003) (*Stephenson II*) further illustrates the point. In *Stephenson II*, a majority of this Court affirmed a trial court ruling that districts 6, 10, 11, 14, 16, 21, 26 36 and 44 in the remedial Senate redistricting plan drawn after the Court invalidated the General Assembly's first plan in *Stephenson I* were unconstitutional under the state constitution as interpreted in *Stephenson I* because they were "not compact." *Id.* at 314. This Court did not specify what metric determined a district's compactness for constitutional purposes even though the software programs used at the time calculated geographic compactness in nine different ways and did not delineate how non-compact is too non-compact. There was no objection that the compactness standard must not be administrable because the General Assembly didn't comply with it when drawing remedial districts; no holding that the State Constitution cannot be interpreted to require geographically compact districts because the word compactness does not appear in the Constitution; no objection that the court was taking over the function of the legislature by substituting its own notions of what might be sufficiently geographically compact. It is impossible to reconcile the *Stephenson II* opinion with the majority's decision in this case, and its failure to apply the same principles here illustrates the majority's intellectual dishonesty. The only consistency is that the result of both opinions is to impose on the voters of this state districting plans that benefit Republican legislators.

data. More importantly, however, the majority's representation is highly misleading. In considering Republican House and Senate candidates' aggregate share of the statewide vote, the majority takes advantage of the fact that there are many districts in which there was no Democratic candidate. Specifically, using the data cited by the majority, 25% of House districts did not have a Democrat on the ballot, compared to the 7.5% of districts in which there was no Republican on the ballot. In the Senate, 28% of districts lacked a Democratic candidate, whereas only a single district, which represents 2% of Senate districts, lacked a Republican candidate. Considering only the aggregate statewide vote is therefore misleading because it suggests that Republicans beat more Democrats, entitling them to more seats, than is true in reality. That the majority has no reservations about engaging in this kind of statistical manipulation is telling.

When considering races that included only Republican and Democratic candidates, the results paint a much different story. With respect to the State House race, though Republicans won 59% of the seats, they only won approximately 53% of the statewide vote, meaning Democrats won approximately 47% of the statewide vote. Without the RHP, Republicans likely would have won a supermajority in the House, despite that, in races in which members of both parties were actually competing, both parties won a very close share of the statewide vote. As to the State Senate race, Republicans won 60% of the seats—a supermajority in the Senate—by receiving only 51% of the statewide vote, compared to Democrats' 49%. Though the RSP was used

in the 2022 election cycle, allowing Republicans to win a supermajority of seats when barely able to win a majority of the statewide votes, *Harper II* eventually struck it down while retaining the RHP. To clarify any confusion for the majority, the "small difference" between Republicans winning 59% of the seats with 53% of the vote in the House versus 60% of seats in the Senate with only 51% of the statewide vote is the Senate's veto-proof supermajority.

### 3. Textual Commitment

Almost sixteen years before the U.S. Supreme Court decided *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), this Court explained that:

> the obligation of [judges'] oaths and the duty of their office require[s] them . . . to give their opinion on that important and momentous subject; and . . . notwithstanding the great reluctance they might feel against involving themselves in a dispute with the Legislature of the State, yet no object of concern or respect could come in competition or authorize them to dispense with the duty they owe[ ] the public, in consequence of the trust they were invested with under the solemnity of their oaths.

*Bayard v. Singleton*, 1 N.C. (Mart.) 5–6 (1787). Since then, "[i]t has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution." *Leandro v. State*, 346 N.C. 336, 345 (1997).

Though the majority is correct that the state constitution assigns the redistricting authority to the legislature, it does not give the General Assembly license to "dictate electoral outcomes." *Cook v. Gralike*, 531 U.S. 510, 523 (2001). Recognizing this limitation on the General Assembly's redistricting authority, this

Court long ago established that "within the context of state redistricting and reapportionment disputes, it is well within the 'power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan.'" *Stephenson I*, 355 N.C. at 362 (quoting *Scott v. Germano,* 381 U.S. 407, 409 (1965) (per curiam)); *see also Blankenship*, 363 N.C. at 522–28; *State ex rel. Martin v. Preston*, 325 N.C. 438 (1989).

There is no exception to this principle for redistricting cases, and for good reason. "Indeed, the need for judicial review is at its most urgent in these cases. For here, politicians' incentives conflict with voters' interests, leaving citizens without any political remedy for their constitutional harms." *Gill v. Whitford*, 138 S. Ct. 1916, 1941 (2018) (Kagan, J., concurring). But the majority lets none of this stand in its way in carving out its own partisan gerrymandering exception. In so holding, the majority violates the established principle that "the 'judicial power' under the North Carolina Constitution is plenary, and '[e]xcept as expressly limited by the constitution, the inherent power of the judicial branch of government continues.'" *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 607 (2021) (quoting *Beard v. N.C. State Bar*, 320 N.C. 126, 129 (1987)). No express limitation on the judicial power exists with respect to the General Assembly's redistricting authority, and judicial oversight in such cases, including partisan gerrymandering cases, is mandatory.

The majority's conclusion that partisan gerrymandering claims are not

reviewable by this state's courts largely turns on the existence of two specific provisions in the state constitution that restrict the legislature's redistricting authority. In particular, the majority points to article II, sections 3 and 5 of the North Carolina constitution. Article II, section 3 provides:

> The Senators shall be elected from districts. The General Assembly, at the first regular session convening after the return of every decennial census of population taken by order of Congress, shall revise the senate districts and the apportionment of Senators among those districts, subject to the following requirements:
>
> (1) Each Senator shall represent, as nearly as may be, an equal number of inhabitants, the number of inhabitants that each Senator represents being determined for this purpose by dividing the population of the district that he represents by the number of Senators apportioned to that district;
>
> (2) Each senate district shall at all times consist of contiguous territory;
>
> (3) No county shall be divided in the formation of a senate district;
>
> (4) When established, the senate districts and the apportionment of Senators shall remain unaltered until the return of another decennial census of population taken by order of Congress.

N.C. Const. art. II, § 3. Article 2, section 5 prescribes the same guidelines and restrictions for the North Carolina House of Representatives. N.C. Const. art. II, § 5. Together, the third limitations in both sections are known as the Whole County Provisions (WCP). In the majority's view, article II, sections 3 and 5 are effectively the only limitations in the state constitution that restrict the General Assembly's

redistricting powers. Accordingly, the majority believes that "the role of our courts is limited to identifying a redistricting plan that violates those express limitations."

This reasoning, of course, ignores that *Harper I* identified multiple constitutional protections that prohibit partisan gerrymandering, rendering such an express provision redundant. That the rights and principles upon which *Harper I*'s holding is based are more encompassing than those found in article II, sections 3 and 5 is of no moment. As the majority itself explains, the North Carolina Declaration of Rights, which contains all of the rights protected by *Harper I*, speaks in "abstract" terms. The majority admits that this quality is what has allowed the Declaration of Rights to survive. To maintain this "abstractness," the Declaration of Rights necessarily does not explicitly define every type of conduct or act that constitutes a constitutional violation.

Whether through narrow and explicit provisions, like article II, sections 3 and 5, or those that are broad and less indefinite, like the free elections clause, the state constitution protects the rights that are fundamental to our state and upon which our democracy was founded. It is the duty of the courts to interpret precisely what conduct these provisions proscribe. This duty is not to be abandoned simply because a constitutional provision is not sufficiently "explicit."[12] All of this aside, the

---

[12] For this reason, the majority's reliance on *Stephenson I* as an appropriate example of judicial oversight with respect to a redistricting dispute as compared to *Harper I* is unavailing. Just as the Court in *Stephenson I* properly reviewed and ruled unconstitutional malapportioned maps that violated article II, sections 3 and 5, 355 N.C. at 371, *Harper I*

majority's reasoning also fails to acknowledge that the restrictions articulated in article II, sections 3 and 5 of the North Carolina constitution were first recognized in principle by this Court before they were ever added to the state constitution.

In *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 220 (1875), this Court struck down an act of the General Assembly that divided Wilmington, North Carolina into three wards from which nine members—three members from each ward—of the Board of Alderman would be elected. The first and second ward consisted of approximately 400 voters, whereas the third ward had approximately 2,800 voters. *Id.* at 225. The Court struck down the malapportioned map as a "plain violation of fundamental principles, the apportionment of representation." *Id.* The Court further explained that "[o]ur government is founded on the will of the people. Their will is expressed by the ballot." *Id.* at 220.

The principle *Van Bokkelen* recognized, however, was not expressly contained in the text of the North Carolina constitution—article II, sections 3 and 5 were not added until much later—and the U.S. Supreme Court's one-person, one-vote principle was not recognized for almost another ninety years. Thus, *Van Bokkelen* recognized that, with respect to city representatives, "representation shall be *apportioned* to the popular vote *as near as may be*" nearly one hundred years before express constitutional provisions requiring the same were adopted. 73 N.C. at 224. This point

---

properly reviewed and ruled unconstitutional maps that violated the free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause.

is absent from the majority's extensive musings about the requirement that there be an "express" limitation on the General Assembly's reapportionment power in order for courts to exercise judicial review.

Finally, the majority exalts this Court's decision in *Stephenson I* as an example of the proper exercise of judicial review over a dispute arising from legislative redistricting maps. But its reliance on *Stephenson I* is misplaced.

*Stephenson I* concerned state House of Representative and Senate maps that divided counties throughout the state into multiple districts in violation of the WCP, which "prohibit[ ] the General Assembly from dividing counties into separate Senate and House districts." 355 N.C. at 359. The defendants "contend[ed] that the constitutional provisions mandating that counties not be divided are wholly unenforceable because of the requirements of the Voting Rights Act." *Id.* at 361. The Court rejected this argument, holding that "the WCP remain[ ] valid and binding upon the General Assembly during the redistricting and reapportionment process . . . except to the extent superseded by federal law." *Id.* at 372.

The majority recognizes that "[o]nce [the Court] found that the 2001 Plans violated the still-valid WCP, [it] then crafted detailed criteria harmonizing the WCP . . . with the [Voting Rights Act] and the federal one-person, one-vote principle." But the *Stephenson I* Court did not *only* "harmonize" the WCP with federal law. It also went on to ensure that the legislative maps complied with the state constitution's equal protection clause. The Court specifically explained, "the WCP cannot be applied

in isolation or in a manner that fails to comport with other requirements of the State Constitution." *Id.* at 376. The particular issue the Court was tasked with resolving at this stage was "[p]laintiffs['] conten[tion] that remedial compliance with the WCP require[d] the formation of multi-member legislative districts" in addition to single-member districts within the same plan. *Id.* And so, the Court went on to evaluate whether such a plan would comply with the requirements of North Carolina's equal protection clause *in addition* to other constraints imposed by federal law.

As part of its state equal protection analysis, the Court explained that "[i]t is well settled in this State that 'the right to vote on equal terms is a fundamental right." *Id.* at 378 (quoting *Northampton Cnty Drainage Dist No. One v. Bailey*, 326 N.C. 742, 746 (1990)). With this in mind, "[t]he classification of voters into both single-member and multi-member district within plaintiffs' proposed remedial plans necessarily implicates the fundamental right to vote on equal terms," making strict scrutiny the appropriate standard of review. *Id.*

The Court was faced with a problem, however, in that article II, sections 3(1) and 5(1)

> arguably contemplate multi-member districts by stating that, for apportionment purposes, each member of the General Assembly from such a district represents a fraction of the voters in that district. The principle of 'one-person, one-vote' is preserved because the number of voters in each member's fraction of the multi-member district is the same as the number of voters in a single-member district.

*Id.* at 379. This point is worth emphasizing. Though the state constitution does not expressly permit partisan gerrymandering, there is an express provision that permits use of single-member and multi-member districts together.

Were we to accept the Court's rationale today, this fact would have been the end of the Court's inquiry in *Stephenson I*: enacting maps that use single and multi-member districts in tandem is a power that is expressly granted to the General Assembly, and there is no express limitation on this power (as it involves a clause other than the WCP), so the courts are unable to oversee the General Assembly's exercise of this authority. This, of course, is not what *Stephenson I* did.

Instead, *Stephenson I* analyzed the practical effects of the combined use of single and multi-member districts in light "of the fundamental right of each North Carolinian to substantially equal voting power" under the state equal protection clause. *Id.* at 379. The Court concluded that such maps violate this fundamental right. *Id.* at 384. As such, based on the principle that "a constitution cannot be in violation of itself," the Court determined that article II, sections 3(1) and 5(1) cannot, as their text suggests, be construed as "affirmative constitutional mandates and do not authorize use of both single-member and multi-member districts in a manner" that violates the fundamental right to substantially equal voting power. *Id.* at 378–79.

This is all that *Harper I* did. Where *Stephenson I* analyzed the General Assembly's apportionment powers under article II, sections 3(1) and 5(1) in light of

the equal protection clause, *Harper I* analyzed the General Assembly's redistricting powers under article II, sections 3 and 5 and the federal Constitution in light of the state equal protection clause, the free elections clause, the free speech clause, and the freedom of assembly clause. The majority might disagree about whether partisan gerrymandering actually violates any of these constitutional provisions. But as *Stephenson I* demonstrates, it is simply inaccurate to characterize this issue as committed solely to the province of the General Assembly.

In sum, the majority's textual commitment analysis does not establish that this state's courts lack a constitutionally contemplated role in ensuring that the General Assembly respects the will of the voters through constitutionally complaint maps.

### 4. *Policy Decisions*

The majority's final effort to establish that partisan gerrymandering claims are nonjusticiable is based on its conclusion that such claims involve "a host of 'policy determination[s] of a kind clearly for nonjudicial discretion[,]' " quoting *Baker*, 369 U.S. at 217 (alteration in original). I have already addressed many of the arguments the majority raises here, and I will not repeat why those arguments fail. A few additional points are warranted, however.

First, the majority argues that the "political science tests"—or the empirical analyses—that *Harper I* identified as means of determining whether a legislative redistricting plan constitutes an unconstitutional partisan gerrymander are

insufficient because they use data from past elections to predict how "voters will vote in the future." Such data will not provide accurate results, the majority posits, because "individual voters may vote inconsistently at different times in their life for a variety of reasons."

This argument is smoke in mirrors. These tests do not simply permit courts to "gaze into crystal balls, as the majority tries to suggest." *Rucho*, 139 S. Ct. at 2519 (Kagan, J., dissenting). Using these reliable analyses that courts around the country have successfully employed, courts can make "findings about . . . gerrymanders' effects on voters—both in the past and predictably in the future—[that are] evidence-based, data-based, statistics-based." *Id.* In other words, these tests use *the same data* and analyses that the General Assembly uses in attempting to create egregious partisan gerrymanders in the first place.[13] When the General Assembly uses

---

[13] The dissent in *Rucho* explained clearly why the argument raised by the majority is not a legitimate concern, particularly in light of the constitutional rights that are at stake:

> Mapmakers now have access to more granular data about party preference and voting behavior than ever before. County-level voting data has given way to precinct-level or city-block-level data; and increasingly, mapmakers avail themselves of data sets providing wide-ranging information about even individual voters. . . . Just as important, advancements in computing technology have enabled mapmakers to put that information to use with unprecedented efficiency and precision. . . . While bygone mapmakers may have drafted three or four alternative districting plans, today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting traditional districting requirements). The effect is to make gerrymanders far more effective and durable than before, insulating politicians against all but the most titanic shifts in

advanced technological tools and similar analyses in drawing legislative plans, it does not simply cross its fingers and hope that it is making a close guess about election outcomes. It knows with near certainty what the outcomes are going to be. The same is true when trial courts use this data to determine whether the maps as drawn by the General Assembly have been gerrymandered on a partisan basis. In acknowledging the purpose and capabilities of such analyses, the Court in *Harper I* "refused to content [itself] with unsupported and out-of-date musings about the unpredictability of the American voter. . . . They did not bet [North Carolina's] future—as today the majority does—on the idea that maps constructed with so much expertise and care to make electoral outcomes impervious to voting would somehow or other come apart." *Id.*

The majority goes on to criticize *Harper I* for making policy judgments about a number of issues that, as explained previously, are nothing more than evidentiary questions. Though I will not repeat this explanation in depth, it is necessary to clarify what the majority is doing here. As an initial matter, determining how to discriminate against a certain kind of voter most effectively "reflects *no* policy, but simply arbitrary and capricious action." *Baker*, 369 U.S. at 226. This issue aside, rather than pointing out genuine policy disputes, the majority uses the term as a

---

the political tides. These are not your grandfather's—let alone the Framers'—gerrymanders.

*Rucho*, 139 S. Ct. at 2513 (Kagan, J., dissenting).

misnomer for what are really just evidentiary judgments. A quick exercise illuminates the point. Every time the majority uses the term "policy question" or "policy determination," replace it with the term "evidentiary judgments."[14] The latter term is the accurate way to describe the different decisions that the majority explores and that come before a court analyzing partisan gerrymandering issues. Repeatedly declaring that these considerations are policy judgments does not make them so.

For example, contrary to the majority's conclusion "[s]electing between past elections, current voter registration information, or some other data as the 'best' source for garnering partisan election data" is not a "non-judicial policy determination," but an evidentiary judgment that a court must resolve in determining which data yields the most accurate results. This is the kind of judgment that courts must frequently make in other contexts, and the use of experts in the particular field can help provide guidance on making the right decision. How this is a policy question in any respect is unclear.

The majority also takes aim at the fact that a single test, such as the mean-median difference analysis or the efficiency gap analysis, can yield different results.

___

[14] Note that there is one particular claim in the majority's analysis where this comparison will not work. Specifically, the majority states that using "these political science metrics at all requires policy determinations that are not grounded in any constitutional guidance." As explained in depth, this argument simply advances the incorrect notion that the tests for proving a constitutional violation must be found within the state constitution itself. Apparently, if a court itself prescribes a test that is sufficient to prove a constitutional violation, this is a "policy decision." Many members of the legal community will be surprised to learn this.

This is simply another way of expressing the concern addressed above because it takes issue with the variety of data, as well as "software" and "calculation methods" that a single analysis can utilize. But when these analyses, despite their different methods and data, yield results that point in substantially the same direction as consistently happened in both *Harper I* and *Harper II*, there is only greater confidence that the results are accurate. For example, as the three-judge panel found in *Harper I* with respect to the Congressional Plan, "[e]ven though [Plaintiffs'] experts employed different methodologies, each expert found that the enacted plan is an outlier that could only have resulted from an intentional effort to secure Republican advantage." Further, the trial court explained that "Legislative Defendants offered no defense of the 2021 Congressional Plan. No expert witness opined that it was not the product of an intentional partisan redistricting." In this way, a variety of analyses that employ different methods only support that the trial court's conclusion was correct.

**D. The Issues Presented Here Have Already Been Decided by this Court**

Finally, the majority attempts to convince us that today's decision—a decision that used raw partisan power to overturn two of this Court's precedents—is nothing out of the ordinary. "We have never hesitated," the majority explains "to rehear a case when it is clear that the Court 'overlooked or misapprehended' the law." What the majority has done today is anything but ordinary. It is an extreme departure from 205 years of practice. "Indeed, data from the Supreme Court's electronic filing system indicate that, since January 1993, a total of 214 petitions for rehearing have been

filed, but rehearing has been allowed in only two cases." *Harper Order* at 550 (Earls, J., dissenting).

Nothing has changed since *Harper I* and *Harper II* were decided. "The legal issues are the same; the evidence is the same; and the controlling law is the same. The only thing that has changed is the political composition of the Court." *Id.* at 550–51. Now emboldened by its sheer political might, it takes the extraordinary step of overturning not just the two cases at issue here, but also a *third* voting rights case that this Court decided just months ago. *See Holmes v. Moore*, 383 N.C. 171 (2022), *rev'd*, No. 342PA19-3 (N.C. Apr. 28, 2023)

Rehearing in this case never should have been granted. The cases that the majority cites to justify its conduct confirm this. For example, the majority cites only two cases in which rehearing was granted in this millennium. The scarcity of such instances speaks for itself.[15]

---

[15] These cases need not be distinguished: That they were the only two cases that were granted rehearing in the last twenty-three years proves that rehearing is granted in exceedingly rare instances. Even so, as explained in my dissent to the Court's order granted rehearing:

> The Court most recently granted rehearing in *Jones v. City of Durham*, 361 N.C. 144 (2006). There, the Court granted rehearing for the limited purpose of reconsidering specific evidence in a negligence action that involved a single plaintiff, rather than to consider abolishing a constitutional right that belongs to millions of voters. There was no dissent to the per curiam final opinion of the Court, indicating the absence of any partisan divide over the issue. The other case in which the Court permitted rehearing was *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805 (1999). That case similarly did not involve a fundamental issue central to the structure of our

The cases that the Court cites in which rehearing was granted over twenty years ago offer no more support for its mischaracterization of the remedy. For example, in *Whitford v. Gaskill*, 345 N.C. 762 (1997), rehearing was granted for the sole and limited purpose of modifying the final clause of the last paragraph on the last page of an opinion. Specifically, a party sought to have this clause changed from stating "for entry of judgment consistent with this opinion," to "for further proceedings not inconsistent with this opinion." *Id.* at 762. Thus, rehearing was not granted to overturn the result of a previous case, but rather to provide more accurate instructions to the trial court regarding the proper way to proceed in the litigation. In *Alford v. Shaw*, 320 N.C. 465 (1987), the Court granted rehearing because it originally misunderstood the pertinent legal issue. In other words, it did not originally address the question the case presented. In *Lowe v. Tarble*, rehearing was granted without explanation, but the Court did not overturn its previous decision on rehearing, explaining that "the question [at issue] is no longer debatable; it has been resolved against defendants." 313 N.C. 460, 462 (1985). And in *Housing, Inc. v. Weaver*, 304 N.C. 588 (1981), the Court granted rehearing for the limited purpose of rescinding a previous order that denied a party's petition for a writ of certiorari and allowed the petition instead. The case had not even been argued, let alone decided

---

democracy and had no impact whatsoever on elections.
*Harper Order* at 550 n.1 (Earls, J., dissenting).

(and affirmed by a separate case). *Id.*

These cases "demonstrate that rehearing in this Court is used cautiously; it is rarely permitted, and when allowed, it is limited in scope." *Harper Order* at 552 (Earls, J., dissenting). By contrast, the majority has used rehearing in this case to "upend the constitutional guarantee that voters in the State will enjoy 'substantially equal voting power,' regardless of their political affiliations." *Id.* "Such a change . . . fundamentally alter[s] the political rights of every voter in North Carolina." *Id.* (quoting *Harper I*, 380 N.C. at 376).

The Court cites only one case in which the outcome changed on rehearing after an adjustment in the Court's composition. *See Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805 (1999). This case did not involve voting rights or redistricting. Nevertheless, even if it were analogous, a politically motivated decision in a single case over twenty years ago does not excuse or justify such conduct going forward. Instead, it highlights the fact that, despite ideological differences, this Court has historically abided by its own precedent out of "[r]espect for the institution and the integrity of its processes." *Harper Order* at 550 (Earls, J., dissenting).

## III.    Conclusion

Following decisions such as this, we must remember that, though the path forward might seem long and unyielding, an injustice that is so glaring, so lawless, and such a betrayal to the democratic values upon which our constitution is based will not stand forever. As *Harper II* explained, the rights that prohibit partisan

gerrymandering in this state "are . . . the enduring bedrock of our sacred system of democratic governance, and may be neither subordinated nor subverted for the sake of passing political expediency." *Harper II*, 383 N.C. at 95.

I dissent from this Court's majority opinion and its shameful manipulation of fundamental principles of our democracy and the rule of law. I look forward to the day when commitment to the constitutional principles of free elections and equal protection of the laws are upheld and the abuses committed by the majority are recognized for what they are, permanently relegating them to the annals of this Court's darkest moments. I have no doubt that day will come.

Justice MORGAN joins in this dissenting opinion.